UNITED STATES of America

v.

Billy G. BYERS, Appellant.

No. 78–1451.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 2, 1983.

Decided July 24, 1984.

A. Franklin Burgess, Jr., Washington, D.C. (appointed by this Court) with whom James Klein and James McComas, Washington, D.C., were on the brief, for appellant.

John R. Fisher, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Washington, D.C. (at the time the brief was filed), Michael W. Farrell and Roger M. Adelman, Asst. U.S. Atty., Washington, D.C., were on the brief, for appellee.

· Joel I. Klein, Joseph Onek and Peter E. Scheer, Washington, D.C., were on brief for amicus curiae, American Psychiatric Ass'n urging affirmance. H. Bartow Farr, III, Washington, D.C., also entered an appearance for American Psychiatric Ass'n.

Donald N. Bersoff, Washington, D.C., was on the brief for amicus curiae, American Psychological Ass'n urging remand on fifth and sixth amendment grounds.

Before ROBINSON, Chief Judge, WRIGHT, TAMM, WILKEY, WALD, MIKVA, EDWARDS, GINSBURG, BORK and SCALIA, Circuit Judges, and BAZELON and MacKINNON, Senior Circuit Judges.

Opinion filed by Circuit Judge SCALIA, in which Circuit Judges TAMM, WILKEY, GINSBURG, BORK and Senior Circuit Judge MacKINNON join.

Concurring opinion filed by Chief Judge SPOTTSWOOD W. ROBINSON, III, in which Circuit Judge J. SKELLY WRIGHT joins.

Dissenting opinion filed by Senior Circuit Judge BAZELON, in which Circuit Judges WALD and MIKVA join; and in which Circuit Judge HARRY T. EDWARDS joins with exceptions noted.

SCALIA, Circuit Judge:

We consider on this appeal whether, when a defendant asserts, and supports through expert testimony, the defense of insanity, the guarantee of the Fifth Amendment against compelled self-incrimination is violated by a government psychiatrist's testimony to unrecorded statements made by the defendant during a court-ordered examination; whether the guarantee of the Sixth Amendment to assistance of counsel is violated by the exclusion of counsel from such an examination; and whether the courts' supervisory power over the trial process permits the exclusion of psychiatric testimony that is the product of a lawful examination.

By indictment of October 26, 1976, appellant was charged with first degree murder while armed, in violation of D.C.Code §§ 22–2401, 22–3202, and two related weap-

ons offenses. At arraignment counsel informed the court that appellant's defense to the charges would be insanity and moved pursuant to D.C.Code § 24–301(a) for an order committing appellant to St. Elizabeths Hospital for examination to determine both competency to stand trial and capacity, at the time of the offense, to form an intent to commit the crimes with which he was charged.[1] 11/2/76 Tr. 3, 6–7. The motion was granted and appellant was committed. After two months of examinations, the staff at St. Elizabeths found that appellant was competent to stand trial, but had "probably lacked substantial capacity to appreciate the wrongfulness of his conduct, [and] to conform his conduct to the requirements of the law." Letter from Dr. Roger Peele, Acting Superintendent, dated Jan. 13, 1977, at 1. Soon after that, the Government moved to have appellant committed to the Medical Center for Federal Prisoners at Springfield, Missouri, for a second examination.[2] Over an unfocused defense objection, that motion was granted.[3] Appellant was transferred to Spring-

1. Section 24–301 of the D.C.Code (1981) provides specifically for court-ordered psychiatric examinations only to determine competency to stand trial. This court has long required that psychiatric examinations conducted pursuant to this provision include an examination into the defendant's sanity at the time of the offense. *See Winn v. United States,* 270 F.2d 326, 328 (D.C.Cir.1959), *cert. denied,* 365 U.S. 848, 81 S.Ct. 810, 5 L.Ed.2d 812 (1961). In other federal circuits, psychiatric examinations are undertaken pursuant to 18 U.S.C. § 4244 (1982), which also provides only for examinations into competency. These courts have declined to extend that limited authority to include examinations into sanity at the time of the offense, and instead have rested their decisions authorizing such examinations upon the inherent powers of the district court. *See, e.g., United States v. Alvarez,* 519 F.2d 1036, 1041 (3d Cir.1975); *United States v. Malcolm,* 475 F.2d 420, 424 (9th Cir.1973).

2. The dissent asserts that the reason the Government requested the second examination was that it was "[d]ispleased with the conclusions of the doctors at St. Elizabeths." Dissent at 1139. It might be noted that there was reason for such displeasure apart from (what the dissent implies) disappointment at the finding of insanity. The conclusion was framed. in extraordinarily tentative terms. ("There is difficulty in reach-

ing a definitive opinion on criminal responsibility in reference to the murder.... His current lack of conviction ... may well be the result of a reconstitutive process.... [H]e probably lacked substantial capacity to appreciate the wrongfulness of his conduct." Letter from Dr. Roger Peele, *supra,* at 1. The team at St. Elizabeths had been headed by a psychologist rather than a psychiatrist, *see* 2/7/77 Tr. 156, and the government asserted that the institution of St. Elizabeths itself was not accredited, *id.*

3. The dissent asserts that since, prior to the granting of this motion, the court had entered an order finding Byers competent to stand trial, it "could not properly authorize another 'dual purpose' examination," so that the second examination could not have been conducted pursuant to § 24–301 of the D.C.Code, *see supra,* note 1, but must have been an examination into sanity only. Dissent at 1142 n. 16. We know of no authority, and the dissent cites none, for the proposition that a court cannot reconsider—or even less than that, take steps authorized by statute that will *enable* it to reconsider—an order already entered. Discussion with counsel before issuance of the order plainly indicated that the court had a dual purpose examination in mind, 1/27/77 Tr. 7; the order itself specifically required inquiry into both competence and sanity, *United States v. Byers,* Criminal No. 78–

field on February 25, 1977 and remained there for some six weeks, under the principal supervision of Dr. Nicola Kunev, manager of the Center's Forensic Unit. At the end of this examination period, Dr. Kunev and his staff concluded that appellant was competent to stand trial and that he had been capable of appreciating the wrongfulness of his conduct and of conforming that conduct to the requirements of the law at the time of the alleged offense. A report outlining these conclusions was prepared by the staff and forwarded to the court.

Trial of the case began on January 18, 1978. Appellant did not contest the substance of the charge, which was that he had shot and killed his lover of seven years who had left him the month before. Instead, as expected, he vigorously pressed his defense that he was insane at the time of the offense, specifically alleging that he was under the delusion that the decedent had cast a spell on him and had killed her to break free of its influence. He elicited testimony from various relatives, neighbors and medical experts. The testimony of three of these witnesses was of particular importance to the defense. The first was appellant's estranged wife, who had left him because of his relationship with the decedent. She testified that appellant told her before she left that he wanted to salvage their relationship but he could not end his affair with the decedent because she had cast a spell on him. Appellant had reaffirmed his belief in the spell, she said, when she confronted him about a small vial marked "spell remover" which she claimed she had found in his clothing.

The second, Dr. David L. Shapiro, a clinical psychologist who had examined appellant during his commitment to St. Elizabeths, testified that he believed appellant suffered from "an underlying paranoid delusion," 1/25/78 Tr. 90, as a result of which he felt "controlled by and unable to break out of the [decedent's] power," id. at 94.

He related that appellant had told him that the decedent "was engaged in a practice known as taking roots." Appellant had explained that the roots were passed to him when the decedent forced him to participate in sex acts with her during menses. Appellant believed he could free himself from decedent's spell if he could stay away from her for forty-two days but that, "somehow she would always edge near. She would come back into his life and regain control over him somewhere ... within the 42-day period," id. at 95–96. Although Dr. Shapiro admitted he had "nagging doubts" because, among other things, appellant's recitals lacked conviction, 1/26/78 Tr. 140–41, 143–44, his conclusion was that the murder was the product of this delusional system.

The third witness, Dr. Glen H. Miller, a psychiatrist at St. Elizabeths who also had examined appellant, testified that appellant had described the spell to him. Based primarily on this description, but informed also by the reports of test results and presentations by his colleagues, Dr. Miller generally concurred in Dr. Shapiro's diagnosis. His judgment, too, was qualified to the extent that he believed appellant's was not "an absolutely clear-cut case." 1/31/78 Tr. 177.

Following this defense testimony, Dr. Emry A. Varhely, a clinical psychologist at the Medical Center for Federal Prisoners, and Dr. Kunev testified for the Government in rebuttal. Both had examined appellant while he was at the Springfield facility pursuant to the court's order. Appellant had told Dr. Varhely, as he had the staff at St. Elizabeths, that he believed the decedent had cast a spell on him. After further discussion with appellant, however, Dr. Varhely came to the judgment that Byers suffered not from paranoid delusion, that is, "a set of false beliefs, cohesive in nature ... [that] overshadows the whole

686 (D.D.C. Jan. 27, 1977) (order committing defendant to Springfield Federal Medical Center); and the prologue of the order explicitly recited that it was entered in response to a motion "for an examination of the mental com-

petency of the defendant, pursuant to Title 24, Section 301, of the District of Columbia Code, as amended," id. There is no valid basis for converting this order into something other than what it purported to be.

sphere of action of that individual"; but rather from "magical thinking or superstitious type of belief" not rising to the level of a mental illness. 2/1/78 Tr. 91. He was thus of the opinion that at the time of the offense, appellant was not suffering from a mental disease and was fully able to appreciate the wrongfulness of his conduct.

Dr. Kunev's testimony followed. It is his testimony and the circumstances surrounding his interview of appellant with which we are concerned on this appeal. Dr. Kunev briefly related how appellant had described his relationship with the decedent, and his sense of rejection when she had rebuffed his overtures of marriage. Then, despite defense counsel's objection, but after noting that the defense would have "a free field for cross-examination," 2/7/78 Tr. 133, the court permitted Dr. Kunev to recount the following about his initial interview of appellant shortly after the latter's arrival in Springfield:

I asked Mr. Byers as to his understanding for the reason of the shooting.

He said that he has no explanation and no reason, but he has been thinking about it.

I asked him, since that has been several months since the incident if he has some idea what might have been the reason for the shooting.

He said that this is a question that Mrs. Byers asked him about the time that he was admitted to St. Elizabeths

Hospital on November 11th, 1976, and that his answer to her was the same, that he has no answer for why did he shoot Mrs. Dickens.

*At that time, Mr. Byers said that Mrs. Byers suggested to him that this could be under the influence of some magic, spells or some influence of roots.*

And Mr. Byers said that not having any other explanation, this appeared as a possible answer to the reason for the shooting.[4]

*Id.* at 138–39 (emphasis added). Dr. Kunev took appellant's statements overall, and the italicized portion in particular, to demonstrate that the notion of supernatural influences working upon the defendant entered his mind after the murder and thus was irrelevant to his mental state at that time. On the basis of this interpretation he testified that in his opinion appellant had been sane.[5]

Dr. Kunev's testimony substantially discredited appellant's insanity defense. The trial court characterized it as "very devastating," 2/9/78 Tr. 35, and suggested that it would "take the wind out of the defendant's sails and perhaps ... torpedo [him] out of the water," *id.* at 82. The prosecution's summation called it the "critical thing" in the Government's case, and pointed to it as proof that appellant's insanity defense was a rationalization constructed

---

**4.** Despite the broad mandates of Fed.R.Crim.P. 16, the prosecution had not apprised defense counsel of this testimony in advance of trial. There is every reason to believe, however, that it came as a surprise to the prosecution. There was no record of appellant's alleged statements. Dr. Kunev indicated that he had not recorded the substance of this particular exchange in his contemporaneous notes of the interview and that in any event he had destroyed the notes when he dictated his report to the court. 2/7/78 Tr. 200. The report made no mention of this portion of the conversation.

**5.** The dissent asserts that it is "critical" whether the defendant told Dr. Kunev that his wife suggested the supernatural influences before or after the defendant's admission to St. Elizabeths, since at the time of his admission he recounted these influences to the hospital staff. If the

wife's suggestion had been made after admission, the dissent asserts, "it would have been irrelevant." Dissent at 1174–75. This is an exaggeration. The point at issue, of course, is not when the wife's suggestion had been made, but when Byers' statement *said* it had been made. That is considerably less than crucial. The main point of Byers' statement was that when his wife asked him why he killed the decedent he had no idea, whereupon his wife suggested a possible motive to him. If Byers said that this conversation had occurred after rather than before his admission (and thus after he had already described the "roots" and "spells" to the St. Elizabeths staff), he is much more likely to have been in error on that point of chronological detail than on the basic issue of where the notion of supernatural influences originated.

weeks after the shooting had occurred. 2/10/78 Tr. 236.

The jury found appellant guilty of second-degree murder and of both weapons offenses. An appeal was taken in which a number of errors was assigned. On December 24, 1980, this court, with Judge Bazelon in dissent, affirmed the convictions in a brief, *per curiam* opinion. A petition by appellant for rehearing, with a suggestion for rehearing *en banc* followed on March 10, 1981. While that petition was pending, the Supreme Court rendered its decision in *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), sustaining Fifth and Sixth Amendment challenges to a psychiatrist's testimony in the sentencing phase of a capital case based on pre-trial examination of the defendant to determine competency to stand trial. We requested and received memoranda from the parties on the effect, if any, of *Estelle* on the Fifth and Sixth Amendment arguments made by appellant in his petition for rehearing. We also invited the American Psychological Association and the American Psychiatric Association to submit *amicus* briefs on these arguments, which they did; both parties were then permitted to respond to these briefs. Appellant's request for rehearing *en banc* was granted November 24, 1982, after which we instructed the parties to file supplemental briefs addressing the additional questions whether the court should exercise its supervisory power in this case, and whether the constitutional and supervisory power issues had been properly raised below. We

heard argument on February 2, 1983. We entered judgment against appellant in this appeal on May 19, 1983, 711 F.2d 420, noting that the instant opinion would follow.

### Fifth Amendment

Appellant argues that the Fifth Amendment's proscription against compelled self-incrimination was violated by Dr. Kunev's testimony to statements made during the examination in Springfield. His claim is not that the testimony tended to show that he committed the murders; as noted, appellant did not contest this at trial. Rather, he contends that the Government forced from his lips (via the compelled examination) the evidence to negate his defense of insanity and thereby proved, indirectly through rebuttal, that he was of the necessary mind to commit the crimes. Since *mens rea* is an element of the offenses on which the Government had the burden of proof—indeed in this case it was the only contested issue—he argues that this was equivalent to a forced admission of guilt.[6]

Little guidance can be derived from our previous opinions on the applicability of the Fifth Amendment privilege against compelled self-incrimination to psychiatric examinations. We first touched upon the broad issue well over a decade ago in *Thornton v. Corcoran*, 407 F.2d 695 (D.C. Cir.1969), where we said in dictum—and for that reason over the dissent of then Circuit Judge Burger—that after *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16

6. There is some question whether this claim is appropriately before us. It is conceded that appellant "did not clearly advance a constitutional objection until appeal." Memorandum in Support of Petition for Rehearing at 24; *see also* Appellant's Supplemental Memorandum at 38. Even then, the focus of appellant's argument was the construction to be given 18 U.S.C. § 4244, pursuant to which he contended he was committed for examination. *See* Appellant's Appeal Brief at 23–24. He urged us to adopt the narrow reading given to that section by the Third Circuit in *United States v. Alvarez*, 519 F.2d 1036, 1041–44 (3d Cir.1975), thereby barring admission of Dr. Kunev's testimony, even on the issue of sanity. He specifically argued, however, that such a narrow reading was neces-

sary, among other reasons, to "protect the accused's Fifth Amendment rights against self-incrimination." *Id.* at 24.

We are satisfied the issue has arisen in a manner that justifies our departure from the usual rule that we will not consider claims of error raised here for the first time. Dr. Kunev's testimony came as a complete surprise to appellant, *see* note 4, *supra*, and counsel could well have thought the objection futile since no federal circuit had barred such testimony on Fifth Amendment grounds. *See, e.g., Smith v. Estelle*, 602 F.2d 694, 708 n. 19 (5th Cir.1979), *aff'd*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) (Sixth Amendment issue considered on appeal, although not raised at trial, because of surprise involved and apparent futility in raising point).

L.Ed.2d 694 (1966), the Fifth Amendment would not admit of a principled distinction between the standards applicable to proof of factual guilt and those applicable to proof of the requisite mental state, since the Government bore the burden of proof with respect to both. 407 F.2d at 700. The clear implication was that the privilege against self-incrimination would apply with full force to compelled psychiatric examinations and interviews. The issue came before us again the next term, but was avoided without commentary. *United States v. Marcey,* 440 F.2d 281 (D.C.Cir.1971). Finally, we faced the question again four years ago, in *United States v. Whitlock,* 663 F.2d 1094 (D.C.Cir.1980). There we rejected the appellant's contention that her Fifth Amendment rights were violated by admitting the rebuttal testimony of Government psychiatrists who had examined her pursuant to court order. Our opinion stated, without analysis, that the question did not "generate grave concern," since although the testimony "incorporated statements by appellant regarding the manner in which she planned and committed the offense," it had been admitted (in a bench trial) solely on the issue of sanity.[7] Moreover, appellant could not have been harmed since the fact of the offense was not even contested. *Id.* at 1107. Because the opinion gave no reasoned discussion (and hence perhaps no reasoned consideration) to the question of admissibility on the issue of sanity, and because it was applying a "plain error" test to an objection not raised below, *id.,* it represents something short of a definitive resolution of the matter.

Appellant contends that the Supreme Court's decision in *Estelle* dictates the result in this case. But it does not. In the first place, *Estelle* was materially different on its facts. There the defendant had been examined by a State psychiatrist, at the court's order, to ascertain *only* his competency to stand trial. The State had later introduced the psychiatrist's testimony to demonstrate the defendant's future dangerousness at the penalty stage of the proceeding. The Court held that "[i]n these distinct circumstances," 451 U.S. at 466, 101 S.Ct. at 1874—which included the fact that the defendant had not raised before trial any issue of competency to stand trial or sanity at the time of the offense, had introduced no evidence regarding insanity, and had been given no notice that results of the competency examination could be used against him at the sentencing stage of the proceeding—the defendant had been denied his Fifth Amendment rights. Moreover, the Court expressly distinguished *Estelle* from a case such as we now have before us:

> Nor was the interview analogous to a sanity examination occasioned by a defendant's plea of not guilty by reason of insanity at the time of his offense. When a defendant asserts the insanity defense and introduces supporting psychiatric testimony, his silence may deprive the State of the only effective means it has of controverting his proof on an issue that he interjected into the case. Accordingly, several Courts of Appeals have held that, under such circumstances, a defendant can be required to submit to a sanity examination conducted by the prosecution's psychiatrist.

451 U.S. at 465, 101 S.Ct. at 1874 (citations omitted). And its holding was specifically limited to account for the perceived difference:

> A criminal defendant, *who neither initiates a psychiatric evaluation nor at-*

---

7. The court's attention was perhaps drawn to this factor by our earlier decision in *Edmonds v. United States,* 260 F.2d 474 (D.C.Cir.1958), holding that 18 U.S.C. § 4244 bars admission of statements relating to factual guilt made during a psychiatric examination pursuant to D.C.Code § 24–301. Section 4244 provides:

   No statement made by the accused in the course of any examination into his sanity or mental competency provided for by this section, whether the examination shall be with or without the consent of the accused, shall be admitted in evidence against the accused on the issue of guilt in any criminal proceeding. We said, however, that that section would not bar statements going only to the issue of sanity. 260 F.2d at 476–77.

*tempts to introduce any psychiatric evidence,* may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding.

*Id.* at 468, 101 S.Ct. at 1875 (emphasis added). Thus, if *Estelle* has any bearing upon the present case, it is that it suggests by its dicta that no Fifth Amendment protection may exist.

While we have no firm and directly relevant authority in our own opinions or in the holdings of the Supreme Court, virtually all other circuits have addressed claims materially indistinguishable from that raised by appellant. They have uniformly held that where the defendant has interposed the defense of insanity, the Fifth Amendment's privilege against self-incrimination is not violated by a court-ordered psychiatric examination (whether by a psychiatrist appointed by the court or one selected by the Government); and that where the defendant introduces psychiatric testimony at trial, the Fifth Amendment does not prevent testimony by the psychiatrist who conducted the court-ordered examination on the issue of sanity.[8] *See, e.g., United States v. Madrid,* 673 F.2d 1114 (10th Cir.), *cert. denied,* 459 U.S. 843, 103 S.Ct. 96, 74 L.Ed.2d 88 (1982); *United States v. Reifsteck,* 535 F.2d 1030 (8th Cir.1976); *United States v. Cohen,* 530 F.2d 43 (5th Cir.), *cert. denied,* 429 U.S. 855, 97 S.Ct. 149, 50 L.Ed.2d 130 (1976); *United States v. Bohle,* 445 F.2d 54 (7th Cir.1971), *over-* *ruled on other grounds in United States v. Lawson,* 653 F.2d 299, 303 n. 12 (7th Cir.1981); *United States v. Handy,* 454 F.2d 885 (9th Cir.1971), *cert. denied,* 409 U.S. 846, 93 S.Ct. 49, 34 L.Ed.2d 86 (1972); *United States v. Weiser,* 428 F.2d 932 (2d Cir.1969), *cert. denied,* 402 U.S. 949, 91 S.Ct. 1606, 29 L.Ed.2d 119 (1971); *United States v. Baird,* 414 F.2d 700 (2d Cir.1969), *cert. denied,* 396 U.S. 1005, 90 S.Ct. 559, 24 L.Ed.2d 497 (1970); *United States v. Albright,* 388 F.2d 719 (4th Cir.1968); *Alexander v. United States,* 380 F.2d 33 (8th Cir.1967); *Pope v. United States,* 372 F.2d 710 (8th Cir.1967) *(en banc), vacated and remanded on other grounds,* 392 U.S. 651, 88 S.Ct. 2145, 20 L.Ed.2d 1317 (1968), *cert. denied,* 401 U.S. 949, 91 S.Ct. 953, 28 L.Ed.2d 232 (1971); *accord, United States v. Reason,* 549 F.2d 309 (4th Cir.1977). The only district court opinion in this circuit to address the Fifth Amendment question ruled similarly. *Battle v. Cameron,* 260 F.Supp. 804 (D.D.C.1966).

Various justifications for denying the claim have been advanced by these courts. The Eighth Circuit, in a case remarkably similar to the one before us, *Pope v. United States, supra,* was perhaps the first federal circuit to reach the issue. Then Circuit Judge Blackmun, writing for the *en banc* court, relied at least alternatively upon the theory that the defendant had "waived" the Fifth Amendment protection by voluntarily making psychiatric evaluation an issue in the case. 372 F.2d at 720.

**8.** Where testimony to a defendant's statement during a compelled psychiatric examination is introduced not on the defendant's sanity but to prove that he committed the criminal act in question, of course a different issue is presented. Such testimony is proscribed by both 18 U.S.C. § 4244, and Fed.R.Crim.P. 12.2(c), *see, e.g., United States v. Bennett,* 460 F.2d 872, 878–79 n. 23 (D.C.Cir.1972); *Edmonds v. United States,* 260 F.2d 474 (D.C.Cir.1958). Some courts have held it to be constitutionally inadmissible. *Gibson v. Zahradnick,* 581 F.2d 75, 78 (4th Cir.1978), *cert. denied,* 439 U.S. 996, 99 S.Ct. 597, 58 L.Ed.2d 669 (1978); *United States v. Bohle,* 445 F.2d 54, 66–67 (7th Cir.1971). The dissent would expand this constitutional proscription, so that the Fifth Amendment would exclude as well "statements made by the defendant to the psychiatrist which are not integral to

his process of diagnosis." Dissent at 1157. Even if that novel principle were to be accepted, it would have no bearing here. The dissent is wrong in describing the statement as irrelevant to Kunev's diagnosis. As the dissent itself elsewhere notes, Dr. Kunev concluded, on the basis of the statement, "that since the claimed delusions did not arise until after the homicide, they could not logically have had any relation to the killing of Jacqueline Dickens." *Id.* at 1145. That is to say, of course, that they could not have had any relation in the only way Kunev had been asked to inquire into—as affecting Byers' mental state at the time. Kunev testified that he rejected the "roots" and "spells" delusions precisely because "[t]his being suggested by his wife, I didn't consider it important.... [T]his was not his thinking." 2/7/78 Tr. 75.

The Ninth Circuit, in *United States v. Handy, supra,* likened compelled psychiatric examination to "compelling blood tests, handwriting exemplars, 'fingerprinting, photographing or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture.' " 454 F.2d at 889 (footnote omitted), *quoting from Schmerber v. California,* 384 U.S. 757, 764, 86 S.Ct. 1826, 1832, 16 L.Ed.2d 908 (1966). Thus, it reasoned, the psychiatric interview compelled neither "communications" nor "testimony," but "real or physical" evidence, and for that reason was not entitled to Fifth Amendment protection. *See also United States v. Cohen, supra,* 530 F.2d at 48; *Battle v. Cameron, supra,* 260 F.Supp. at 806. A Second Circuit case, again factually quite similar to the one here, *United States v. Baird, supra,* in effect combined the first two theories. It disapproved the notion of a naked "waiver," but found that the defendant's implicit reliance upon the theory that statements made in psychiatric examinations are "real or physical evidence" in order to have his expert's testimony received despite the hearsay rule, created an estoppel against objection to the Government's reliance upon the same theory to overcome the Fifth Amendment bar. 414 F.2d at 709. *See also United States v. Weiser, supra,* 428 F.2d at 936. Finally, in a fourth category of cases, the Fifth Amendment claim has been rejected in whole or in part because of a belief that the privilege against self-incrimination narrowly reaches only statements introduced to show that the defendant actually committed the offense in question, but not statements brought in on the issue of sanity. *See, e.g., United States v. Whitlock, supra,* 663 F.2d at 1107; *United States v. Bohle, supra,* 445 F.2d at 66–67; *United States v. Albright, supra,* 388 F.2d at 725.

We rely upon none of these rationales. The second of them has been categorically rejected, and the last cast in grave doubt, by the Supreme Court's decision in *Estelle v. Smith, supra.* There the State urged, as the Ninth Circuit in *Handy* had held, that Smith's communications to the court-appointed psychiatrist during an examination limited to competency to stand trial were nontestimonial in character, and specifically sought support by way of analogy to the Court's decisions in *United States v. Dionisio,* 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973) (voice exemplar), *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967) (handwriting exemplar), *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) (lineup), and *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (blood sample). The Court dismissed the argument out of hand. The psychiatrist's prognosis had been based on statements made to him by respondent Smith, and he had related the "substance" of these statements; this was sufficient, the Court said, to implicate directly the Fifth Amendment. The State also contended that "incrimination is complete once guilt has been adjudicated," 451 U.S. at 462, 101 S.Ct. at 1872, and therefore that the Fifth Amendment did not prohibit introduction of Smith's statements at the sentencing phase of the bifurcated trial. This is similar (though not identical) to the reasoning set forth in *Whitlock,* that no Fifth Amendment problem is presented as long as the statements are admitted on the question not of guilt, but of sanity—the dichotomy suggested by 18 U.S.C. § 4244 and Fed.R.Crim.P. 12.2(c). This argument too was rejected, the Court reiterating what it said in *In re Gault,* 387 U.S. 1, 49, 87 S.Ct. 1428, 1455, 18 L.Ed.2d 527 (1967):

> "the availability of the [Fifth Amendment] privilege does not turn upon the type of proceeding in which its protection is invoked, but upon the nature of the statement or admission and the exposure which it invites."

451 U.S. at 462, 101 S.Ct. at 1872. Because the possible consequence of Smith's statements to the psychiatrist was imposition of the death penalty, the court held the Fifth Amendment applied to the examination. A similar conclusion would seem compelled with regard to statements to a psychiatrist

that are introduced to achieve the consequence of eliminating an insanity defense and thus obtaining a conviction.

As for the other two theories discussed above: It seems to us at best a fiction to say that when the defendant introduces his expert's testimony he "waives" his Fifth Amendment rights. What occurs is surely no waiver in the ordinary sense of a known and voluntary relinquishment, but rather merely the product of the court's decree that the act entails the consequence—a decree that remains to be justified. Even if the average defendant pleading insanity were aware of this judicially prescribed consequence (an awareness that the doctrine of waiver would normally require), his acceptance of it could hardly be called unconstrained. And although "the Constitution does not forbid 'every government-imposed choice in the criminal process that has the effect of discouraging the exercise of constitutional rights,'" *Jenkins v. Anderson,* 447 U.S. 231, 236, 100 S.Ct. 2124, 2128, 65 L.Ed.2d 86 (1980), *quoting from Chaffin v. Stynchombe,* 412 U.S. 17, 30, 93 S.Ct. 1977, 1984, 36 L.Ed.2d 714 (1973), it is doubtful whether such a "waiver" could meet the high standard required for a voluntary, "free and unconstrained," *Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961), relinquishment of the Fifth Amendment privilege. *See, e.g., Miranda v. Arizona, supra,* 384 U.S. at 475–76, 86 S.Ct. at 1628–29. We are no more persuaded by the "estoppel" argument. Defendants in appellant's position make no representations or promises, either express or implied in fact. And we think that the proper scope of any implied-in-law promise would be that they would not object to the Government's use of the "physical evidence" theory *for the same purpose* of overcoming the hearsay rule. The Fifth Amendment objection would remain—especially since, as noted above, the Supreme Court has explicitly rejected the "physical evidence" theory in that application.

All of these theories are easy game, but it is not sporting to hunt them. The eminent courts that put them forth intended them, we think, not as explanations of the genuine reason for their result, but as devices—no more fictional than many others to be found—for weaving a result demanded on policy grounds unobtrusively into the fabric of the law. Whether they have described this policy as the need to maintain a "fair state-individual balance" (one of the values underlying the Fifth Amendment set forth in *Murphy v. Waterfront Commission,* 378 U.S. 52, 55, 84 S.Ct. 1594, 1596, 12 L.Ed.2d 678 (1964) (citation omitted)), *see, e.g., United States v. Albright, supra,* 388 F.2d at 724; *United States v. Bohle, supra,* 445 F.2d at 67, or as a matter of "fundamental fairness," *see, e.g., Pope v. United States, supra,* 372 F.2d at 720, or merely a function of "judicial common sense," *see, e.g., Alexander v. United States, supra,* 380 F.2d at 39; *United States v. Reifsteck, supra,* 535 F.2d at 1034, they have denied the Fifth Amendment claim primarily because of the unreasonable and debilitating effect it would have upon society's conduct of a fair inquiry into the defendant's culpability. As expressed in *Pope:*

> It would be a strange situation, indeed, if, first, the government is to be compelled to afford the defense ample psychiatric service and evidence at government expense and, second, if the government is to have the burden of proof, ... and yet it is to be denied the opportunity to have its own corresponding and verifying examination, a step which perhaps is the most trustworthy means of attempting to meet that burden.

372 F.2d at 720. We agree with this concern, and are content to rely upon it alone as the basis for our rejection of the Fifth Amendment claim. We share the dissent's solicitude for the "private enclave of the human personality," Dissent at 1151. But when, as here, a defendant appeals to the nature of that enclave as the reason why he should not be punished for murder, and introduces psychiatric testimony for that purpose, the state must be able to follow where he has led.

Appellant and *amici* would have us believe that the mere availability of cross-examination of the defendant's experts is sufficient to provide the necessary balance in the criminal process. That would perhaps be so if psychiatry were as exact a science as physics, so that, assuming the defense psychiatrist precisely described the data (consisting of his interview with the defendant), the error of his analysis could be demonstrated. It is, however, far from that. Ordinarily the only effective rebuttal of psychiatric opinion testimony is contradictory opinion testimony; and for that purpose, as we said in *Rollerson v. United States*, 343 F.2d 269, 274 (D.C.Cir.1964), "[t]he basic tool of psychiatric study remains the personal interview, which requires rapport between the interviewer and the subject."

Our judgment that these practical considerations of fair but effective criminal process affect the interpretation and application of the Fifth Amendment privilege against self-incrimination is supported by the long line of Supreme Court precedent holding that the defendant in a criminal or even civil prosecution may not take the stand in his own behalf and then refuse to consent to cross-examination. *See, e.g., Fitzpatrick v. United States*, 178 U.S. 304, 20 S.Ct. 944, 44 L.Ed. 1078 (1900) (criminal prosecution); *Brown v. United States*, 356 U.S. 148, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958) (civil denaturalization proceeding). The justification for this similarly "coerced"

testimony is precisely that which we apply to the present case. As said in *Brown*, a defendant

cannot reasonably claim that the Fifth Amendment gives him not only this choice [whether to testify or not] but, if he elects to testify, an immunity from cross-examination on the matters he has himself put in dispute. It would make of the Fifth Amendment not only a humane safeguard against judicially coerced self-disclosure but a positive invitation to mutilate the truth a party offers to tell. ... The interests of the other party and regard for the function of courts of justice to ascertain the truth become relevant, and prevail in the balance of considerations determining the scope and limits of the privilege against self-incrimination.

356 U.S. at 155–56, 78 S.Ct. at 626–27 (footnote & citation omitted).

In the dissent's view, the process of determining where the right to remain silent ends and the society's need to require testimony begins is to be conducted not merely on the basis of self-incrimination concerns, but with an eye to unrelated constitutional guarantees as well. The issue here, it asserts, is not whether the defendant who wishes to bring forward psychiatric evidence can decline psychiatric examination, but rather whether he can decline such examination in absence of tape recording, Dissent at 1155–1157.[9] That safeguard, of course, has nothing to do with the values and concerns underlying the right not to

---

**9.** This recording can consist of an audio- or video-tape, or note-taking by counsel or a "defense expert." *Id.* at 1157 n. 116. Judge Edwards would require only "complete notes of the interview," presumably made by the psychiatrist himself. Dissent at 1155 n.\*\*. None of the present dissenters opted for transcription by a court reporter, but that is an intermediate position which—along with an infinitude of other variables, such as restrictions upon the location and duration of the examination, *see id.* at 1152—an approach such as the dissent's ought to take into account. These refinements presumably await a later day.

The dissent is confident that recording will not distort the psychiatric interview, since "a criminal defendant subject to a court-ordered clinical interview ... know[s] that none of what he says will be kept in confidence in any event,"

and since in such circumstances no "sanctity of the therapeutic relationship" exists. *Id.* at 1156. This is inconsistent with the dissent's later judgment that the defendant should receive a *Miranda* warning before the psychiatric examination because he confronts "a variety of solicitous, confidence-inspiring mental health professionals" who "present[ ] a therapeutic facade beneath which exists a real adversity of interests," *id.* at 1158. Whichever of these incompatible perceptions is correct, one must admire the dissent's courage in assessing the needs and prescribing the details of psychiatric practice, despite its awareness that even our less refined calculations in this field have left us (and, judging by the repeated legislative reversals of our determinations, the people) "sorely disappointed." *Id.* at 1175.

incriminate oneself, but pertains instead to the right not to be convicted on the basis of unreliable evidence. It is a due process rather than a self-incrimination issue, and there is no reason in law or logic why the due process clause should be given special application in cases that happen to involve self-incrimination issues as well. Why, for example, is videotaping a defendant's statements to a psychiatrist any more important than videotaping an oral confession, where the same need exists to assure that the statement is accurately reported at trial and is not the product of suggestiveness? Indeed, where the oral confession is made to a police officer there would seem to be much greater reason to insist upon such protection; but there is no such rule. *See, e.g., Ashdown v. Utah,* 357 U.S. 426, 78 S.Ct. 1354, 2 L.Ed.2d 1443 (1958). What the dissent does, in other words, is to seize upon the self-incrimination issue as a means of importing into this case unrelated (and elsewhere nonexistent) constitutional guarantees. The choice before us in the Fifth Amendment aspect of this case—whether or not to compel the defendant to testify—is converted into a veritable constitutional delicatessen, in which we can pick and choose among various exotic protections for inclusion in the defendant's basket. We can *of course* decree that testimony will not be required unless a videotape is made—just as we can decree that it will not be required unless counsel is allowed to be present, or unless the defendant's statements are corroborated by three independent witnesses or the psychiatrist's testimony heard by an 18-person jury. But such fiats would be appended to, rather than contained within, the self-incrimination clause of the Fifth Amendment.

A particularly odd selection from among the available constitutional savories is the dissent's requirement that a *"Miranda*-type warning"* be provided before the psychiatric examination, Dissent at 1158–1159. We are tempted to suggest that the

goal of erecting what the dissent considers the necessary distrust might be more effectively achieved by requiring the examining psychiatrist to wear a police uniform. (As the dissent notes, "[t]he Constitution ... is not wedded to particular technologies," *id.* at 1157 n. 116.) The proposal obviously has the effect, if not the purpose, of depriving the examination of whatever validity it might contain. It has nothing whatever to do with the rule of *Miranda,* which was designed to assure the voluntariness of testimony that was *not* required by law. If a similar warning served any purpose here, it would not be to induce the defendant to remain silent where he has a right to do so, but to induce him to withhold legally required testimony, or to dissemble.

◼ Accordingly, we reject appellant's claim that his privilege against compelled self-incrimination was denied by Dr. Kunev's testimony. We hold that when a defendant raises the defense of insanity, he may constitutionally be subjected to compulsory examination by court-appointed or government psychiatrists without the necessity of recording; and when he introduces into evidence psychiatric testimony to support his insanity defense, testimony of those examining psychiatrists may be received (on that issue) as well.

### SIXTH AMENDMENT

◼ In addition to the Fifth Amendment objection, appellant claims that his Sixth Amendment guarantee of assistance of counsel [10] was violated when he was examined at Springfield, without his lawyer present, after commencement of criminal proceedings. Because the availability of a Sixth Amendment claim does not necessarily turn upon the existence of a Fifth Amendment right against compelled self-incrimination, *United States v. Wade,* 388 U.S. 218, 223, 226, 87 S.Ct. 1926, 1930, 1931, 18 L.Ed.2d 1149 (1967), we must separately consider this aspect of the appeal.[11]

---

10. The guarantee provides: "In all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence."

11. Neither at trial nor on appeal did appellant raise this Sixth Amendment claim. Appellant concedes that it was asserted for the first time (by new counsel) in his Petition for Rehearing

This court has never been presented with this specific question. On a number of occasions, however, we have faced, but found it unnecessary to decide, the claim that a criminal defendant's Sixth Amendment rights were violated by failure to permit his attorney to attend psychiatric staff conferences leading to an evaluation (for subsequent introduction at trial) of his mental state at the time of the crime. *See United States v. Canty*, 469 F.2d 114, 121 (D.C.Cir.1972); *United States v. Marcey*, 440 F.2d 281, 284–85 (D.C.Cir.1971); *United States v. Eichberg*, 439 F.2d 620, 621 n. 1 (D.C.Cir.1971); *Thornton v. Corcoran, supra*, 407 F.2d at 702. In the last cited of these cases we opined that that claim— which on its face would seem less substantial than the current one, since it involved proceedings in which the defendant himself was not even a participant—was "anything but frivolous," and indeed of "constitutional dimensions" if the right to cross-examination could not be protected through any other means.[12] 407 F.2d at 702.

At the time this dictum was written, it had credible support in Supreme Court precedent. The governing case on the issue of what constituted a "critical stage" of prosecution, at which the right to assistance of counsel applied, was *United States v. Wade, supra*, which found the right applicable to a post-arraignment lineup. The language of that opinion seemed to suggest that counsel had to be permitted to attend

pretrial proceedings in which the existence of unfairness and inaccuracy could not otherwise be detected and challenged at trial. Thus, various other steps preparatory to trial, such as "systematized or scientific analyzing of the accused's fingerprints, blood sample, clothing, hair, and the like," where counsel is not required, were distinguished from lineups on the ground that "[k]nowledge of the techniques of science and technology is sufficiently available ... that the accused has the opportunity for a meaningful confrontation of the Government's case at trial through the ordinary processes of cross-examination of the Government's expert witnesses and the presentation of the evidence of his own experts," so that "there is minimal risk that ... counsel's absence at such stages might derogate from his right to a fair trial." 388 U.S. at 227–28, 87 S.Ct. at 1932–33. By contrast, the Court said, "the accused's inability effectively to reconstruct at trial any unfairness that occurred at the lineup may deprive him of his only opportunity meaningfully to attack the credibility of the witness' courtroom identification," *id.* at 231–32, 87 S.Ct. at 1934–35. As the Court summarized its holding on this aspect of the case:

> Since it appears that there is grave potential for prejudice, intentional or not, in the pretrial lineup, which may not be capable of reconstruction at trial, and since presence of counsel can often avert

and Suggestion for Rehearing En Banc. Appellees argue that we are therefore precluded from considering it. It is true as a general rule that appellate courts will not consider questions raised for the first time on appeal, *see, e.g., Singleton v. Wulff*, 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976). However, we are "bound to consider any change, either in fact or in law, which has supervened since the judgment [from which appeal is taken] was entered," *Patterson v. Alabama*, 294 U.S. 600, 607, 55 S.Ct. 575, 578, 79 L.Ed. 1082 (1935); *see, e.g., Pendergrast v. United States*, 416 F.2d 776, 780–81 (D.C.Cir.1969). We think that the Supreme Court's decision in *Estelle v. Smith, supra,* handed down during our consideration of Byers' Petition for Rehearing, which elevated Byers' Sixth Amendment claim from completely untenable to plausible, *see* pages 1119–1120, *infra,* invokes this limited exception.

12. Then Judge Burger objected to this discussion, which he considered "plainly dicta and in no sense authoritative." *Thornton, supra,* 407 F.2d at 705. His dissent from this portion of the opinion appended his dissent from an earlier order filed in the same case, in which he rejected the contention that the staff conference was a critical prosecutive stage invoking Sixth Amendment protections. 407 F.2d at 711. The Supreme Court cited this dissent approvingly in *Estelle, supra,* 451 U.S. at 470 n. 14, 101 S.Ct. at 1876 n. 14.

A Sixth Amendment claim to presence of counsel at a staff conference has been rejected by our district court. *United States v. Fletcher,* 329 F.Supp. 160 (D.D.C.1971).

prejudice and assure a meaningful confrontation at trial, there can be little doubt that for Wade the post-indictment lineup was a critical stage of the prosecution.

*Id.* at 236–37, 87 S.Ct. at 1937 (footnote omitted). The Court neither mentioned any distinctively legal decisions which the defendant would have to make at the lineup, for which the expert advice of counsel would be needed, nor stressed the fact that the lineup involves a personal confrontation between the prosecution and the defendant himself. The opinion was, in short, well susceptible of the interpretation that our dictum in *Thornton* gave it—that the Sixth Amendment requires counsel's presence as a witness at post-arraignment proceedings whenever that is necessary to enable the fairness or accuracy of those proceedings to be effectively challenged at trial.

As we later learned, however, this interpretation of *Wade* was mistaken—or in any event superseded. In *United States v. Ash*, 461 F.2d 92 (D.C.Cir.1972) (*en banc*), we were confronted with the question whether right to counsel obtained at a post-indictment, pretrial photograph display for witness identification of a suspected offender. Relying upon the analysis of *Wade*, the five-to-four majority opinion held that it did. The Supreme Court reversed, *United States v. Ash*, 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973), describing the essence of the majority's error as follows:

> We conclude that the dangers of mistaken identification, mentioned in *Wade*, were removed from context by the Court of Appeals and were incorrectly utilized

as a sufficient basis for requiring counsel. Although *Wade* did discuss possibilities for suggestion and the difficulty for reconstructing suggestivity, this discussion occurred only after the Court had concluded that the lineup constituted a trial-like confrontation, requiring the "Assistance of Counsel" to preserve the adversary process by compensating for advantages of the prosecuting authorities.

413 U.S. at 314, 93 S.Ct. at 2576. In the case of the lineup involved in *Wade*, the Court said, "[t]he similarity to trial was apparent, and counsel was needed to render 'Assistance' in counterbalancing any 'overreaching' by the prosecution." *Id.* In the case of photo displays, on the other hand, "[s]ince the accused himself is not present ... no possibility arises that the accused might be misled by his lack of familiarity with the law or overpowered by his professional adversary." *Id.* at 317, 93 S.Ct. at 2577. The right to counsel therefore did not apply.[13]

■ The dissenting Justices in *Ash* claimed that the majority was rewriting rather than applying *Wade*. 413 U.S. at 326–44, 93 S.Ct. at 2581–91 (Brennan, J., dissenting). Be that as it may, *Ash* sets forth what is now unquestionably the governing test. *See, e.g., Moore v. Illinois*, 434 U.S. 220, 227 n. 3, 98 S.Ct. 458, 464 n. 3, 54 L.Ed.2d 424 (1977) (quoting extensively from *Ash*). It is a test under which, as the initial criterion of Sixth Amendment applicability, the accused must find himself "confronted, just as at trial, by the procedural system, or by his expert adversary,

---

**13.** The dissent's analysis of *Ash* omits all reference to the statements of the Court's conclusions quoted in this paragraph, relying instead upon the opinion's earlier description of *Wade* and upon Justice Brennan's dissent. Dissent at 1162–1163. As we acknowledge, the dictum in *Wade* may be regarded as incompatible with the holding of *Ash*. The dissent overlooks the fact that *Ash* was the later case, and that Justice Brennan's dissent was a dissent. The position of the present dissent is in fact a faithful reproduction of the position of the majority of this court in *Ash*, that "the difficulty of reconstructing" events, 461 F.2d at 100, calls forth the right

to counsel. It is differentiated from that reversed opinion only in that it acknowledges (to accommodate *Ash*) that the event must be one at which the defendant was present. That differentiation is of course utterly illogical. The dissent does not explain why it is important to have counsel present "to remedy the defendant's comparative disadvantage as an observer," Dissent at 1163, when the defendant himself is present at the unrecorded event, but not important to have counsel present to remedy the defendant's absolute disadvantage as an observer when he is not present, as in *Ash*.

or by both." *United States v. Ash, supra,* 413 U.S. at 310, 93 S.Ct. at 2574.[14] The two elements of this criterion are repeated several times later in the opinion, when the Court says that "the accused [must] require[ ] aid in coping with legal problems or assistance in meeting his adversary," *id.* at 313, 93 S.Ct. at 2575, and that the Sixth Amendment protection does not apply if there is "no possibility ... that the accused might be misled by his lack of familiarity with the law or overpowered by his professional adversary," *id.* at 317, 93 S.Ct. at 2577. Evidently, the defendant must be confronted *either* with the need to make a decision requiring distinctively legal advice—which may occur even in a context in which the prosecutor or his agents are not present—*or* with the need to defend himself against the direct onslaught of the prosecutor—which may require some skills that are not distinctively legal,[15] such as the quality mentioned in *Wade,* of being "schooled in the detection of suggestive influences," 388 U.S. at 230, 87 S.Ct. at 1934 (footnote omitted).

■ It is obvious that neither condition exists here. Byers was confronted by the procedural system at the point at which he had to decide whether to raise the insanity defense, a determination that would have several legal consequences, including the likelihood of a court order that he undergo psychiatric examination, *see* Fed.R.Crim.P. 12.2(c). At that stage, assistance of counsel was provided. He was likewise confronted by the procedural system at the point at which he had to decide whether to introduce psychiatric testimony on his own behalf—which would have the effect of permitting the Government to introduce psychiatric testimony to the contrary. There also, assistance of counsel was provided. But at the psychiatric interview itself, he was not confronted by the procedural system; he had no decisions in the nature of legal strategy or tactics to make—not even, as we have seen, the decision whether to refuse, on Fifth Amendment grounds, to answer the psychiatrist's questions. The only conceivable role for counsel at the examination would have been to observe. Appellant acknowledges as much. *See* Memorandum in Support of Petition for Rehearing at 10.

**14.** If this initial criterion is met, yet a second inquiry must be made before a constitutional right to counsel can be found to exist: whether "the subsequent trial would cure a one-sided confrontation between prosecuting authorities and the uncounseled defendant." *United States v. Ash, supra,* 413 U.S. at 315, 93 S.Ct. at 2576. If so, the confrontation "cease[s] to be 'critical,'" *id.* at 316, 93 S.Ct. at 2577, and counsel is not required. It is this second step which the *Ash* court said the *Wade* court was taking when it distinguished the lineup from such other preparatory stages as fingerprint or blood analysis on the ground that cross-examination or rebuttal witnesses could remedy any defects in the latter. *Id.* at 314–16, 93 S.Ct. at 2576–77.

**15.** Since this elaboration is part of the rationale of *Ash,* it is difficult to understand why the dissent believes *United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), can be regarded as modifying *Ash* by finding a right to counsel "even though no legal advice was required." Dissent at 1163. *Henry* involved placing in the defendant's jail cell an informer who was to be compensated "only if he produced useful information." 447 U.S. at 270, 100 S.Ct. at 2186. The Court said that "[e]ven if the [federal] agent's statement that he did not intend that Nichols [the informer] would take affirmative steps to secure incriminating information is accepted, he must have known that such propinquity likely would lead to that result." *Id.* at 271, 100 S.Ct. at 2187. It noted that "according to his own testimony, Nichols was not a passive listener," *id.,* and rested its holding upon the fact that "confinement may bring into play subtle influences that will make [the defendant] particularly susceptible to the ploys of undercover Government agents," *id.* at 274, 100 S.Ct. at 2188. In short, *Henry* found that a lawyer would have been of assistance in detecting and resisting tricks to elicit testimony not required by law, just as a lawyer would have been of assistance in *Wade* in detecting and resisting suggestive influences. If, as the dissent believes, the constitutionally required function of counsel can be merely to *record* rather than to *intervene in* events, the Court's considerable inquiry into whether the informer sought to *elicit* the confession would have been irrelevant. Surely an accurate record of the confession itself is at least as important as an accurate record of whether it was obtained by a "ploy." Nor do we understand the dissent's assertion that the baiting of Henry by a paid government informer did not constitute a "direct onslaught of the prosecutor." *Qui facit per alium facit per se.*

The foregoing discussion explains why the holding of *Estelle v. Smith, supra,* has relevance to this case. There counsel had not been advised, in advance of his client's pretrial psychiatric examination to determine competency to stand trial, that the psychiatrist would attempt to assess in addition the accused's future dangerousness, for use in any subsequent sentencing hearing—which use was later made. The accused had neither pleaded insanity nor given any notice of intent to plead insanity, and clearly had a Fifth Amendment right to decline to undergo the psychiatric inquiry for sentencing purposes. In that inquiry, therefore, although the defendant was not confronted by his adversary he *was* confronted "by the legal system," in that he had a law-related choice before him, and could have profited from the expert advice of counsel "in making the significant decision of whether to submit to the examination and to what end the psychiatrist's findings could be employed," 451 U.S. at 471, 101 S.Ct. at 1877. It was that, and that alone which (given the importance of the matter involved) caused the interview "to be a 'critical stage' of the aggregate proceedings against respondent," *id.* at 470, 101 S.Ct. at 1876—which is why the Court described its holding as affirming a Sixth Amendment right to assistance of counsel *"before* submitting to the ... psychiatric interview," *id.* at 469, 101 S.Ct. at 1876 (emphasis added). The Court specifically disavowed any implication of a "constitutional right to have counsel actually present during the examination," citing the

*dissent* in our opinion in *Thornton v. Corcoran, supra. Id.* at 470 n. 14.[16]

As for the alternative condition for required assistance of counsel—that the defendant find himself "confronted ... by his expert adversary" or "by his professional adversary"—that did not exist here either. An examining psychiatrist is not an adversary, much less a professional one. Nor is he expert in the relevant sense—that is, expert in "the intricacies of substantive and procedural criminal law." *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972) (plurality opinion). Appellant asserts the contrary, on the basis of language contained in that portion of the *Estelle* opinion dealing with the Fifth Amendment rather than the Sixth Amendment claim. The irrelevance of that language is apparent when it is quoted in full:

That respondent was questioned by a psychiatrist designated by the trial court to conduct a neutral competency examination, rather than by a police officer, government informant, or prosecuting attorney, is immaterial. When Dr. Grigson went beyond simply reporting to the court on the issue of competence and testified for the prosecution at the penalty phase on the crucial issue of respondent's future dangerousness, his role changed and became essentially like that of an agent of the State recounting unwarned statements made in a postarrest custodial setting. During the psychiatric evaluation, respondent assuredly was "faced with a phase of the adversary

**16.** It is clear from the context of this statement in *Estelle,* as well as from the citation to the dissent in *Thornton,* that the Court was disavowing any Sixth Amendment right during the psychiatric interview. The line it drew was one between the right to counsel *before* the interview and the right to counsel *during* the interview—rather than, as the dissent would have it, between the right to assistance of counsel in person and the right to assistance of counsel through the device of a tape recording. The referenced page in then Judge Burger's *Thornton* dissent stated:

There is no legal basis for equating a Medical Staff Conference to a "confrontation"....

The vice of requiring a sensitive diagnostic process to be conducted as though it were an adversary matter seems too obvious to need discussion. The value of that process is undermined by anything which inhibits the free exchange of views; the integrity of the process makes privacy imperative.

*Thornton v. Corcoran,* 407 F.2d 695, 705, 711 (D.C.1969) (Burger, J., dissenting). Thus, in relying upon *Estelle* to establish a Sixth Amendment right, the dissent finds the Supreme Court to have held what it specifically disavowed holding. *See* Dissent at 1161–1162.

system" and was "not in the presence of [a] perso[n] acting solely in his interest." *Estelle v. Smith, supra,* 451 U.S. at 467, 101 S.Ct. at 1875, *quoting Miranda v. Arizona, supra,* 384 U.S. at 469, 86 S.Ct. at 1625. All this establishes is that the psychiatrist's "role changed" and *became* "like that of an agent of the state" when he testified. Far from proving that he was the defendant's "expert adversary" during the examination, it suggests just the opposite. As for the observation that the psychiatrist was not "acting solely in [the defendant's] interest" during the examination, and that the examination was "a phase of the adversary system": The same can be said of us judges and of the proceedings in which we participate—yet we are surely not the "professional adversaries" *Ash* had in mind, because we (like the examining psychiatrist up until the point of his testimony) do not participate *as adversaries.* The fact is that the Fifth Amendment issue under discussion in this portion of *Estelle,* namely, whether the interrogation was sufficiently "custodial" to require warnings against self-incrimination, *see Miranda v. Arizona, supra,* 384 U.S. at 444, 86 S.Ct. at 1612, is quite different from the Sixth Amendment issue of whether the interrogator is the defendant's "professional adversary." The test used for the one should not be expected to be the test used for the other—as the language of *Estelle* confirms. Even if the opinion had, in the Fifth Amendment context, unrealistically given psychiatrists the same "professional adversary" label, one could not transfer that label to the Sixth Amendment portion of the opinion without attributing to the Court a decision it simply did not have in mind. Indeed, if the Fifth Amendment portion of *Estelle* had established what the dissent suggests, the Sixth Amendment portion could have been significantly shortened, thusly: "Since, as noted above, the defendant was confronted by his professional adversary, Sixth Amendment protections applied as well." In fact, however, the Court found it necessary to establish another ground for application of the counsel guarantee—explicitly noting, in the pro-

cess, that it was not finding any right to counsel during the psychiatric interview. 451 U.S. at 470 n. 14, 101 S.Ct. at 1876 n. 14.

Even if a psychiatric interview otherwise met one of the two theoretical tests for Sixth Amendment protection, it would be relevant to consider the pragmatic effects of presence of counsel upon the process. The Sixth Amendment, like the Fifth (as we have earlier discussed), is not oblivious to practical consequences. In *Wade,* for example, the Court felt constrained to note that "[n]o substantial countervailing policy considerations have been advanced against the requirement of the presence of counsel." 388 U.S. at 237, 87 S.Ct. at 1937. That is not so here. The "procedural system" of the law, which is one justification for the presence of counsel and which, by the same token, the presence of counsel brings in its train, is evidently antithetical to psychiatric examination, a process informal and unstructured by design. Even if counsel were uncharacteristically to sit silent and interpose no procedural objections or suggestions, one can scarcely imagine a successful psychiatric examination in which the subject's eyes move back and forth between the doctor and his attorney. Nor would it help if the attorney were listening from outside the room, for the subject's attention would still wander where his eyes could not. And the attorney's presence in such a purely observational capacity, without ability to advise, suggest or object, would have no relationship to the Sixth Amendment's "Assistance of Counsel."

The last point is an additional reason for rejecting the appellant's and the dissent's suggestion that the Sixth Amendment requires the psychiatric interview to be recorded. Memorandum in Support of Petition for Rehearing at 11–12; Dissent at 1171–1173. Whatever the feasibility of such a practice, we can find no basis for it in the Sixth Amendment. Its only utility would be to record events (the precise questions of the psychiatrist and the precise responses of the defendant) that are otherwise difficult to reconstruct. But as

*Ash* made completely clear, "lack of scientific precision and inability to reconstruct an event are not the tests" for application of the Sixth Amendment guarantee.[17] 413 U.S. at 316, 93 S.Ct. at 2577. They are not the tests because preservation of evidence for trial is not the Amendment's purpose. In *Wade,* for example, the reason for requiring attendance of counsel was not that he might silently witness the lineup, but that he might "serve both his client's and the prosecution's interests by objecting to suggestive features of a procedure before they influence a witness' identification." *Moore v. Illinois,* 434 U.S. 220, 225, 98 S.Ct. 458, 463, 54 L.Ed.2d 424 (1977), *citing United States v. Wade, supra,* 388 U.S. at 236, 238, 87 S.Ct. at 1937, 1938. *See also* 434 U.S. at 230, 98 S.Ct. at 465. Using the guarantee of counsel for the purpose of preserving evidence would make "[a] substantial departure from the historical test," and convert the Sixth Amendment into "a generalized protection of the adversary process." *United States v. Ash, supra,* 413 U.S. at 317, 93 S.Ct. at 2577. If recording the psychiatric examination here would provide effective "Assistance of Counsel," in the constitutional sense, by simply helping the defense attorney to establish the true facts (both of the accuracy of the psychiatrist's diagnosis and of the defendant's statements upon which that diagnosis was based); so would the recording of all witness interviews conducted by the prosecution, some of which can be even more crucial to the defendant, because of the risk of suggestiveness or coaching that can fix the witness's testimony and distort subsequent recollection. If the discussion at this point seems reminiscent of our earlier discussion concerning the Fifth Amendment, it is because the suggestion of recording as a substitute for assistance of counsel, like the suggestion of recording as a substitute for testimonial immunity, makes the consideration of one constitu-

tional guarantee the occasion for creation of limitations that serve an entirely unrelated constitutional purpose. *See* pages 1114–1115, *supra.*

Recording psychiatric interviews may be a good idea, but not all good ideas have been embodied in the Constitution in general or the Sixth Amendment in particular. It is enough, as far as the constitutional minima of the criminal process are concerned, that the defendant has the opportunity to contest the accuracy of witnesses' testimony by cross-examining them at trial, and introducing his own witness in rebuttal. And it is enough that Byers had the opportunity to contest the accuracy of both the details and the conclusion of Dr. Kunev's analysis by cross-examining him (pointing out, as he did, that the crucial statement on which Kunev based his conclusion was not reflected in the psychiatrist's summary of the interview), by himself denying the statements attributed to him, by introducing other witnesses to show that the statement Kunev attributed to him was not true (as again he did, introducing his wife to testify that she had not first suggested the theory of "spell"), and by introducing the contrary conclusion of other psychiatrists.

This Sixth Amendment claim, like the Fifth Amendment claim we discussed earlier, has been squarely addressed and uniformly rejected by other circuits. *See United States v. Bohle, supra,* 445 F.2d at 67; *United States v. Smith, supra,* 436 F.2d at 790; *United States v. Baird, supra,* 414 F.2d at 711–12; *United States v. Albright, supra,* 388 F.2d at 726–27; *accord, United States v. Cohen, supra,* 530 F.2d at 48; *United States v. Greene,* 497 F.2d 1068, 1079–80 (7th Cir.1974), *cert. denied,* 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975); *United States v. Trapnell,* 495 F.2d 22, 24–25 (2d Cir.1974); *United States ex rel. Wax v. Pate,* 409 F.2d 498 (7th

---

**17.** As *Ash* went on to explain, the facility of reconstructing an event is a consideration that can *eliminate* a right to counsel that would otherwise attach. When any mistakes which counsel might have prevented are readily detect-

able, "the opportunity to cure defects at trial causes the confrontation to cease to be 'critical'" for Sixth Amendment purposes. 413 U.S. at 316, 93 S.Ct. at 2577.

Cir.1969). We join them for the reasons set forth above.

## THE SUPERVISORY POWER

■ Explicit appeal to the court's supervisory power to exclude evidence was not made in the trial court, and the issue has been briefed here only by our express invitation. In our view the issue is not properly before us, since the defendant did not even raise below any concerns that are the proper object of that power. We add this section to our opinion to demonstrate the latter point, which demonstration is simultaneously a response to the dissent's argument on the merits.

The d sent argues that we have authority to implement "good ideas" under our supervisory power, Dissent at 1173, and proceeds to discuss this issue as though the question were whether a district judge, when ordering required psychiatric interviews, could and should require taping (or, as Judge Edwards would have it, merely some record). Whatever may be the proper resolution of that question—for which purpose there should be considered not only the majority's dictum in *Thornton v. Corcoran*, 407 F.2d 695, 702 (D.C.Cir.1969), which the dissent cites, but also the dissent of then Judge Burger in the same case, *id.* at 703–04, 709–11, which was cited approvingly by the Supreme Court in *Estelle, supra*, 451 U.S. at 470 n. 14, 101 S.Ct. at 1876 n. 14—it happens not to be the question before us here. Any supervisory power the district court may possess with regard to the ordering of psychiatric examinations was in fact *not* used to implement the dissent's "good idea," and the issue here presented is whether the district court's supervisory power with regard to the conduct of trial could and must have been used to exclude incriminating evidence because of lack of taping. That issue is not even doubtful.

[T]he court's inherent power to refuse to receive material evidence is a power that must be sparingly exercised. . . .

The function of a criminal trial is to seek out and determine the truth or falsi-

ty of the charges brought against the defendant. Proper fulfillment of this function requires that, constitutional limitations aside, all relevant, competent evidence be admissible, unless the manner in which it had been obtained—for example, by violating some statute or rule of procedure—compels the formulation of a rule excluding its introduction in a federal court.

*Lopez v. United States*, 373 U.S. 427, 440, 83 S.Ct. 1381, 1388, 10 L.Ed.2d 462 (1963). The Supreme Court's last holding sanctioning the use of the supervisory power to exclude evidence is now almost twenty-five years old. *Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960). That case involved evidence acquired by the government through unconstitutional means. More recent cases make it clear that not even all cases of illegal acquisition—and indeed not even all cases of unconstitutional acquisition—justify exclusion. In *United States v. Payner*, 447 U.S. 727, 735, 100 S.Ct. 2439, 2446, 65 L.Ed.2d 468 (1980), the Court held that "the supervisory power does not authorize a federal court to suppress otherwise admissible evidence on the ground that it was seized unlawfully from a third party not before the court." That opinion contains the following analysis relevant to the present question (and perhaps relevant as well to the quite different exercise of the supervisory power which the dissent addresses):

The values assigned to the competing interests do not change because a court has elected to analyze the question under the supervisory power instead of the Fourth Amendment. In either case, the need to deter the underlying conduct and the detrimental impact of excluding the evidence remain precisely the same.

*Id.* at 736, 100 S.Ct. at 2447. Here the dissent seeks to make up the deficiencies in its Fifth and Sixth Amendment analysis by shifting the context of the discussion to the supervisory power. *Payner* holds that cannot be done.

It is in fact difficult to imagine a less auspicious case for invocation of the supervisory power to exclude evidence. In the first case in which the Supreme Court invoked the doctrine, applying it to exclude testimony based upon unconstitutionally seized evidence, the expressed justification was that only by depriving unlawful police conduct of its benefits could it be deterred. *McNabb v. United States*, 318 U.S. 332, 340–47, 63 S.Ct. 608, 612–16, 87 L.Ed. 819 (1943). Here, by contrast, the dissent (to the extent it is addressing concerns other than Fifth and Sixth Amendment concerns impermissibly smuggled in under the cover of supervisory power) proposes that we set a convicted murderer free *in order to deter ourselves* from inadequate use of our supervisory power over psychiatric examinations.

In sum: Assuming (as we do not believe to be true) that it was an abuse of discretion for the district court not to have used supervisory power over court-ordered psychiatric examinations to require taping (or recording), a challenge could have been raised by resisting the allegedly improper examination on that ground. That was not done. The only issues now before the court are (1) whether a Fifth or Sixth Amendment violation has occurred—acknowledged bases for excluding the evidence thus obtained, and (2) whether the permissible purposes for use of the supervisory power over trial, i.e., purposes other than meeting the same concerns addressed by the Fifth and Sixth Amendments, *see United States v. Payner, supra*, required its application to exclude the evidence here. We addressed the first issue in the earlier sections of this opinion. As to the latter, no conceivable permissible purpose exists in this case (where no unlawful activity has occurred) except self-deterrence. One can hardly consider that enough to comply with the Supreme Court's instruction that the exclusionary rule should be "restricted to those areas where its remedial objectives are thought most efficaciously served." *United States v. Calandra*, 414 U.S. 338, 348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561 (1974). Even if one believes that mandating taping (or recording) of psychiatric interviews would be a "good idea," setting aside this murder conviction for the failure to implement that idea would seem to us a prime example of what the Supreme Court has disapprovingly called "unbending application of the exclusionary sanction to enforce ideals of governmental rectitude." *United States v. Payner, supra*, 447 U.S. at 734, 100 S.Ct. at 2445.

*Affirmed.*

SPOTTSWOOD W. ROBINSON, III, Chief Judge, with whom J. SKELLY WRIGHT, Circuit Judge, joins, concurring in the judgment:

Two principal issues have been placed before the court. One is whether the Government contravened the Sixth Amendment by conducting Byers' court-ordered psychiatric examination in the absence of his lawyer and without recording his interviews with the governmentally-employed psychiatrist.[1] Byers argues that these omissions eviscerated his right to assistance of counsel by stripping his attorney of any meaningful opportunity to cross-examine the psychiatrist at trial.[2] The second issue proffered is whether the Fifth Amendment was infringed by testimony of the psychiatrist which significantly impeded Byers' attempt to negate criminal charges by establishing an insanity defense.[3]

Though the court splits sharply on decision of these questions, the great majority of my colleagues believe they are properly before us. I am unable to concur in this determination. Because Byers neglected to raise either the Fifth or Sixth Amendment issue before the District Court, I would adhere to traditional canons of feder-

---

**1.** See Supplemental Brief for Appellant at 30–38; Supplemental Brief for Appellee at 1–16.

**2.** Supplemental Brief for Appellant at 30.

**3.** See Supplemental Brief for Appellant at 14–29; Supplemental Brief for Appellee at 1–16.

al jurisprudence and decline to entertain them now.

## I. OBJECTIONS IN THE DISTRICT COURT

During the course of the District Court proceedings, Byers made three objections implicating significantly the psychiatric examination of which he now complains. The first occurred several months before trial when the Government moved for, and the court ordered, Byers' temporary commitment to a federal facility at Springfield, Missouri, for such an examination. Byers resisted the motion on the grounds that this was unnecessary in light of his earlier examination at Saint Elizabeths' Hospital, in Washington, D.C., and that the remoteness of Springfield would subject him to needless hardship.[4]

During trial, an objection was registered against the introduction of testimony by Dr. Nicola Kunev, a psychiatrist employed at Springfield, which hinted strongly that Byers may, at his wife's suggestion, have concocted the theory of his insanity plea. Byers opposed this testimony primarily on the grounds that it lacked probative value and was extremely prejudicial,[5] and he attempted to demonstrate that it was unreliable[6]—in his words, "total speculation."[7]

Byers' counsel also remarked briefly upon the difficulty of cross-examination occasioned by destruction of Dr. Kunev's interview notes and silence of the official interview reports on this aspect of his testimony.[8]

The third objection came at the close of trial when, in support of a motion for a new trial, Byers contended that the District Court had admitted Dr. Kunev's testimony[9] in violation of a statute admonishing that statements made by an accused to his psychiatrist during an examination conducted pursuant to its provisions "shall [not] be admitted into evidence against the accused on the issue of guilt in any criminal proceeding."[10]

Contrary to an earlier representation to this court,[11] Byers now would have us find that these three objections, cumulatively if not singly, tendered his present constitutional claims to the District Court sufficiently to warrant their consideration on appeal.[12] In my view, they are wholly inadequate to that end.

Federal Criminal Rule 51 directs a party not only to "make[ ] known to the court the action which he desires the court to take or his objection to the action of the court," but also to explicate "the grounds therefor."[13]

---

**4.** Transcript (Tr.) 5–7 (Jan. 27, 1977).

**5.** Tr. 69 (Feb. 7, 1978).

**6.** Tr. 68–133 (Feb. 7, 1978).

**7.** Tr. 88 (Feb. 7, 1978).

**8.** Tr. 89 (Feb. 7, 1978).

**9.** Record on Appeal (R.) 59 at 2.

**10.** 18 U.S.C. § 4244 (1982).

**11.** Byers previously had conceded that "[t]he Sixth Amendment argument was first raised by new counsel in the Petition for Rehearing." Memorandum in Support of Petition for Rehearing (filed July 28, 1981) at 24; accord, Petition for Rehearing and Suggestion for Rehearing *En Banc* (filed Mar. 10, 1981) at 12 n. 5.

**12.** See Supplemental Brief for Appellant at 38.

**13.** Fed.R.Crim.P. 51, providing in full: Exceptions to rulings or orders of the court are unnecessary and for all purposes for which an exception has heretofore been necessary it is

sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take or his objection to the action of the court and the grounds therefor; but if a party has no opportunity to object to a ruling or order, the absence of an objection does not thereafter prejudice him. In addition to promotion of the orderly administration of justice, see text *infra* at notes 29–38, and prevention of unfair prejudice to the Government, see text *infra* at notes 39–42, this rule was adopted to prevent defendants from withholding objections for purposes of appeal and meanwhile gambling on acquittal. See, e.g., *United States v. Smith*, 160 U.S.App.D.C. 221, 226–227, 490 F.2d 789, 794–795 (1974); *United States v. Bamberger*, 456 F.2d 1119, 1131 (3d Cir.1972), *cert. denied*, 413 U.S. 919, 93 S.Ct. 3067, 37 L.Ed.2d 1040 (1973), and *sub nom. Elam v. United States*, 406 U.S. 969, 92 S.Ct. 2424, 32 L.Ed.2d 668 (1972); *United States v. Greene*, 578 F.2d 648, 654 (5th Cir.1978), *cert. denied*, 439 U.S. 1133, 99 S.Ct. 1056, 59 L.Ed.2d 96 (1979); *McNeely v. United States*, 353 F.2d 913, 917 (8th Cir.1965); *United States v. Peter-*

This provision and its forerunners have consistently been interpreted to require an objection sufficiently clear and specific [14] to apprise the trial court and opposing counsel of the claim distinctly, in order that the purported error may be addressed and hopefully cured at that time.[15] Of equal importance to this litigation are holdings of the Supreme Court and other federal tribunals that vague or general objections do not suffice to preserve constitutional claims;[16] in such cases, "the orthodox rule of evidence requiring specification of the objection is buttressed by the uniform policy requiring constitutional questions to be raised at the earliest possible stage in the litigation." [17] Tested by these standards, it simply is not enough to say merely that objections tendered to the District Court may in some sense have "reflect[ed]" [18] some of the concerns implicated by the constitutional provision relied on.[19]

*sen*, 611 F.2d 1313, 1332–1333 (10th Cir.1979), *cert. denied*, 447 U.S. 905, 100 S.Ct. 2985, 64 L.Ed.2d 854 (1980); *United States v. Stout*, 667 F.2d 1347, 1354 (11th Cir.1982).

**14.** *E.g., United States v. Lewis*, 140 U.S.App.D.C. 40, 46, 433 F.2d 1146, 1152 (1970); *Miller v. Avirom*, 127 U.S.App.D.C. 367, 370, 384 F.2d 319, 322 (1967); *Johnston v. Reily*, 82 U.S.App. D.C. 6, 7, 160 F.2d 249, 250 (1947); *Skiskowski v. United States*, 81 U.S.App.D.C. 274, 279, 158 F.2d 177, 182 (1946), *cert. denied sub nom. Quinn v. United States*, 330 U.S. 822, 67 S.Ct. 769, 91 L.Ed. 1273 (1947); *DeForest v. United States*, 11 App.D.C. 458, 460 (1897); *Harney v. United States*, 306 F.2d 523, 534 (1st Cir.), *cert. denied sub nom. O'Connell v. United States*, 371 U.S. 911, 83 S.Ct. 254, 9 L.Ed.2d 171 (1962); *United States v. Bryant*, 480 F.2d 785, 792 (2d Cir.1973); *United States v. Adamson*, 665 F.2d 649, 660 (5th Cir. *en banc* 1982), *cert. denied*, —— U.S. ——, 104 S.Ct. 116, 78 L.Ed.2d 116 (1983); *United States v. Rizzo*, 418 F.2d 71, 78 (7th Cir.1969), *cert. denied sub nom. Tornabene v. United States*, 397 U.S. 967, 90 S.Ct. 1006, 25 L.Ed.2d 260 (1970); *Dranow v. United States*, 307 F.2d 545, 568 (8th Cir.1962); *United States v. Hubbard*, 603 F.2d 137, 142 (10th Cir.1979).

**15.** *E.g., Johnston v. Reily, supra* note 14, 82 U.S.App.D.C. at 8, 160 F.2d at 251; *DeForest v. United States, supra* note 14, 11 App.D.C. at 460; *Harney v. United States, supra* note 14, 306 F.2d at 534; *United States v. Bryant, supra* note 14, 480 F.2d at 792; *United States v. Greenfield*, 554 F.2d 179, 186 (5th Cir.1977), *cert. denied*, 439 U.S. 860, 99 S.Ct. 178, 58 L.Ed.2d 168 (1978); *United States v. Hubbard, supra* note 14, 603 F.2d at 142. Fed.R.Civ.P. 46, by reference to which interpretation of Fed.R.Crim.P. Rule 51 is informed, *see* Notes of Advisory Committee on Fed.R.Crim.P. 51; 3A C. Wright, Federal Practice § 841 at 284 (2d ed. 1982), similarly calls for reasonably specific objections during trial proceedings to preserve claims on appeal. *E.g., Koshorek v. Pennsylvania R.R.*, 318 F.2d 364, 371 (3d Cir.1963); *Colonial Refrigerated Transp., Inc. v. Mitchell*, 403 F.2d 541, 551–552 (5th Cir. 1968); *Employers Mut. Cas. Co. v. Johnson*, 201 F.2d 153, 155–156 (5th Cir.1953). These re-

quirements have long been deemed vital to sound appellate practice:

> The rule is universal that, where an objection is so general as not to indicate the specific grounds upon which it is made, it is unavailing on appeal, unless it be of such a character that it could not have been obviated at the trial. The authorities on this point are all one way. Objections to the admission of evidence must be of such a specific character as to indicate distinctly the grounds upon which the party relies, so as to give the other side full opportunity to obviate them at the time, if under any circumstances that can be done.

*Noonan v. Caledonia Mining Co.*, 121 U.S. 393, 400, 7 S.Ct. 911, 915, 30 L.Ed. 1061, 1063 (1887).

**16.** *On Lee v. United States*, 343 U.S. 747, 750 n. 3, 72 S.Ct. 967, 970 n. 3, 96 L.Ed. 1270, 1273 n. 3 (1952) ("a general objection ... is insufficient to preserve such a specific claim as violation of a constitutional provision in obtaining the evidence"), *quoted in, e.g., United States v. Indiviglio*, 352 F.2d 276, 279 (2d Cir.1965), *cert. denied*, 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966); *United States v. Lazarus*, 425 F.2d 638, 642 (9th Cir.), *cert. denied*, 400 U.S. 869, 91 S.Ct. 102, 27 L.Ed.2d 108 (1970); *Ignacio v. Territory of Guam*, 413 F.2d 513, 517 (9th Cir.1969), *cert. denied*, 397 U.S. 943, 90 S.Ct. 959, 25 L.Ed.2d 124 (1970). *See also United States v. Lazarus, supra*, 425 F.2d at 642 ("[a] general objection is not sufficient to raise a constitutional question").

**17.** *On Lee v. United States, supra* note 16, 343 U.S. at 750 n. 3, 72 S.Ct. at 970 n. 3, 96 L.Ed. at 1273 n. 3, *quoted in, e.g., United States v. Indiviglio, supra* note 16, 352 F.2d at 279.

**18.** *See* Appellant's Supplemental Brief at 38.

**19.** There is an additional reason for declining examination of Byers' Fifth Amendment protest. Not only did Byers fail to pursue this line of attack in the District Court, but his cryptic allusion to the Fifth Amendment in his first brief before this court, *see* Brief for Appellant at 23–24, was insufficient even to raise the point prior to submission of the appeal at the panel level. *See* Fed.R.App.P. 28(a)(2), (b); D.C.Cir.R.

Byers urges us to acknowledge Fifth and Sixth Amendment rights which have yet to be recognized by any federal court, and which, if validated, would impose substantial affirmative duties upon the Government. Of the three objections proffered by Byers to support the contention that he presented his current claims to the District Court, two may be dismissed out of hand. Neither Byers' objection to the Government's motion for commitment for the Springfield examination nor his motion for a new trial predicated on the alleged statutory violation even remotely revealed or suggested either of the constitutional theses he now advances.

The third objection upon which Byers relies—that particular testimony of Dr. Kunev was inadmissible because it lacked probative value and was prejudicial—merits closer scrutiny, but ultimately proves to be no more beneficial to his cause. At no time did Byers invoke either the Fifth or Sixth Amendment *eo nomine,* or even hint that he intended an objection of constitutional dimensions. His counsel did observe briefly that cross-examination of Dr. Kunev would be hampered by the latter's failure either to preserve his interview notes or to refer in official reports to the challenged topic of the testimony. This was hardly sufficient, however, to communicate the nature and scope of Byers' constitutional claims to the court, or even to intimate that he thought the testimony would derogate his privilege against self-incrimination or trammel his right to assistance of counsel.[20] Indeed, if Byers had in mind a Fifth or Sixth Amendment foundation for the objection, he could appropriately and much more beneficially have made it before Dr. Kunev began to testify.

Given these circumstances, I cannot believe that Byers presented the objection with sufficient clarity and particularity to apprise trial participants of the specific constitutional components now claimed for it. From all appearances, the objection arose simply pursuant to Federal Evidence Rule 403, which authorizes trial judges to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice."[21] We should not, by indulgence in vastly overgenerous hindsight, construe it to germinate and preserve Byers' current Fifth and Sixth Amendment positions.

## II. APPLICATION OF FEDERAL CRIMINAL RULE 52(b): THE PLAIN ERROR DOCTRINE

Since Byers did not advance his constitutional claims in the District Court, we are not at liberty to consider them on appeal unless the record discloses "plain error" within the meaning of Federal Criminal Rule 52(b). I am not persuaded that either of the constitutional violations asserted by Byers—if indeed they were that—rises to the level of "plain" error. Consequently, I would not entertain either the Fifth or the Sixth Amendment arguments.

The Supreme Court and numerous other federal courts have stated time and again that the plain-error doctrine is to be used

---

8(b) (1980); *Andrews v. Louisville & N. R.R.,* 406 U.S. 320, 324–325, 92 S.Ct. 1562, 1565, 32 L.Ed.2d 95, 100 (1972); *New York v. Kleinert,* 268 U.S. 646, 651, 45 S.Ct. 618, 619, 69 L.Ed. 1135, 1137 (1925); *May v. United States,* 84 U.S.App.D.C. 233, 328, 175 F.2d 994, 999, *cert. denied,* 338 U.S. 830, 70 S.Ct. 58, 94 L.Ed. 505 (1949). Courts traditionally have refused to consider issues presented for the first time on rehearing, absent exceptional circumstances. See, *e.g., Bullock v. Mumford,* 166 U.S.App.D.C. 51, 55, 509 F.2d 384, 388 (1974); *Moore v. United States,* 598 F.2d 439, 441 (5th Cir.1979); *United States v. Sutherland,* 428 F.2d 1152, 1158 (5th Cir.1970), *cert. denied,* 409 U.S. 1078, 93 S.Ct. 698, 34 L.Ed.2d 668 (1972); *United States v.*

*Bohlmann,* 625 F.2d 751, 754 (6th Cir.1980); *Stephens v. Arrow Lumber Co.,* 354 F.2d 732, 734 (9th Cir.1966); *General Ins. Co. v. Pathfinder Petroleum Co.,* 145 F.2d 368, 373 (9th Cir. 1944), *cert. denied,* 324 U.S. 844, 65 S.Ct. 679, 89 L.Ed. 1406 (1945).

**20.** This conclusion is bolstered by the fact that defense counsel's remarks, Tr. 89 (Feb. 7, 1978), constituted only a tiny segment of a lengthy voir dire. Tr. 68–133 (Feb. 7, 1978).

**21.** The Government appears to have so perceived the objection, Tr. 90 (Feb. 7, 1978), and defense counsel at no time indicated disagreement with that understanding.

sparingly,[22] and only in exceptional circumstances.[23] Advertently to this caveat, as well as to the commonsense meaning of the words "plain error," these courts have recognized that obviousness of an alleged impropriety figures crucially in any plain-error determination.[24] The instant case, I submit, hardly qualifies for special treatment on this score. Whatever constitutional transgression the District Court may have tolerated during the trial proceedings, it cannot fairly be characterized as obvious.

That the court today encounters difficulty with both the Fifth and Sixth Amendment question is itself proof that any constitutional infirmity in the Springfield examination procedures or their testimonial products is far from clear. Additionally, no federal court has yet accepted the identical or any substantially similar Fifth Amendment argument,[25] and every such court reaching the Sixth Amendment issue

Byers tenders has resolved it adversely to his position [26]—facts further confirming that the validity of his claims is not obvious.[27] We ourselves have held that purported constitutional error is not made "plain," within the meaning of Rule 52(b), simply by the circumstance that the claim is novel.[28] If asserted error is not "plain" merely because no federal court has yet addressed the issue, surely it cannot be "plain" when federal courts repeatedly and uniformly have resolved the issue unfavorably to the claimant.

Complementary to lack of obviousness, an even more fundamental principle impels me to the conclusion that Byers' belatedly-posed constitutional issues should not be examined under the plain-error doctrine. As I had recent occasion to observe,[29] it is a well-established principle of federal jurisprudence that courts will not decide a ques-

**22.** *United States v. Frady,* 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816, 827 n. 14 (1982); *United States v. Blackwell,* 224 U.S.App.D.C. 350, 366, 694 F.2d 1325, 1341 (1982); *United States v. King,* 505 F.2d 602, 605 (5th Cir.1974); *United States v. Greene,* 497 F.2d 1068, 1077 (7th Cir.1974), *cert. denied,* 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975); *United States v. Van Horn,* 553 F.2d 1092, 1094 (8th Cir.1977); 3A C. Wright, *supra* note 15, § 856 at 338.

**23.** *United States v. Frady, supra* note 22, 456 U.S. at 163 n. 13, 102 S.Ct. at 1592 n. 13, 71 L.Ed.2d at 827 n. 13; *United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555, 557 (1936); *United States v. Blackwell, supra* note 22, 224 U.S.App.D.C. at 366, 694 F.2d at 1341; *McMillen v. United States,* 386 F.2d 29, 35 (1st Cir.1967), *cert. denied,* 390 U.S. 1031, 88 S.Ct. 1424, 20 L.Ed.2d 288 (1968); *United States v. Chaney,* 662 F.2d 1148, 1152 (5th Cir.1981); *United States v. Rudinsky,* 439 F.2d 1074, 1076 (6th Cir.1971); *United States v. Greene, supra* note 22, 497 F.2d at 1077; *Petschl v. United States,* 369 F.2d 769, 773 (8th Cir.1966); *United States v. Sims,* 617 F.2d 1371, 1377 (9th Cir. 1980); 3A C. Wright, *supra* note 15, § 856 at 338.

**24.** *E.g., United States v. Frady, supra* note 22, 456 U.S. at 163 & n. 13, 102 S.Ct. at 1592 & n. 13, 71 L.Ed.2d at 827 & n. 13; *United States v. Atkinson, supra* note 23, 297 U.S. at 160, 56 S.Ct. at 392, 80 L.Ed. at 557; *United States v. Blackwell, supra* note 22, 224 U.S.App.D.C. at 367, 694 F.2d at 1342; *United States v. McCord,* 166 U.S. App.D.C. 1, 8 n. 10, 509 F.2d 334, 341 n. 10 (*en*

banc 1974), *cert. denied,* 421 U.S. 930, 95 S.Ct. 1656, 44 L.Ed.2d 87 (1975); *United States v. Edgewood Health Care Center,* 608 F.2d 13, 14 (1st Cir.1979), *cert. denied,* 444 U.S. 1046, 100 S.Ct. 734, 62 L.Ed.2d 732 (1980); *United States v. O'Connor,* 237 F.2d 466, 472 (2d Cir.1956); *United States v. Rad-O-Lite of Philadelphia,* 612 F.2d 740, 743 (3d Cir.1979); *United States v. Chaney, supra* note 23, 662 F.2d at 1152; *United States v. Greene, supra* note 22, 497 F.2d at 1077; *United States v. Stout, supra* note 13, 667 F.2d at 1354.

**25.** *United States v. Weiser,* 428 F.2d 932, 936 (2d Cir.1969), *cert. denied,* 402 U.S. 949, 91 S.Ct. 1606, 29 L.Ed.2d 119 (1971); *United States v. Reifsteck,* 535 F.2d 1030, 1033 (8th Cir.1976); *United States v. Handy,* 454 F.2d 885, 888–889 (9th Cir.1971), *cert. denied,* 409 U.S. 846, 93 S.Ct. 49, 34 L.Ed.2d 86 (1972).

**26.** *E.g., United States v. Baird,* 414 F.2d 700, 711–712 (2d Cir.1969), *cert. denied,* 396 U.S. 1005, 90 S.Ct. 559, 24 L.Ed.2d 497 (1970); *United States v. Albright,* 388 F.2d 719, 726 (4th Cir.1968); *United States v. Cohen,* 530 F.2d 43, 48 (5th Cir.), *cert. denied,* 429 U.S. 855, 97 S.Ct. 149, 50 L.Ed.2d 130 (1976).

**27.** See *Page v. United States,* 282 F.2d 807, 811 (8th Cir.1960).

**28.** *Blackwell v. United States, supra* note 22, 224 U.S.App.D.C. at 367, 694 F.2d at 1342.

**29.** *Id.* at 369, 694 F.2d at 1344 (concurring opinion).

tion raised initially on appeal absent a record adequate enough to ensure its sound resolution.[30] The concerns prompting this salutary rule are apparent. Our duty to the parties, as well as allegience to the adjudicative process, demands that we strive continually for sensitive, informed and accurate decisionmaking, especially with respect to complex constitutional issues.[31] Beyond that, it would unjustifiably penalize the Government to resolve any matter adversely to its interests when the accused's procedural default has robbed it

of the potential opportunity to build a record favorable to its cause. An assessment of Byers' constitutional contentions in light of these concerns makes it further evident that the rule precluding consideration of an untimely issue on a materially flawed record applies squarely to the case at bar.

Record deficiencies militate with special force against attempted resolution of the Fifth Amendment controversy here. Byers' self-incrimination claim calls for ju-

**30.** *United States v. Lewis, supra* note 14, 140 U.S.App.D.C. at 46, 433 F.2d at 1152; *Washington v. United States,* 134 U.S.App.D.C. 223, 225–226, 414 F.2d 1119, 1121–1122 (1969); *Gray v. United States,* 114 U.S.App.D.C. 77, 78, 311 F.2d 126, 127 (1962), *cert. denied,* 374 U.S. 838, 83 S.Ct. 1886, 10 L.Ed.2d 1057 (1963); *United States v. Bryant, supra* note 14, 480 F.2d at 792–793; *United States v. D'Amico,* 408 F.2d 331, 332 (2d Cir.1969); *United States v. Weldon,* 384 F.2d 772, 775 (2d Cir.1967); *United States v. Gitlitz,* 368 F.2d 501, 504 (2d Cir.1966), *cert. denied,* 386 U.S. 1038, 87 S.Ct. 1492, 18 L.Ed.2d 602 (1967); *United States v. Sten,* 342 F.2d 491, 493 (2d Cir.), *cert. denied,* 382 U.S. 854, 86 S.Ct. 103, 15 L.Ed.2d 91 (1965); *United States v. Meadows,* 523 F.2d 365, 368 (5th Cir.1975), *cert. denied,* 424 U.S. 970, 96 S.Ct. 1469, 47 L.Ed.2d 738 (1976); *Sykes v. United States,* 373 F.2d 607, 612–613 (5th Cir.1966), *cert. denied,* 386 U.S. 977, 87 S.Ct. 1172, 18 L.Ed.2d 138 (1967); *United States v. Easter,* 539 F.2d 663, 665 (8th Cir. 1976), *cert. denied,* 434 U.S. 844, 98 S.Ct. 145, 54 L.Ed.2d 109 (1977); *Clay v. United States,* 394 F.2d 281, 283–284 (8th Cir.1968), *cert. denied,* 393 U.S. 926, 89 S.Ct. 260, 21 L.Ed.2d 262 (1968); *Robinson v. United States,* 327 F.2d 618, 623 (8th Cir.1964); *Spahr v. United States,* 409 F.2d 1303, 1306 (9th Cir.), *cert. denied,* 396 U.S. 840, 90 S.Ct. 102, 24 L.Ed.2d 91 (1969); *York v. United States,* 389 F.2d 761, 762 (9th Cir.1968); *United States v. Lepinski,* 460 F.2d 234, 239 (10th Cir.1972).

**31.** See generally *Kennedy v. Silas Mason Co.,* 334 U.S. 249, 257, 68 S.Ct. 1031, 1034, 92 L.Ed. 1347, 1351 (1948) (refusing to address important legal question because, "[w]hile we might be able, on the present [inadequate] record, to reach a conclusion that would decide the case, it might well be found later to be lacking in the thoroughness that should precede judgment of this importance and which it is the purpose of the judicial process to provide"); *United States v. Lewis, supra,* note 14, 140 U.S.App.D.C. at 46, 433 F.2d at 1152 ("[t]he rationale for [the specific-objection requirement [ ] includes importantly the need for a record, developed by adversary processes, upon which appellate consideration

and resolution can safely proceed"); *Lee v. Habib,* 137 U.S.App.D.C. 403, 409, 424 F.2d 891, 897 (1970) ("[t]here can never be effective appellate review if the reviewing court is not able to obtain a clear picture of the precise nature of the alleged errors in the court below").

Even aside from Rule 52(b), the well-entrenched rule is that courts will not resolve constitutional issues on a deficient record. *Kleppe v. New Mexico,* 426 U.S. 529, 546, 96 S.Ct. 2285, 2295, 49 L.Ed.2d 34, 47–48 (1976), quoting *Public Affairs Assocs. v. Rickover,* 369 U.S. 111, 113, 82 S.Ct. 580, 582, 7 L.Ed.2d 604, 607 (1962) (holding that courts should not decide important constitutional questions on less than an "'adequate and full-bodied record'"); *Tennessee Publishing Co. v. American Nat'l Bank,* 299 U.S. 18, 22, 57 S.Ct. 85, 87, 81 L.Ed. 13, 15 (1936) ("[i]t is a familiar rule that the court will not anticipate the decision of a constitutional question upon a record which does not appropriately present it"). See also *Wheeler v. Barrera,* 417 U.S. 402, 426–427, 94 S.Ct. 2274, 2288, 41 L.Ed.2d 159, 178 (1974); *Alabama State Fed'n of Labor v. McAdory,* 325 U.S. 450, 461–462, 65 S.Ct. 1384, 1389–1390, 89 L.Ed. 1725, 1734–1735 (1945); *Allen-Bradley Local 1111, United Elec. Workers v. Wisconsin Employment Relations Bd.,* 315 U.S. 740, 746, 62 S.Ct. 820, 824, 86 L.Ed. 1154, 1163 (1942); *Wilshire Oil Co. v. United States,* 295 U.S. 100, 102–103, 55 S.Ct. 673, 674, 79 L.Ed. 1329, 1331 (1935); *Bandini Petroleum Co. v. Superior Court,* 284 U.S. 8, 22, 52 S.Ct. 103, 108, 76 L.Ed. 136, 145 (1931). See generally *Socialist Labor Party v. Gilligan,* 406 U.S. 583, 588 & n. 2, 92 S.Ct. 1716, 1719 & n. 2, 32 L.Ed.2d 317, 322 & n. 2 (1972) (court should not decide constitutional question unless it is "presented with the clarity needed for effective adjudication"); *Rescue Army v. Municipal Court,* 331 U.S. 549, 584, 67 S.Ct. 1409, 1427, 91 L.Ed. 1666, 1686 (1947) (court should not decide constitutional question unless it is presented in "clean-cut and concrete form"); *Associated Press v. NLRB,* 301 U.S. 103, 132, 57 S.Ct. 650, 655, 81 L.Ed. 953, 960 (1937) (court will not resolve constitutional question on basis of hypothetical facts).

dicial assessment of the totality of a diverse group of facts and circumstances, and, as even Byers concedes,[32] the record before us has not been developed sufficiently in this regard. Resolution of Byers' Sixth Amendment claim requires an evaluation of sparse and contradictory empirical data, necessitates a delicate accommodation of competing values in the context of a wide range of potentially suitable procedural protections,[33] and, if favorable to Byers, might possibly involve the erection of a formidable structure of interrelated rights and duties.

Despite these aspects of the claims, however, Byers' failure to assert them seasonably before the District Court has imbued the record with no more than a sketchy description of the circumstances surrounding his Springfield examination,[34] and has left it entirely devoid of any adversary presentation—testimony, analysis or discussion—on the extant empirical information and professional literature, an informed appraisal of which is so essential to an intelligent disposition. It would seem a gross disregard of the gravity and delicacy with which constitutional matters are to be treated [35] to proceed to the merits of Byers' claim in the face of such deficiencies. And

it would seem highly ironic to levy a substantial constitutional duty upon the Government and to justify the imposition by an ad hoc evaluation of empirical information badly in need of testing and analysis in the crucible of the adversary process.

More than a decade ago, this court viewed a strikingly similar constitutional challenge presented by a mandamus petition and declined to consider the merits of the claim on so barren a record, reasoning that

> the complexity of the issues involved and the uncertain factual matrix within which they must be resolved persuades us that a solution should not be attempted in the context of this petition for a writ of mandamus.[36]

The court has also made clear that this rationale extends fullforce to cases in which the record deficiency was the result of the claimant's failure reasonably to raise the issue:

> [A] party asserting the unconstitutionality of governmental action has the burden of demonstrating it. That burden extends to production of the facts essential to a determination respecting the constitutional claim. [Appellant's] trial counsel made no effort in that direction. We

**32.** Supplemental Brief for Appellant at 45.

**33.** That a highly similar Sixth Amendment issue, see note 37 *infra*, required consideration of a "broad range" of alternative procedural safeguards was found in *Thornton v. Corcoran*, 132 U.S.App.D.C. 232, 239, 407 F.2d 695, 702 (1969), to be a particularly persuasive reason for not resolving it in the absence of a "full factual record."

**34.** See Supplemental Brief for Appellant at 45–46.

**35.** See *Kremens v. Bartley*, 431 U.S. 119, 127–128, 97 S.Ct. 1709, 1714, 52 L.Ed.2d 184, 192 (1977); *Wheeler v. Barrera, supra* note 31, 417 U.S. at 426, 94 S.Ct. at 228, 41 L.Ed.2d at 178; *Ashwander v. TVA*, 297 U.S. 288, 345, 56 S.Ct. 466, 482, 80 L.Ed. 688, 710 (1936) (concurring opinion). The Supreme Court has long adhered to the general rule that courts must not fashion principles of constitutional law more expansive than required by the facts of the case. *E.g.,*

*Kremens v. Bartley, supra,* 431 U.S. at 136–137, 97 S.Ct. at 1719, 52 L.Ed.2d at 197; *Alabama State Fed'n of Labor v. McAdory, supra* note 31, 325 U.S. at 461–462, 65 S.Ct. at 1389–1390, 89 L.Ed. at 1734–1735; *Ashwander v. TVA, supra,* 297 U.S. at 347, 56 S.Ct. at 483, 80 L.Ed. at 711 (concurring opinion); *Liverpool, N.Y. & Philadelphia S.S. Co. v. Commissioners*, 113 U.S. 33, 39, 5 S.Ct. 352, 355, 28 L.Ed. 899, 901 (1885). It would seem a logical outgrowth of these holdings that when, as here, the record is materially deficient, the court should not undertake any constitutional pronouncement at all.

**36.** *Thornton v. Corcoran, supra* note 33, 132 U.S.App.D.C. at 239, 407 F.2d at 702. There the petitioner contended that the Sixth Amendment required Saint Elizabeths' Hospital, to which he had been committed for a psychiatric examination to determine his competency to stand trial and his mental condition at the time of an alleged offense, to permit his attorney and an independent psychiatrist to attend the staff conference integral to preparation of the report the hospital would submit to the District Court.

do not in these circumstances pursue the abstract right-to-counsel question which [appellant] urges.[37]

I do not believe that the case *sub judice* presents us with a record materially better than that then confronting the court, and accordingly would likewise decline to address Byers' constitutional contentions.[38]

Furthermore, I cannot be certain that the Government would not have been able to show that it did not tread upon any constitutionally-protected interests of Byers if it had been afforded a meaningful opportunity to present its side of the issues during the trial proceedings. As but one example, Byers himself admits that whether he voluntarily waived his right to counsel is a matter that cannot be resolved on the record before us.[39] Beyond that, the present state of the record forecloses any accurate forecast on any of a number of justifications presumably open to the Government. It thus is premature and unsound, as well as unfair to the Government, to venture opinions on whether Byers' constitutional rights, even as he perceives

them, have been invaded. Put another way, we cannot possibly know that error, much less plain error, has occurred here.[40]

The general rule counseling against appellate resolution of issues unraised at the trial level finds still another foundation in this case. Were we to accept Byers' arguments and hold that the Springfield examination was fatally flawed, the appropriate remedy would be disallowance of any testimony by Springfield psychiatrists thereon. That outcome, however, would deprive the Government of any real opportunity to oppose Byers' insanity plea, for it is highly unlikely that a psychiatric examination conducted now would shed light on Byers' mental state more than seven years ago, when the charged offenses were committed. We would then, in effect, let Byers' procedural lapses subvert the Government's capacity to rebut the insanity defense by ensuring its inability to use an efficacious expert witness when proper objections might well have allowed it to substitute adequately for the challenged testimony. In my view, Byers should not be

---

**37.** *United States v. Canty,* 152 U.S.App.D.C. 103, 109–110, 469 F.2d 114, 120–121 (1972). *Canty* involved the very issue discussed by the *Thornton* court.

**38.** Federal courts on occasion have manifested a willingness more readily to find plain error for constitutional claims. See, *e.g., United States v. Tobias,* 662 F.2d 381, 388 (5th Cir.1981), *cert. denied,* 457 U.S. 1108, 102 S.Ct. 2908, 73 L.Ed.2d 1317 (1982); 3A C. Wright, *supra* note 15, § 856 at 342. This proclivity, however, must be tempered by the Supreme Court's unambiguous pronouncement that "[n]o procedural principle is more familiar to this Court than that a constitutional right may be forfeited in criminal ... cases by the failure to make timely assertion of the right." *Yakus v. United States,* 321 U.S. 414, 444, 64 S.Ct. 660, 677, 88 L.Ed. 834, 859 (1944); accord, *e.g., United States v. Indiviglio, supra* note 16, 352 F.2d at 280; *United States v. Popejoy,* 578 F.2d 1346, 1350 (10th Cir.), *cert. denied,* 439 U.S. 896, 99 S.Ct. 257, 58 L.Ed.2d 243 (1978). It also is constrained by the traditional doctrine that courts will "never ... anticipate a question of constitutional law in advance of the necessity of deciding it." *Liverpool, N.Y. and Philadelphia S.S. Co. v. Commissioners, supra* note 35, 113 U.S. at 39, 5 S.Ct. at 355, 28 L.Ed. at 901; accord, *e.g., Kremens v. Bartley, supra* note 35, 431 U.S. at 136, 97 S.Ct. at 1719, 52 L.Ed.2d

at 197, quoting *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 138, 95 S.Ct. 335, 356, 42 L.Ed.2d 320, 350 (1974); *Bush v. Texas,* 372 U.S. 586, 590, 83 S.Ct. 922, 925, 9 L.Ed.2d 958, 960 (1963); *Peters v. Hobby,* 349 U.S. 331, 338, 75 S.Ct. 790, 794, 99 L.Ed. 1129, 1137 (1955); *Alma Motor Co. v. Timken-Detroit Axle Co.,* 329 U.S. 129, 136–137, 67 S.Ct. 231, 234, 91 L.Ed. 128, 133 (1946); *Ashwander v. TVA, supra* note 35, 297 U.S. at 346–347, 56 S.Ct. at 482–483, 80 L.Ed. at 711 (concurring opinion).

**39.** See Petition for Rehearing and Suggestion for Rehearing *En Banc* (filed Mar. 10, 1981) at 14; Memorandum in Support of Petition for Rehearing (filed July 28, 1981) at 13.

**40.** I note additionally that federal courts have required the plain-error determination to be made on the basis of the entire record. See, *e.g., United States v. Del Llano,* 354 F.2d 844, 848 (2d Cir.1965); *United States v. Montgomery,* 582 F.2d 514, 519 (10th Cir.1978), *cert. denied,* 439 U.S. 1075, 99 S.Ct. 850, 59 L.Ed.2d 42 (1979); *United States v. Williams,* 445 F.2d 421, 424 (10th Cir.), *cert. denied,* 404 U.S. 966, 92 S.Ct. 342, 30 L.Ed.2d 286 (1971). It would violate the purpose if not the letter of this requirement to find plain error on the materially defective record before us.

permitted to reap such rewards from his own neglect.[41] Courts have refused to reach untimely issues on inadequate records even without inquiry as to whether the Government on remand would have ample opportunity to adduce facts favorable to its position.[42] Surely, then, we should decline to consider Byers' belatedly-raised constitutional claims when any decision against the Government would leave it without important testimony it might have been able to procure absent Byers' procedural defaults.

The court relies upon an aspect of the Fifth Circuit's decision in *Smith v. Estelle* [43] in reaching the conclusion that Byers' Fifth Amendment argument should be entertained despite his failure to advance it before the District Court.[44] In *Smith*, the prosecution had introduced psychiatric testimony at the sentencing stage of a trial after representing to the court and opposing counsel that the testimony would not be used.[45] The court held that the state, by surprising defense counsel in this way, had frustrated effective cross-examination of the witness and significantly impaired the "interest in reliability" of the judicial process.[46] The court then allowed the accused to litigate Fifth and Sixth Amendment claims, noting that defense counsel, as a result of the "surprise," could "scarcely be faulted for failing to enumerate all of the many constitutional rights that the state violated" when it unexpectedly presented the testimony.[47]

In the case at bar, there was neither such a surprise nor such detrimental consequences. Byers knew well in advance that Dr. Kunev would testify and, in fact, registered several nonconstitutional objections to the testimony during the trial proceedings.[48] A litigant does not gain entitlement to the Fifth Amendment merely because his adversary's witness blurts out something unanticipated. And although the challenge here is to testimonial reproduction of a statement allegedly made by Byers during Dr. Kunev's examination, an important element of *Estelle* is lacking. There the defendant was left without any opportunity to "prepare an effective response to [the] testimony or to impeach it in any significant way." [49] Here, on the other hand, there was much that could have been utilized in Byers' behalf.[50]

In sum, the absence of obvious error in the trial proceedings, the seriously deficient record, and the unfair and prejudicial effect on the Government of any decision adverse to it convinces me that this case does not threaten the "miscarriage of jus-

**41.** In an attempt to mitigate the danger of unfair prejudice to the Government, Byers' counsel at oral argument appeared to represent that, should Byers win, he would not object generally to testimony by Dr. Kunev at a new trial. He would, however, insist upon exclusion of testimony that Byers had in effect admitted the invalidity of his insanity plea. See text *supra* at notes 5–8. This offer, I submit, is insufficient to discount the danger of prejudice to the Government. If Byers were to prevail, any and all testimony by Dr. Kunev would be the product of a constitutionally-tainted examination and, hence, outlawed. It would be highly injudicious in these circumstances to permit Byers to allay this concern by waiving his objection to the least potent testimony available to the Government, all the while secure in the knowledge that the evidence most beneficial to the Government's cause would be excluded. The Government has no real opportunity to oppose an insanity plea when the accused himself controls the evidence it can offer.

**42.** See cases cited *supra* note 31.

**43.** 602 F.2d at 694, 708 n. 19 (5th Cir.1979), aff'd, 451 U.S. 454, 468 n. 12, 101 S.Ct. 1866, 1876 n. 12, 68 L.Ed.2d 359, 372 n. 12 (1981).

**44.** Majority Opinion (Maj. Op.) at 1106 n. 3.

**45.** *Smith v. Estelle, supra* note 43, 602 F.2d at 699.

**46.** *Id.* at 701; see *Gardner v. Florida,* 430 U.S. 349, 360, 97 S.Ct. 1197, 1205–1206, 51 L.Ed.2d 393, 403 (1977).

**47.** *Smith v. Estelle, supra* note 43, 602 F.2d at 708 n. 19.

**48.** See text *supra* at notes 4–10.

**49.** *Smith v. Estelle, supra* note 43, 602 F.2d at 701.

**50.** See note 51 *infra.*

tice"[51] necessary to support a determination of plain error under Rule 52(b).

## III. THE SUPERVENING-DECISION DOCTRINE AND ESTELLE V. SMITH

Federal appellate courts often forgive a litigant's failure to raise an issue seasonably when at that time it would have been futile to do so, but a substantial change in or clarification of the law occurs in the litigant's favor after final judgment in the trial court.[52] This dispensation has sometimes been justified by reference to the court's statutory authority to effect such disposition "as may be just under the circumstances."[53] On this basis, the court holds that the Supreme Court's decision in *Estelle v. Smith*[54] provided such an elucidation of Sixth Amendment principles as to excuse Byers' procedural default respecting the right-to-counsel claim.[55] That *Estelle* refined some facets of Sixth Amendment doctrine cannot be doubted; there the Supreme Court, for the first time, held a psychiatric examination to be a "critical stage" for Sixth Amendment purposes,[56] and indicated that the Sixth Amendment does not inexorably require the presence of

**51.** See *United States v. Frady, supra* note 22, 456 U.S. at 163 & n. 14, 102 S.Ct. at 1592 & n. 14, 71 L.Ed.2d at 827 & n. 14; *United States v. Grasso,* 437 F.2d 317, 319 (3d Cir.1970), *cert. denied,* 403 U.S. 920, 91 S.Ct. 2236, 29 L.Ed.2d 698 (1971); *United States v. Chaney, supra* note 23, 662 F.2d at 1152; *United States v. Rudinsky, supra* note 23, 439 F.2d at 1076; *United States v. Millpax, Inc.,* 313 F.2d 152, 156 (7th Cir.), *cert. denied,* 373 U.S. 903, 83 S.Ct. 1291, 10 L.Ed.2d 198 (1963); *United States v. Van Horn, supra* note 22, 553 F.2d at 1094; *United States v. Sims, supra* note 23, 617 F.2d at 1377. My conclusion that this case does not present a clear "miscarriage of justice" is fortified by the fact that Byers was not entirely bereft of means by which to discredit Dr. Kunev's damaging testimony relating an oral statement, allegedly made by Byers, suggesting that his insanity defense had been concocted. See text *supra* at notes 5–8. Although Byers asserts that his cross-examination was hindered because he had neither counsel at nor transcripts of the interviews in question, the very factors Byers advances to demonstrate the unreliability of this testimony—that Dr. Kunev's interview notes had been destroyed; that the official reports were silent on this topic; that Dr. Kunev recounted the oral statement, originally believed to be of no significance, from memory after lapse of a year; that the environment in which Byers allegedly made the statement was inherently coercive; that Dr. Kunev was employed by the Government; that Dr. Kunev had given varying versions of the statement to different persons; that no third party attended the interview; and that the statement as related by Dr. Kunev was in some respects ambiguous—all were available at trial to impeach the challenged testimony or the conclusions sought to be drawn therefrom.

**52.** See *Singleton v. Wulff,* 428 U.S. 106, 121, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826, 837 (1976); *Standard Indus., Inc. v. Tigrett Indus.,* 397 U.S. 586, 587–588, 90 S.Ct. 1310, 1311, 25 L.Ed.2d 590, 591 (1970) (dissenting opinion); *Leary v. United States,* 395 U.S. 6, 27–28, 89 S.Ct. 1532,

1543, 23 L.Ed.2d 57, 76–77 (1969); *Grosso v. United States,* 390 U.S. 62, 70–71, 88 S.Ct. 709, 715, 19 L.Ed.2d 906, 913–914 (1968); *Hormel v. Helvering,* 312 U.S. 552, 557–559, 61 S.Ct. 719, 721–723, 85 L.Ed. 1037, 1041–1042 (1941); *Patterson v. Alabama,* 294 U.S. 600, 607, 55 S.Ct. 575, 578, 79 L.Ed. 1082, 1085–1086 (1935); *Alexander v. United States,* 135 U.S.App.D.C. 367, 370, 418 F.2d 1203, 1206 (1969); *Pendergrast v. United States,* 135 U.S.App.D.C. 20, 24–25, 416 F.2d 776, 780–781, *cert. denied,* 395 U.S. 926, 89 S.Ct. 1782, 23 L.Ed.2d 243 (1969); *Wright v. United States,* 131 U.S.App.D.C. 279, 283 & n. 22, 404 F.2d 1256, 1260 & n. 22 (1968); *In re Elmore,* 127 U.S.App.D.C. 176, 178, 382 F.2d 125, 127 (1967); *Schaff v. R.W. Claxton, Inc.,* 79 U.S.App.D.C. 207, 208, 144 F.2d 532, 533 (1944); *United States v. Indiviglio, supra* note 16, 352 F.2d at 280 n. 7; *Harris v. United States,* 390 F.2d 616, 616–617 (8th Cir.1968); *United States v. Patrin,* 575 F.2d 708, 712 (9th Cir.1978); *Kohatsu v. United States,* 351 F.2d 898, 901 n. 4 (9th Cir.1965), *cert. denied,* 384 U.S. 1011, 86 S.Ct. 1915, 16 L.Ed.2d 1017 (1966).

**53.** 28 U.S.C. § 2106 (1982). For cases justifying the supervening-decision doctrine on the basis of this section, see, *e.g., Grosso v. United States, supra* note 52, 390 U.S. at 71, 88 S.Ct. at 715, 19 L.Ed.2d at 914; *Pendergrast v. United States, supra* note 43, 135 U.S.App.D.C. at 24–25 & n. 19, 416 F.2d at 780–781 & n. 19; *In re Elmore, supra* note 52, 127 U.S.App.D.C. at 178 & n. 12, 386 F.2d at 127 & n. 12. Some courts have treated supervention of a decision simply as a factor entering into the plain error determination under Fed.R.Crim.P. 52(b). See, *e.g., Kohatsu v. United States, supra,* note 52, 351 F.2d at 901 n. 4.

**54.** *Supra* note 43.

**55.** See Maj. Op. at 1110 n. 7.

**56.** *Estelle v. Smith, supra* note 43, 451 U.S. at 470, 101 S.Ct. at 1877, 68 L.Ed.2d at 374.

counsel at "critical stages." [57] The importance of this clarification, it might be argued, is underscored by the fact that federal courts theretofore held uniformly that Byers' Sixth Amendment contention lacked merit, and this, as a strong indication of likely futility of an objection,[58] might have been at least partly responsible for Byers' procedural default. Despite these considerations, however, I am not persuaded that we could soundly resolve that contention on this appeal.

Like the inquiry as to whether the trial proceedings disclose "plain error," the ruling on whether to excuse a procedural lapse because of a supervening decision is entrusted largely to sound judicial discretion.[59] The similarities between these two determinations do not end here, for in each the objective guiding the exercise of discretion is achievement of a just disposition of the case.[60] It stands to reason, then, that the factors central to plain-error deliberations should also figure prominently in the decision on whether to regard *Estelle* as sufficient reason to overlook Byers' procedural neglect. Here, as already observed, the absence of obvious error, the defective record and the danger of prejudice to the Government militate strongly against con-

sideration of the merits on any notion of plain error.[61] Moreover, I am not persuaded that *Estelle* engendered a significant clarification of Sixth Amendment doctrine favorable to Byers, or that there was sufficient reason to believe an objection at trial would be futile. I cannot see that these factors are any the less dispositive with respect to the determination on whether, under the supervening-decision doctrine, an examination of the merits of Byers' claim is essential to a just determination.

*Estelle v. Smith* involved a defendant in a state capital prosecution who underwent a court-ordered psychiatric examination to determine whether he was competent to stand trial. A dispute arose at the penalty phase of the bifurcated proceeding when the examining psychiatrist, on the basis of the examination, gave testimony indicating that the defendant had a violent nature and posed a continuing threat to society. The Supreme Court held that admission of this testimony violated the defendant's Fifth Amendment privilege against self-incrimination because the state had not informed him that he had the right to remain silent during the examination and that any statement might be used against him at a sen-

**57.** *Id.* at 471, 101 S.Ct. at 1877, 68 L.Ed.2d at 374.

**58.** For cases stating that futility of an objection might itself constitute ground for excusal of a failure to make it, see, *e.g., Smith v. Estelle, supra* note 43, 602 F.2d at 708 & n. 19; *United States v. Scott,* 425 F.2d 55, 57–58 (9th Cir. *en banc* 1970); *Meadows v. United States, supra* note 30, 420 F.2d at 797. This rationale may have been a primary animus behind adoption of the supervening-decision doctrine. See, *e.g., Standard Indus. v. Tigrett Indus., supra* note 52, 397 U.S. at 588, 90 S.Ct. at 1311, 25 L.Ed.2d at 591 (dissenting opinion); *United States v. Indiviglio, supra* note 16, 352 F.2d at 280 n. 7. That consideration of Byers' Sixth Amendment claim cannot be supported on the theory of futility of objection is discussed in text *infra* at notes 72–81.

**59.** See, *e.g., Singleton v. Wulff, supra* note 52, 428 U.S. at 121, 96 S.Ct. at 2877, 49 L.Ed.2d at 837; *United States v. Patrin, supra* note 52, 575 F.2d at 712. For cases relegating the plain-error determination to judicial discretion, see *Washington v. United States, supra* note 30, 134 U.S.

App.D.C. at 225, 414 F.2d at 1121; *United States v. Indiviglio,* supra note 16, 352 F.2d at 280; *United States v. Grasso, supra* note 51, 437 F.2d at 319; *Gendron v. United States,* 295 F.2d 897, 902 (8th Cir.1961); *United States v. Bacall,* 443 F.2d 1050, 1063 (9th Cir.), *cert. denied,* 404 U.S. 1004, 92 S.Ct. 565, 30 L.Ed.2d 557 (1971); *Gilbert v. United States,* 307 F.2d 322, 325 (9th Cir.1962), *cert. denied,* 372 U.S. 969, 83 S.Ct. 1095, 10 L.Ed.2d 132 (1963).

**60.** Just as courts will utilize plain error only to prevent a "miscarriage of justice," see text *supra* at note 51, so will they excuse procedural lapses under the supervening-decision doctrine only as required by the interests of justice. See cases cited *supra* note 53; see also *Singleton v. Wulff, supra* note 52, 428 U.S. at 121, 96 S.Ct. at 2877, 49 L.Ed.2d at 837; *Hormel v. Helvering, supra* note 52, 312 U.S. at 557–558, 61 S.Ct. at 721–722, 85 L.Ed. at 1041–1042; *Patterson v. Alabama, supra* note 52, 294 U.S. at 607, 55 S.Ct. at 578, 79 L.Ed. at 1085–1086; *Schaff v. R.W. Claxton, Inc., supra* note 52, 79 U.S.App.D.C. at 208, 144 F.2d at 533.

**61.** See text *supra* at notes 22–51.

tencing proceeding.[62] The Court further held that the state had also infringed the defendant's Sixth Amendment right to assistance of counsel when, by failing to tell him that the psychiatrist might testify at the sentencing phase, it deprived him of any meaningful opportunity to consult with his attorney before deciding whether to submit to the examination.[63]

In its opinion, the Court made clear that a psychiatric examination is a "critical stage" in a criminal proceeding,[64] and that as such it might warrant Sixth Amendment protections, albeit other than presence of counsel.[65] Despite this subsidiary pronouncement, however, I regard *Estelle*, viewed in light of its primary holdings, as not a significant doctrinal clarification helpful to the position Byers espouses. In the first place, the Court expressly limited its decision to criminal cases in which the defendant, unlike Byers, does not offer psychiatric evidence in his own behalf.[66] The Court suggested that a defendant who interposes an insanity defense has no right to remain silent during a psychiatric examination ordered to afford the Government a fair chance to oppose the defense.[67] I think this rationale seriously undermines Byers' Sixth Amendment claim.

Second, the *Estelle* Court extended Sixth Amendment protections only to the degree necessary to ensure intelligent exercise of the defendant's right to remain silent during the examination.[68] Since the Court indicated that defendants, such as Byers, forfeit the privilege of silence by entering an insanity plea,[69] the existence of concomitant Sixth Amendment protections would appear to be problematic. The only theory upon which Byers' Sixth Amendment claim might become acceptable—that an observer at or a transcript of the psychiatric interviews is vital to effective cross-examination—was available to the Court in *Estelle*. That it did not invoke or even refer to this rationale might well portend a Sixth Amendment construction too narrow to benefit Byers.

Noteworthy, too, as Byers acknowledges, the *Estelle* Court, far from breaking new constitutional ground or enunciating new Sixth Amendment principles, did no more than decide the case before it by logically [70] applying "well-established doctrines concerning the right to counsel." [71] It is, then, more than a trifle inconsistent to maintain that *Estelle* achieved such a substantial clarification of extant law to warrant forgiveness of Byers' procedural irregularities. Taken as a whole, *Estelle* seems neither to have developed Sixth Amendment principles significantly nor to have increased measurably, if at all, the likelihood that Byers' Sixth Amendment argument has merit.

I shy away from the intervening-decision doctrine also because I am not convinced that Byers reasonably could have assumed that an objection would have been futile

---

**62.** *Estelle v. Smith, supra* note 43, 451 U.S. at 466–469, 101 S.Ct. at 1875–1876, 68 L.Ed.2d at 371–373.

**63.** *Id.* at 469–471, 101 S.Ct. at 1876–1877, 68 L.Ed.2d at 373–374.

**64.** See text *supra* at notes 54–57.

**65.** *Estelle v. Smith, supra* note 43, 451 U.S. at 470 n. 14, 101 S.Ct. at 1877 n. 14, 68 L.Ed.2d at 374 n. 14.

**66.** *Id.* at 465–466, 468, 472, 101 S.Ct. at 1874, 1876, 1877–1878, 68 L.Ed.2d at 370–371, 372, 375.

**67.** *Id.* at 465–466 & n. 10, 101 S.Ct. at 1874 & n. 10, 68 L.Ed.2d at 370–371 & n. 10.

**68.** *Id.* at 470–471, 101 S.Ct. at 1877, 68 L.Ed.2d at 374.

**69.** *Id.* at 465–466 & n. 10, 101 S.Ct. at 1874 & n. 10, 68 L.Ed.2d at 370–371 & n. 10. Equally significantly, the Court indicated that a defendant has no constitutional right to have his lawyer present during a compulsory psychiatric examination. *Id.* at 470 n. 14, 101 S.Ct. at 1877 n. 14, 68 L.Ed.2d at 374 n. 14.

**70.** *Id.* at 471, 101 S.Ct. at 1877, 68 L.Ed.2d at 374. This point is underscored by the Court's extensive reliance upon prior caselaw to justify its Sixth Amendment holding. *Id.* at 469–471, 101 S.Ct. at 1876–1877, 68 L.Ed.2d at 373–374.

**71.** Memorandum in Support of Petition for Rehearing (filed July 28, 1981) at 2.

prior to *Estelle*. To be sure, the Sixth Amendment claim he now asserts had been rejected by a number of federal courts,[72] but it or similar claims had been accepted by several state courts,[73] and neither the Supreme Court nor this circuit had ruled definitively on the issue. Quite significantly, in *Thornton v. Corcoran*,[74] a Sixth Amendment contention closely similar to Byers' had experienced a friendly reception by this court. There we analyzed the complexities of the claim in light of relevant caselaw,[75] expressed reservation concerning the validity of the reasoning by which other courts had denied similar claims,[76] and acknowledged that the issue was "anything but frivolous." [77] Although in *Thornton* we ultimately declined to consider the merits,[78] our opinion virtually invited other defendants to raise the question in future cases fortified by more informative records.[79] I thus am unable to say that prior to *Estelle* there was plausible ground for a belief that an objection would be futile.[80] Indeed, Byers advanced his Sixth Amendment argument early on the appeal and proffered *Thornton* in support, long before the decision in *Estelle* was announced.[81] That suggests to me that *Estelle*, instead of breathing life into a moribund issue, represented but an application of well-settled doctrine to the set of facts before the Court.

For these reasons, I would not entertain Byers' Sixth Amendment protest. I cannot ignore the important factors inveighing against resolution of this tardy contention by resort to the superficially appealing but ultimately inapplicable doctrine by which courts on occasion have excused procedural negligence in the face of a defendant-favoring supervening decision that materially and substantially alters or clarifies the relevant legal landscape.

## V. Conclusion

That a party must register a reasonably specific objection in the trial court to preserve a claim on appeal is a time-honored principle of federal jurisprudence. Its purpose, among others, is to promote the orderly administration of justice by ensuring that claims are presented in the first instance at the trial level. The wisdom of this rule, I submit, has been revalidated today. The court's disposition of this case has been achieved only by debate, on a materially deficient record, of issues never placed before the District Court. From the beginning I believed, and I still believe, this case presents us with the best of reasons

---

**72.** See cases cited *supra* note 26.

**73.** See *In re Spencer*, 63 Cal.2d 400, 46 Cal.Rptr. 753, 406 P.2d 33, 41–42 (1965); *People v. Ranes*, 385 Mich. 234, 188 N.W.2d 568, 571–572 (Mich. Ct.App.1971), *cert. denied*, 405 U.S. 917, 92 S.Ct. 942, 30 L.Ed.2d 787 (1972); *State v. Whitlow*, 45 N.J. 3, 210 A.2d 763, 776 (1965); *Lee v. County Court*, 37 N.Y.2d 432, 318 N.Y.S.2d 705, 267 N.E.2d 452, 459 (1971), *cert. denied*, 404 U.S. 823, 92 S.Ct. 46, 30 L.Ed.2d 50 (1971).

**74.** *Supra* note 33.

**75.** *Thornton v. Cocoran, supra* note 33, 132 U.S. App.D.C. at 235–240, 407 F.2d at 698–703.

**76.** *Id.* at 237, 407 F.2d at 700.

**77.** *Id.* at 239, 407 F.2d at 702.

**78.** See text *supra* at note 36.

**79.** *Thornton v. Corcoran, supra* note 33, 132 U.S.App.D.C. at 239, 407 F.2d at 702.

**80.** As Byers apparently acknowledges, see Memorandum in Support of Petition for Rehearing (filed July 28, 1981) at 8 n. 5, this court subsequently has confirmed, on more than one occasion, that the Sixth Amendment matter discussed in *Thornton* remains an open question of some difficulty. *United States v. Morgan*, 157 U.S.App.D.C. 197, 204 n. 27, 482 F.2d 786, 793 n. 27 (1973); *United States v. Canty, supra* note 37, 152 U.S.App.D.C. at 109 & n. 5, 469 F.2d at 120 & n. 5; *United States v. Marcey*, 142 U.S.App. D.C. 253, 256–257, 440 F.2d 281, 284–285 (1971); *United States v. Eichberg*, 142 U.S.App.D.C. 110, 111 n. 1, 439 F.2d 620, 621 n. 1 (1971). But see *United States v. Fletcher*, 329 F.Supp. 160, 160–162 (D.D.C.1971).

**81.** Byers initially advanced his Sixth Amendment claim on March 10, 1981. See Petition for Rehearing and Suggestion for Rehearing *En Banc* (filed March 10, 1981) at 11–14. The Supreme Court announced its decision in *Estelle* on May 18, 1981.

to follow, not disregard, this fundamental rule of procedure.[82] Accordingly, I would affirm Byers' conviction without reaching the merits of his constitutional claims.

In so concluding, I do not suggest that Byers necessarily is barred from litigating the constitutionality of his conviction in another manner. The familiar Section 2255 motion [83] provides a means of collateral attack on federal convictions: "a prisoner in custody under sentence of a [federal] court ... claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States ... may move the court which imposed the sentence to vacate, set aside or correct the sentence." [84]

Although the statute refers expressly to challenges to "the sentence," the courts have interpreted it broadly to permit challenges to all proceedings leading up to a conviction and sentence.[85] A Section 2255 motion must be resorted to before an application for habeas corpus may be made,[86] and relief under the statute is available upon grounds that would warrant the grant of the writ.[87] Section 2255 specifies that "[a] motion for relief may be made at any time," [88] and authorizes an appeal from any order entered on the motion.[89]

Admittedly, Byers might face two hurdles in presenting his constitutional contentions under Section 2255. Not every constitutional claim is sufficient ground for

**82.** [The] belated perception of an issue not theretofore regarded by either trial or appellate counsel as of significance raises the problems inevitably inhering in this disorderly manner of proceeding, such as the compilation of an evidentiary record in the trial court without reference to the legal issue in question, and even more importantly in this instance, the failure to focus the trial court's attention upon it in ruling on the motion.
*United States v. Johnson,* 182 U.S.App.D.C. 383, 391, 561 F.2d 832, 840 (*en banc*), *cert. denied,* 432 U.S. 907, 97 S.Ct. 2953, 53 L.Ed.2d 1080 (1977). Accord, *Miller v. Avirom, supra* note 14, 127 U.S.App.D.C. at 370 & n. 11, 384 F.2d at 322 & n. 11 (justifying requirement of reasonably specific objection as necessary to promote finality of litigation and to prevent "'enormous confusion and interminable delay,'" quoting *Johnston v. Reily, supra* note 14, 82 U.S.App.D.C. at 7, 160 F.2d at 250).

**83.** See 28 U.S.C. § 2255 (1982).

**84.** *Id.* Once, however, issues have been decided adversely to the defendant on direct appeal, the court need not relitigate them on a § 2255 motion. *United States v. Orejuela,* 639 F.2d 1055, 1057 (3d Cir.1981) (district court's decision not to relitigate issues already considered on direct appeal reviewable under abuse of discretion standard); *Buckelew v. United States,* 575 F.2d 515, 517–518 (5th Cir.1978); *Vernell v. United States,* 559 F.2d 963, 964 (5th Cir.1977), *cert. denied,* 435 U.S. 1007, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978). Some courts have held that such matters are completely unavailable for relitigation in a § 2255 proceeding. See *Chin v. United States,* 622 F.2d 1090, 1092 (2d Cir.1980), *cert. denied,* 450 U.S. 923, 101 S.Ct. 1375, 67 L.Ed.2d 353 (1981); *United States v. Natelli,* 553 F.2d 5, 7 (2d Cir.), *cert. denied,* 434 U.S. 819, 98 S.Ct. 59, 54 L.Ed.2d 75 (1977).

**85.** *E.g., Kyle v. United States,* 297 F.2d 507, 511 n. 1 (2d Cir.1961), *cert. denied,* 377 U.S. 909, 84 S.Ct. 1170, 12 L.Ed.2d 179 (1964) (noting that § 2255 is not limited to cases in which the sentence was imposed "in violation of the Constitution" but includes the more general phrase "or is otherwise subject to collateral attack"); *Thomas v. United States,* 368 F.2d 941, 945–946 (5th Cir.1966).

**86.** 28 U.S.C. § 2255 (1982). See *United States v. Hayman,* 342 U.S. 205, 223 n. 40, 72 S.Ct. 263, 274 n. 40, 96 L.Ed. 232, 244 n. 40 (1952); *Thornton v. United States,* 15 U.S.App.D.C. 114, 117 n. 5, 368 F.2d 822, 825 n. 5 (1966); *Hunt v. United States,* 301 F.2d 663, 664 (4th Cir.1962); *Owensby v. Clark,* 451 F.2d 206, 208 (5th Cir.1971).

**87.** *Houser v. United States,* 508 F.2d 509, 511–512 (8th Cir.1974). For a comprehensive discussion of the relationship of § 2255 to the writ of habeas corpus, see 3 C. Wright, *Federal Practice* § 591 (2d ed. 1982).

**88.** 28 U.S.C. § 2255 (1982). See *McKinney v. United States,* 93 U.S.App.D.C. 222, 225, 208 F.2d 844, 847 (1953); *Juelich v. United States,* 300 F.2d 381, 383 (5th Cir.1962).

**89.** "An appeal may be taken to the court of appeals from the order entered on the motion as from a final judgment on application for a writ of habeas corpus." 28 U.S.C. § 2255 (1982). Federal courts of appeal have no power to consider an original motion to set aside a sentence. See *United States v. James,* 446 F.2d 59, 60 (6th Cir.1971); *Flynn v. United States,* 222 F.2d 541 (9th Cir.1955); *Davis v. United States,* 175 F.2d 19–20 (9th Cir.1949). See also 3 C. Wright, *supra* note 87, § 601.

relief.[90] Moreover, a defendant's failure to raise issues, otherwise cognizable under the statute, at trial or on direct appeal may serve to bar consideration of those issues in a subsequent Section 2255 proceeding unless he can show cause for the omission and demonstrate actual prejudice from the alleged violation.[91]

I do not pause to assess the import of these concerns in this case. I do suggest that these obstacles do not appear insurmountable in Byers' instance. Several courts have indicated that claims of Fifth [92] and Sixth Amendment [93] transgressions, similar to those pressed by Byers, may afford a basis for Section 2255 relief. While the failure to urge a nonconstitutional claim on appeal clearly precludes its examination under Section 2255,[94] collateral attack may be available, despite such a failure, for constitutional claims.[95] Furthermore, several courts have declined to adopt the cause-and-prejudice standard in such circumstances,[96] and have required

**90.** The Supreme Court has held that a state prisoner may not seek habeas corpus relief on the ground that unconstitutionally obtained evidence was introduced at his trial if the state has provided an opportunity for full and fair litigation of a Fourth Amendment claim. *Stone v. Powell,* 428 U.S. 465, 481–482, 96 S.Ct. 3037, 3046, 49 L.Ed.2d 1067, 1080 (1976). Because § 2255 relief is available only on grounds that would support an application for a writ of habeas corpus, see text *supra* at note 87, the *Stone* rule seems clearly applicable to a federal prisoner seeking relief under § 2255. See 3 C. Wright, *supra* note 87, at § 594 p. 453 & n. 35.

**91.** See *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), where a prisoner sought habeas corpus relief on the ground that he had not understood the *Miranda* warnings given to him. The Court held that his failure to comply with a state rule requiring a contemporaneous objection to the admission of his statements barred him from habeas relief unless he could show "cause" for failing to object at the time and actual "prejudice." *Id.* at 87, 97 S.Ct. at 2506–2507, 53 L.Ed.2d at 608. See also *Francis v. Henderson,* 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976); *Davis v. United States,* 411 U.S. 233, 93 S.Ct. 1577, 36 L.Ed.2d 216 (1973). The Court "[left] open for resolution in future decisions the precise definition of the 'cause'—and—'prejudice' standard." *Wainwright v. Sykes, supra,* 433 U.S. at 87–88, 97 S.Ct. at 2507, 53 L.Ed.2d at 608. The Court later held that the cause-and-prejudice test also governs a § 2255 attack on a federal conviction based upon alleged errors in the application of District of Columbia criminal law. See *United States v. Frady, supra* note 22, 456 U.S. at 167, 102 S.Ct. at 1594, 71 L.Ed.2d at 830.

**92.** *Tucker v. United States,* 138 U.S.App.D.C. 345, 348–349, 427 F.2d 615, 618–619 (1970) (challenge to admissibility of statements obtained from allegedly involuntary confession); *Proctor v. Anderson,* 124 U.S.App.D.C. 103, 104, 361 F.2d 557, 558 (1966) (same); *Overman v. United States,* 281 F.2d 497, 498 (6th Cir.1960), *cert. denied,* 368 U.S. 993, 82 S.Ct. 612, 71 L.Ed.2d 530 (1962) (same). But see *Williams v. United States,* 197 F.Supp. 198, 199 (D.C.Ore.1961) (improper use of allegedly coerced confession is to be considered on appeal, and cannot be addressed in a § 2255 proceeding).

**93.** *United States v. Tindle,* 173 U.S.App.D.C. 77, 80, 522 F.2d 689, 692 (1975) (claim of ineffective assistance of counsel); *United States v. Williams,* 615 F.2d 585, 593–594 (3d Cir.1980); *Thor v. United States,* 574 F.2d 215, 218 (5th Cir.1978); *Sincox v. United States,* 571 F.2d 876, 879 (5th Cir.1978).

**94.** *Stone v. Powell, supra* note 90, 428 U.S. at 477 n. 10, 96 S.Ct. at 3044 n. 10, 49 L.Ed.2d at 1077 n. 10, quoting *Hill v. United States,* 368 U.S. 424, 428, 82 S.Ct. 468, 471, 7 L.Ed.2d 417, 421 (1962) ("[e]ven those nonconstitutional claims that could not have been asserted on direct appeal can be raised on collateral review only if the alleged error constituted 'a fundamental defect which inherently results in a complete miscarriage of justice' "); *United States v. Capua,* 656 F.2d 1033, 1037–1038 (5th Cir.1981) (alleged defects in jury-selection procedure); *Smith v. United States,* 635 F.2d 693, 695 (8th Cir.1980), *cert. denied,* 450 U.S. 934, 101 S.Ct. 1397, 67 L.Ed.2d 368 (1981) (alleged error concerning presence of witness).

**95.** *Davis v. United States,* 417 U.S. 333, 345 n. 15, 94 S.Ct. 2298, 2305 n. 15, 41 L.Ed.2d 109, 118 n. 15 (1974); *United States v. McCollom,* 664 F.2d 56, 59 (5th Cir.1981), *cert. denied,* 456 U.S. 934, 102 S.Ct. 1989, 72 L.Ed.2d 454 (1982); *United States v. Capua, supra* note 94, 656 F.2d at 1037 (dicta).

**96.** *Grimes v. United States,* 607 F.2d 6, 10–11 (2d Cir.1979); *Pacelli v. United States,* 588 F.2d 360, 362–364 (2d Cir.1978), *cert. denied,* 441 U.S. 908, 99 S.Ct. 2001, 60 L.Ed.2d 378 (1979); *Hunt v. United States,* 456 U.S. 582, 583 (3d Cir.1972); *Randall v. United States,* 454 F.2d 1132, 1133 (5th Cir.1972), *cert. denied,* 409 U.S. 862, 93 S.Ct. 151, 34 L.Ed.2d 109 (1972). But see *Norris v. United States,* 687 F.2d 899, 904 (7th Cir.1982) (even constitutional claims are barred in § 2255 proceeding by failure to appeal unless cause-

only that the Section 2255 movant not have "deliberately bypassed the orderly federal procedures provided at or before trial and by way of appeal." [97] It would seem that under either standard Byers is in position to have his constitutional contentions considered on a Section 2255 motion.[98]

Thus, it appears that a refusal to entertain Byers' constitutional claims on this appeal would nonetheless leave him with an opportunity to submit those claims to the District Court. The court then could squarely address the alleged infirmities in the psychiatric examination, and the record emanating therefrom would enable a sound evaluation of the legal issues at stake and a reasoned judgment upon a full complement of competing evidence and arguments. I would relegate Byers to that route.

## TABLE OF CONTENTS FOR DISSENTING OPINION

| | Page |
|---|---|
| I. BACKGROUND | 1141 |
| II. APPLICATION OF THE FIFTH AMENDMENT TO COURT-ORDERED INSANITY EXAMINATIONS | 1147 |
| A. *Insanity and Incrimination* | 1148 |
| 1. *The Real vs. Testimonial Evidence Distinction* | 1148 |
| 2. *The Factual vs. Legal Guilt Distinction* | 1149 |
| B. *Values Underlying the Privilege* | 1150 |
| 1. *Privacy Rights* | 1151 |
| 2. *Fear of Inhumane Treatment and Abuses* | 1151 |
| 3. *"Cruel Trilemma"* | 1153 |
| 4. *Distrust of Self-Deprecatory Statements* | 1154 |
| 5. *"Fair State-Individual Balance"* | 1154 |
| C. *The Plurality Approach* | 1155 |
| 1. *Alternative Safeguards* | 1155 |
| a. *Recording of all interviews* | 1155 |
| b. *Exclusion of defendant's statements irrelevant to diagnosis* | 1157 |
| c. *Provision of* Miranda-*type warnings* | 1158 |
| 2. *Other Considerations* | 1159 |

and-prejudice test is satisfied); *Ramsey v. United States,* 448 F.Supp. 1264, 1268–1274 (N.D.Ill. 1978) (same).

**97.** *Kaufman v. United States,* 394 U.S. 217, 227 n. 8, 89 S.Ct. 1068, 1075 n. 8, 22 L.Ed.2d 227, 238 n. 8 (1969). See *Chin v. United States, supra* note 84, 62 F.2d at 1093 (defendant deliberately failing to raise point on direct appeal could not urge on it collateral attack); *United States v. Renfrew,* 679 F.2d 730, 731 (8th Cir.1982) (collateral attack barred where defendant dismissed direct appeal on issues); *United States v. Barnes,* 520 F.Supp. 946, 961 (D.D.C.1981). This circuit has left open the question whether the cause-and-prejudice standard of *Wainwright* or the deliberate bypass standard of *Kaufman* governs constitutional claims in failure-to-appeal cases. *United States v. Barnes,* 197 U.S.App.D.C. 369, 373–375, 610 F.2d 888, 892–894 (1979).

**98.** With respect to the *Kaufman* test, there is no indication that Byers made any sort of strategic decision to forego raising his constitutional claims at trial or on appeal. Under *Wainwright,* it seems clear that Byers has adequately demonstrated prejudice resulting from the admission of Dr. Kunev's challenged testimony. Whether Byers could satisfy the "cause" element of this latter standard is less apparent from the record. I note only that my conclusion that Byers' objections on Fifth and Sixth Amendment grounds would not necessarily have been futile if made at trial, see text *supra* at notes 72–81, does not preclude a finding that, under the *Wainwright* test, Byers had cause for not objecting. A real though mistaken belief that an objection would be futile may be a justification amounting to cause for not raising a claim. Other justifications surely exist, and Byers could reasonably be found to have demonstrated one.

III. The Court-Ordered Clinical Interview and the Sixth Amendment ...... 1161

    A. *"Confrontation"* ............................................. 1162

    B. *The Possibility of Prejudice* ..................................... 1165

        1. *The Clinical Interview* ....................................... 1167

        2. *Conclusions* ................................................ 1170

    C. *Safeguarding the Sixth Amendment Right* ....................... 1171

    D. *The Constitutional Safeguard* .................................. 1171

IV. The Supervisory Power and Safeguards to Promote a Reliable Judicial Process ...................................................... 1173

V. Conclusion ...................................................... 1175

BAZELON, Senior Circuit Judge, with whom WALD, MIKVA, and HARRY T. EDWARDS,* Circuit Judges, join, dissenting:

Billy Byers conceded his *actus reus,* and pled not guilty by reason of insanity to a charge of first degree murder.[1] The court ordered a comprehensive psychiatric examination by experts at St. Elizabeths Hospital to determine Byers' competency to stand trial and capacity to form intent. A team of psychiatrists and psychologists concluded that at the time of the commission of the acts charged, Byers "probably lacked substantial capacity to appreciate the wrongfulness of his conduct," and "[lacked] the requisite specific intent."[2] Displeased with the conclusions of the doctors at St. Elizabeths, the government sought, and the court granted over defense objection, a second examination at the Department of Justice Medical Center for Federal Prisoners in Springfield, Missouri.[3]

* With exceptions noted at pp. 1155, 1161, and 1173.

1. Byers was also indicted and pled insanity to two related weapons offenses.

2. Letter from Dr. R. Peele, St. Elizabeths Hospital, to Clerk, United States District Court for the District of Columbia (January 13, 1977) (Peele Letter) (containing psychiatric evaluation by St. Elizabeths staff).

3. The plurality suggests that the government's request for a second examination was motivated not only by its "disappointment at the finding of insanity," but also by three additional considerations: 1) the "extraordinarily tentative terms" in which the conclusion of the St. Elizabeths team was framed; 2) the fact that a psychologist rather than a psychiatrist headed the team; and 3) an implication that "the institution of St. Elizabeths itself" was somehow tainted in a material way because it was "not accredited." Plurality opinion (pl. op.) at 1106 n. 2. Of these three considerations, the latter two were *never* articulated by the government at the hearing at which the Springfield examination was ordered; only the first—what the government termed the "equivocal conclusion" of the St. Elizabeths evaluation—was offered as a justification for the request. Trial Transcript (Tr.) 1/27/77 at 4.

While the determinations made at St. Elizabeths may fairly be characterized as less than "definitive," Peele Letter, *supra* note 2, at 1, it is unfair to call them "tentative" and a distortion to label them "extraordinarily" so. The team at

St. Elizabeths candidly acknowledged that the questions of Byers' capacity and intent were, in certain respects, close ones. Nevertheless, the opinion of the team—two psychiatrists, two psychologists, and a psychiatric social worker—was unanimous on both issues. Tr. 1/25/78 at 123–24. To imply that a judgment, whether in medicine or in law, is somehow invalid because it is difficult, or unreliable because it demands a determination of what is most probable, is to fail utterly to understand the process of judging. To imply that a decisionmaker ought not to acknowledge a degree of uncertainty when and where it exists is to encourage arrogance and deceit at the expense of integrity and honesty. The conclusions of the team at St. Elizabeths were not "extraordinarily tentative" but extraordinarily candid. The language in which they were expressed suggests not suspect equivocation but scrupulous deliberation.

The plurality next attacks the determination made at St. Elizabeths by observing that "[t]he team at St. Elizabeths had been headed by a psychologist rather than a psychiatrist." Pl. op. at 1106 n. 2. The implication, of course, is that the hospital's team was in some way unqualified or impermissibly constituted. Any such suggestion is not only wholly unfounded but, in this circuit, painfully ironic. This court established nearly a quarter of a century ago that psychologists may qualify as mental health experts. *Jenkins v. United States,* 307 F.2d 637 (D.C.Cir. 1962). The critical inquiry, as I wrote for an *en banc* court, is whether "experience or training enables a proffered expert witness to form an

In this custodial environment one thousand miles from home, Billy Byers spent eight weeks under the probing supervision of government psychiatrists. From those eight weeks there emerged one brief, ambiguous statement from one interview which, when presented at trial, proved "devastating" to Byers' defense.[4] One psychiatrist testified that Byers had told him that the crux of his insanity defense was a *post hoc* rationalization invented by Byers' estranged wife and communicated to him after the homicide.

None of the indicia that might support the trustworthiness of such a damaging admission were present in Byers' case. No recording of the interview was made. No third party witnessed the admission. The doctor's notes of the session were destroyed when he dictated his report to the court one week later.[5] This report, which the doctor testified accurately reflected those notes, contains no reference to Byers' alleged admission. Nor was this admission included in the staff evaluation report. Nor did the doctor share his discovery with

any of the other psychiatrists assigned to the evaluation. Rather, for nearly a year, the sole repository of this statement which would, in the words of the trial judge, "torpedo the [defendant] out of the water," was the memory of this one psychiatrist.[6] To this day, we know nothing about Mr. Byers' precise words, the form and content of the psychiatrist's questions, and the context in which the statement was elicited. All that we do know is that this welter of confusion and doubt was sufficient to support Billy Byers' conviction for murder.

This extraordinary background to a murder conviction vividly illustrates the grave potential for abuse that inheres in the court-ordered psychiatric examination. It is the obligation of this court to assure that compelled psychiatric examinations are administered fairly and that the results are reliable and susceptible to scrutiny. In affirming Byers' conviction, the court has failed in its obligation. This case demonstrates the necessity of compiling a full and objective record of every court-ordered in-

opinion which would aid the jury," that is, an opinion "based upon relevant learning and experience." *Id.* at 644. In the instant case, the team of experts at St. Elizabeths was "headed" administratively by Dr. David L. Shapiro, a Harvard and University of Michigan educated clinical psychologist who was responsible for one of the St. Elizabeths pretrial evaluation units. Tr. 1/25/78 at 59–60. The author of several articles of particular relevance to the Byers case, on such subjects as the relationship of crimes of violence to altered states of consciousness and the detection of malingering, Dr. Shapiro was extraordinarily if not uniquely qualified to render an expert opinion in this case. *Id.* at 61. While at St. Elizabeths he had evaluated 800 or 900 patients and had testified in some 200 cases as an expert witness in federal district courts. *Id.* at 61–62. This highly qualified psychologist, moreover, coordinated a team that included, *inter alia*, two psychiatrists who interviewed Byers and who joined in the team's unanimous conclusion. *Id.* at 123–24.

Of what significance, then, is the plurality's observation that the St. Elizabeths team was headed by a psychologist rather than a psychiatrist? None—unless, of course, it is intended ironically to highlight the fact that the prosecution's chief expert witness, Dr. Kunev of the Springfield facility, had twice failed his Board certification examinations and was not a Board-certified psychiatrist. Tr. 2/7/78 at 19–23.

The plurality's final assertion "that the institution of St. Elizabeths itself was not accredited" is yet another irrelevancy. Like the psychologist/psychiatrist distinction, this issue was never alluded to at the hearing on the prosecution's request for a second evaluation, but was raised for the first time at trial during the examination of Dr. Kunev. This court has no way of knowing, on the record before it, whether St. Elizabeths has in fact been criticized or disciplined by any accrediting agencies, or, if it has, whether any problems it has faced are a consequence of the age of its physical plant, its personnel policies, the accessibility of its fire escapes, or any one of dozens of possible considerations. In the absence of any evidence whatever that St. Elizabeths' status as an institution resulted in substandard or incompetent evaluative services or that some deficiency in the hospital should call the unanimous conclusion of qualified experts into question, the plurality's insinuation is misleading and gratuitous.

4. The trial judge so characterized the testimony. Tr. 2/7/78 at 107. The prosecutor hailed this statement as "the critical thing," after which Byers' insanity defense "came tumbling right down to the ground." Tr. 2/10/78 at 236, 131.

5. Tr. 2/7/78 at 200.

6. *Id.* at 82.

sanity examination. In the absence of such a record, Byers' examination at Springfield and, consequently, the admission of the psychiatrist's testimony, were in clear violation of Byers' Fifth Amendment privilege against self-incrimination and his Sixth Amendment right to effective assistance of counsel. In addition, I believe that the testimony should have been excluded in the exercise of our supervisory power over the administration of criminal justice. I therefore dissent.

## I. BACKGROUND

On September 18, 1976, Billy Byers approached Jacqueline Dickens, his former lover, while she was on a neighbor's porch conversing with friends.[7] He asked her in a quiet voice if she would join him for a walk, and she declined.[8] After renewing his request, Byers, without further word, pulled a sawed-off shotgun from beneath his shirt and fired, killing Dickens instantly. Byers turned and walked slowly back down the street to his home, where he telephoned the police.[9] He met the police at the door and told them, "I did the shooting and I shot her." [10] He led police to his kitchen where he retrieved the shotgun for them.[11] He was then placed under arrest.[12]

At Byers' arraignment, the court granted his motion for a comprehensive psychiatric examination pursuant to 24 D.C.Code Ann. § 301(a) (1973).[13] The St. Elizabeths staff found Byers competent to stand trial but concluded that at the time of the offense, Byers suffered from a serious mental disease and lacked the capacity to appreciate the wrongfulness of his conduct.

At a hearing on January 27, 1977, the court, with the agreement of the parties, entered an order finding Byers competent to stand trial.[14] At that time, the government moved for an "independent examination" of Byers at the federal prison medical facility at Springfield, Missouri. The court

---

7. Tr. 1/18/78 at 206, 216–22; Tr. 1/19/78 at 25–26.

8. Tr. 1/18/78 at 208–10; Tr. 1/19/78 at 12.

9. Tr. 1/19/78 at 22, 138.

10. *Id.* at 48.

11. *Id.*

12. *Id.* at 49.

13. Tr. 11/2/76 at 6. Section 24–301 of the D.C.Code provides for court-ordered examinations directed only to the issue of competence to stand trial. In the interests of fairness and complete development of a criminal defendant's psychiatric record, this circuit has exercised its inherent power to require that examinations ordered pursuant to this section also address the issue of sanity as well as competency. *Winn v. United States,* 270 F.2d 326 (D.C.Cir.1959), *cert. denied,* 365 U.S. 848, 81 S.Ct. 810, 5 L.Ed.2d 812 (1961).

*Winn* states that it is the inherent power of the court, not the language of the statute, which authorizes such an examination. As I wrote for the court in *Winn:*

It is true that D.C.Code § 24–301 (Supp. VII, 1959) provides only for an examination limited to trial competency. But nothing in that statute nor anywhere else in the law prevents the court, in a case where it is obvious that the trial will revolve about the issue of the accused's mental state at the time of the crime, from ordering such examinations.

270 F.2d at 328. In a recent application of *Winn* involving a § 24–301 commitment order, this court noted that "federal courts have inherent power—indeed a solemn obligation—to call for a psychiatric examination of criminal responsibility...." *United States v. Whitlock,* 663 F.2d 1094, 1106 & n. 104 (D.C.Cir.1980).

An analogous provision, 18 U.S.C. § 4244 (1976), provides for competency examinations in the other federal circuits. These circuits have also made common the practice of ordering dual purpose examinations. Other circuit courts have similarly held that the basis for the insanity portion of the examination is not § 4244, but rather the inherent power of the federal courts. *See, e.g., United States v. Alvarez,* 519 F.2d 1036, 1041–44 (3d Cir.1975); *United States v. Driscoll,* 399 F.2d 135, 139 (2d Cir. 1968); *United States v. Albright,* 388 F.2d 719, 732 (4th Cir.1968); *Alexander v. United States,* 380 F.2d 33, 39 (8th Cir.1967).

Some commentators have suggested that dual purpose examinations now serve the interests not of defendants but of prosecutors, who view the examinations as useful discovery devices. *See* Pizzi, *Competency to Stand Trial,* 45 U.CHI.L. REV. 21, 51 (1977); Krash. *The Durham Rule and Judicial Administration of the Insanity Defense In the District of Columbia,* 70 YALE L.J. 905, 911 (1961).

14. Tr. 1/27/77 at 2–3.

overruled an objection by Byers' counsel [15] and ordered a second dual purpose examination.[16]

Byers arrived at Springfield on February 25, 1977 and was placed in the forensic unit under the supervision of Dr. Nicola Kunev. Three days after his arrival, Mr. Byers had his only interview with Dr. Kunev. Byers was also interviewed by other members of the Springfield staff, who concluded in their report to the court that Byers was competent and sane. The report made no charge of malingering and made no reference to any purported admission by the defendant.[17] Dr. Kunev was not present at the staff conference at which the official hospital diagnosis was made.[18]

At trial, the defense offered the testimony of the psychiatrists from St. Elizabeths,[19] and the government responded

---

15. Counsel did not make clear his grounds for objection. After objecting generally to the second examination, counsel also objected to Byers' "being taken all the way down to ... Missouri and taken out of the community once again for a very long period of time." Tr. 1/27/77 at 6–7. In moving for a new trial after the guilty verdict, counsel characterized this earlier objection as challenging "the right [of the government] to send Mr. Byers to the Springfield facility on the issue of insanity to begin with." Tr. 3/23/78 at 7.

16. Having already declared Byers competent to stand trial on the basis of the St. Elizabeths' examination, the court could not properly authorize another "dual purpose" examination. This second examination could only have been for the purpose of determining sanity, a purpose which finds no statutory authorization. Accordingly, the entire Springfield examination could only have been ordered pursuant to the inherent power of the federal courts. *See United States v. Whitlock*, 663 F.2d 1094, 1106 (D.C.Cir.1980); *Winn v. United States*, 270 F.2d 326 (D.C.Cir. 1959), *cert. denied*, 365 U.S. 848, 81 S.Ct. 810, 5 L.Ed.2d 812 (1961).

The plurality asserts that the district court explicitly contemplated a second dual purpose order and had reconsidered its prior order finding the defendant competent. I note first that a sanity examination, whether ordered as part of a "dual purpose" examination or by itself, is always authorized pursuant to our inherent powers. *See supra* note 13. Hence, the issue of whether a second competency examination was ordered does not affect our power over the second sanity examination. It is clear as well, however, that the court had not withdrawn its order finding the defendant competent. As the record illustrates, the prosecution asked for a second examination just seconds after agreeing that the defendant was competent.

THE COURT: So far, then, as his competency is concerned, the Court will enter an order holding him competent. That is agreeable with you?
MR. MURPHY [Defense Counsel]: That is agreeable to the defense.
THE COURT: Mr. Adelman, are you agreed to that?
MR. ADELMAN [Prosecutor]: Yes.

THE COURT: What is this Mr. Murphy is telling me you are going to tell me?
MR. ADELMAN: I think I can do that better. Your Honor, the court has received the letter dated January 15th [*sic*] regarding the defendant's mental condition in connection with this case. We would propose to have him examined by an independent psychiatrist or, actually, a team of psychiatrists.
Tr. 1/27/77 at 2–3. The foregoing clearly suggests that the court was mechanically invoking a routine § 24–301 order without considering its prior actions or the distinctions between competency and sanity examinations.

17. *See* Letter from Dr. J. Bradley, Medical Center for Federal Prisoners, Springfield, Missouri, to Honorable William B. Jones, United States District Court (April 8, 1977) (containing psychiatric evaluations by Springfield staff).

18. Tr. 2/8/78 at 64.

19. Byers also called lay witnesses who testified to his symptoms of mental illness. Vaughn Byers, Byers' estranged wife, testified that Byers told her that he could not end his affair with the decedent because she had cast a spell over him. Tr. 1/24/76 at 116–19. She testified that she found a vial in the appellant's belongings marked "spell remover," *id.* at 118–19, and that the appellant seemed detached and incoherent when he spoke of the decedent. *Id.* at 130.

Other witnesses further described Byers' relationship with the decedent. The most extensive testimony came from a neighbor, Reverend Frederick Grant. Grant testified that the deterioration of the appellant's relationship with the decedent was accompanied by aberrant behavior:

Well, he seemed like a man—about six months prior, he started to deteriorate is the best I know how to explain. He wasn't friendly, like he was under a lot of stress, a lot of strain. A lot of times I would be talking to him, we were working on a car out front, and we would talk, and while talking I would observe he might be you know, way off. I ask him sometimes two or three times like something. We would be talking ... and he was in a daze, beginning about six months prior to the incident.

with the expert testimony of doctors who had examined the defendant at Springfield. The dispute turned on whether Byers' symptoms of mental disease were feigned and on the proper diagnostic category to assign to those symptoms if genuine.

The St. Elizabeths psychiatrists concluded that Byers was suffering from paranoid

> ....
> Not the week of the incident, but three weeks before ... I would meet Billy and he looked so nervous and he looked so funny—his eyes and things didn't look quite right, so I was kind of fearful on several occasions, not really fearful for myself, but I thought he had some real mental problems.

Tr. 1/23/78 at 121–24. Shortly before the incident,

> [w]hen I looked at him then, he was different than I had ever seen him before. His eyes looked awful and I looked at him, and it appeared, standing close to him ... it's difficult to explain how his eyes looked, as if he was in a siege or something.... [H]e looked like a madman.

*Id.* at 132.

20. Dr. Shapiro, a St. Elizabeths psychologist, stated that he subjected the appellant to a thorough psychiatric examination which included various objective tests. Tr. 1/25/78 at 76–78. He found that the appellant suffered from "a rather serious mental disorder ... called paranoid schizophrenia," *id.* at 79, and was haunted by a paranoid delusion that the decedent persecuted him. According to Dr. Shapiro, Byers was unable to cope with the awesome powers which he attributed to Ms. Dickens. *Id.* at 93–94. Byers was convinced that the decedent had lesbian lovers, and was undermining his heterosexuality. Dr. Shapiro found that the paranoid delusion was fueled by the appellant's concerns about his masculinity. The delusion represented

> a certain fixed irrational belief which is characterized by a sense of being controlled by, being persecuted by some other individual, some other force. The person feels unable to cope with it.... And in Mr. Byers case it was the persecutory form. He felt controlled by and unable to break out of the power that he attributed to this woman.

*Id.*

At St. Elizabeths, Byers was given the Rorschach test, the Bender Visual Motor Gestalt test, the Minnesota Multiphasic Personality Inventory ("MMPI"), and the Draw-A-Person Test. Tr. 1/25/78 at 77–88. The psychiatrists at Springfield also employed objective tests, although it appears that they chose not to repeat many of the tests given at St. Elizabeths. *See* Tr. 2/1/78 at 94–98 (Shipley IQ Examination; Memory for Design Test; Gorham Proverbs; Reitan-Halstead Neuro-psychological Battery; and the MMPI). This decision may well reflect

delusions at the time of the incident [20] and that these symptoms were so severe that he lacked the capacity to conform his conduct to the requirements of the law.[21] These doctors found the question of Byers' sanity "not a clear-cut case." [22] They did conclude, however, that Byers' mental dis-

the Springfield psychiatrists' view that the tests given at St. Elizabeths were unreliable. But it left the jury with the task not only of evaluating the reasoning of the contending experts but also of judging their methodologies.

21. Dr. Shapiro found that just before the killing, "Mr. Byers was under severe emotional stress and, as we put it together, under the influence of this very powerful delusional system at the time of the offense." Tr. 1/25/78 at 100. Dr. Shapiro explained that

> the trigger for this particular offense was the fact that just immediately prior to the shooting Mr. Byers stated that he saw the decedent with the woman that Mr. Byers suspected was her lesbian lover and that this was the trigger, this brought, stirred up all of Mr. Byers' anxieties and concerns and feelings of being desperately in need of, in a sense, preserving himself.

*Id.* at 106. The shooting then brought the appellant an instant sense of relief. *Id.* at 107. Dr. Shapiro found that this understanding of the events precipitating the shooting was consistent with the eyewitness testimony that Byers walked calmly away from Ms. Dickens after he shot her. *Id.* at 108. Dr. Shapiro concluded that Byers was "overwhelmed by ... internal concerns and misperceptions" stemming from his terrible fears of the decedent, and that although the appellant knew that in a general sense killing was wrong, his judgment was "so substantially impaired by this paranoid delusional system ... that ... he lacked the substantial capacity to appreciate wrongfulness...." *Id.* at 105. Accordingly, Dr. Shapiro concurred in the opinion of the St. Elizabeths staff that "as a result of [the appellant's] mental disease, he most likely or probably lacked the substantial capacity to appreciate the wrongfulness of his conduct." *Id.* at 102–03.

22. On cross-examination, Dr. Shapiro elaborated on his opinion. He acknowledged that Byers' behavior at the hospital did not indicate mental illness, Tr. 1/26/78 at 81, but concluded that his paranoid state, and his belief in the delusions, were in remission, rather than that Byers was a malingerer. *Id.* at 143.

Dr. Miller, a St. Elizabeths psychiatrist, participated in staff conferences on Byers and conducted an interview in the presence of the staff conferees. Dr. Miller concurred in the staff opinion, although he acknowledged on cross-ex-

ease was in remission at the time of the examination in November, 1977, and that the earlier symptoms had not been feigned.

The Springfield psychiatrists rejected this diagnosis. They concluded that Byers' claimed disease could not have gone into remission in the manner described by the St. Elizabeths psychiatrists. In their view, Byers was probably exaggerating his symptoms. Moreover, even if he were not, these symptoms did not indicate the existence of an underlying psychosis, a prereq-

uisite, in their view, for an opinion of nonresponsibility.[23]

. One Springfield psychologist, Dr. Varhely, directly disputed the pathological theory underlying the St. Elizabeths diagnosis, finding that Byers had superstitions or "magical thinking," rather than paranoid delusions.[24] In addition, on the basis of an objective test that he conducted, Dr. Varhely found no evidence of Byers' conscious malingering, but did find "unconscious exaggeration of symptoms." [25]

amination that "this is not an absolutely clear-cut case." Tr. 1/31/78 at 177. Like Dr. Shapiro, Dr. Miller found that Byers' paranoid state was in remission, which resulted in some ambiguities in the examination results. The staff's qualified opinion reflected these ambiguities. And like Dr. Shapiro, Dr. Miller rejected an alternative diagnosis to remission—that Byers was a malingerer.
Dr. Miller described the basis for his conclusion:

> [W]hen he told us about it, he said ... could this really be? Was this really what happened? ... We had to wonder why he had doubts about it. Was it that he was trying to pull something over on us or was it that he had forgotten what had happened? ... Well, my best guess is that he had pulled himself together. He was no longer delusional and he didn't want to remember these delusional things. That's why he responded with, as Dr. Shapiro found on psychological tests, neurotic defenses....
>
> It is possible that Mr. Byers or any other defendant would want to look crazy.... But ... the symptoms ... conform to an established pattern of a mental disease ... there wasn't any unusual or tricky or suspicious kinds of things he described.... The symptoms that he presented to me were consistent with a paranoid.

Tr. 1/31/78 at 184–87.

23. Both experts testifying for the prosecution, Drs. Varhely and Kunev, agreed that a paranoid delusion cannot be limited to one area of an individual's functioning. Rather, a paranoid delusion must "overwhelm" the person's life. In the government doctors' view, a paranoid delusion is chronic, requires hospitalization, is resistant to treatment and treatable only with psychotropic drugs. See Tr. 2/1/78 at 131–35; Tr. 2/7/78 at 183. The Springfield psychiatrists believed it significant that Byers had never before been hospitalized for mental illness, that his symptoms had receded, and that St. Elizabeths psychiatrists had chosen not to administer psychotropic drugs to Byers. See Tr. 2/1/78 at 185; Tr. 2/7/78 at 40.

The St. Elizabeths psychiatrists applied quite different diagnostic criteria. They believed that a paranoid delusion could be limited to a single area of an individual's life, that a delusional person could otherwise function normally, and that the delusion could recede when its focus was no longer present. Tr. 1/26/78 at 125.

24. Dr. Varhely distinguished between magical or superstitious thinking and paranoid delusion as follows:

> Magical thinking is nothing else but the attribution of a power to objects and events that they do not possess. Delusion is a set of false beliefs, cohesive in nature ... at the core of the personality, and it overshadows the whole sphere of the action of that individual.... The whole life of that individual is directed by that system.
> [Question:] Now, why did you say that Mr. Byers' statement about the spells didn't indicate to you a delusion?
> [Answer:] Because there was no ... philosophy that ... would direct the organization of Mr. Byers' whole life.

Tr. 2/1/78 at 91–92. Defense counsel devoted relatively little attention to this distinction during cross-examination. See infra note 38.

Whether mental illness is attributed to supernatural phenomena or childhood trauma has been found to be a function of culture and sophistication. See WORLD HEALTH ORGANIZATION, SCHIZOPHRENIA: AN INTERNATIONAL FOLLOW-UP STUDY (1979).

25. On direct examination, he testified that the results of the test were "varied." Tr. 2/1/78 at 103. He stated:

> [T]he MMPI indicates some exaggeration of problems. Sometimes we call it a "cry for help" that an individual feels he needs help in this area of the personality, and then he will put down more problems. He will answer statements just a little bit in the undesirable direction.

Id. at 104. When asked by the court whether the test indicated exaggeration or malingering, Dr. Varhely answered, "It is on the same contin-

In his testimony, Dr. Kunev offered a similar opinion and a similar approach to the diagnostic criteria for paranoid delusions. Finally, he recounted a series of statements allegedly made by the defendant during their sole interview. He testified that he asked Byers for his explanation of the shooting and Byers responded that he had none. But Dr. Kunev pressed the inquiry; the record, of course, does not reveal how vigorously or in what way he pressed the defendant. Rather, we are left solely with Dr. Kunev's account at trial:

> I asked him, since that has been several months since the incident if he has some idea what might have been the reason for the shooting.

> He said that this is a question that Mrs. Byers asked him *about the time* that he was admitted to St. Elizabeths Hospital on November 11th, 1976, and that his answer to her was the same, that he has no answer why he did shoot Mrs. Dickens.

Dr. Kunev then offered what proved to be the testimony that "devastated" Byers' defense:

> At that time, Mr. Byers said that Mrs. Byers suggested to him that this could be under the influence of some magic, or spells or some influence of roots.

> And Mr. Byers said that not having any other explanation, this appeared as a

possible answer to the reason for the shooting.[26]

Dr. Kunev construed these statements to mean that Byers' delusions, in fact, originated with this conversation with Mrs. Byers. The doctor concluded that since the claimed delusions did not arise until after the homicide, they could not logically have had any relation to the killing of Jacqueline Dickens.[27]

Defense counsel charged that this testimony about the defendant's statement did not comport with what Dr. Kunev had told him in an interview conducted after the trial had begun but prior to his testimony.[28] In the interview, Kunev, according to counsel, indicated that he understood Byers to have been describing a conversation with his wife that took place *in* St. Elizabeths. Counsel considered this of little significance since Byers had told the St. Elizabeths staff about his spells at his very first interview, *before* Mrs. Byers had visited him.[29] In *voir dire* testimony, Dr. Kunev vacillated about his understanding of precisely when this conversation between Byers and his wife took place.[30] He ultimately concluded, and testified to the jury, that his best recollection of this critical timing question was that Byers had had this conversation with his wife "about the time" that he went to St. Elizabeths.[31]

---

uum ... but at one point when the exaggeration becomes such that the test has no meaning then we declare the test invalid." *Id.* In Byers' case, the exaggeration was not sufficient to invalidate the test. *Id.* at 103. On cross-examination, Dr. Varhely stated, "there was no conscious malingering that I could notice in Mr. Byers." *Id.* at 163. What he found was an "unconscious exaggeration of symptoms." *Id.*

**26.** Tr. 2/7/78 at 138–39 (emphasis added).

**27.** *Id.* at 139.

**28.** Defense counsel's interview took place on January 31 or Feb. 1, 1978. The trial began on January 18, 1978. Dr. Kunev testified on Feb. 7, 1978.

**29.** *See* Tr. 2/7/78 at 68–91. The court found that defense counsel's challenge to the doctor's credibility went to the weight, not the admissibility, of the evidence. *Id.* at 93. Without a

record of Dr. Kunev's original conversation with Byers, defense counsel was unable to challenge Dr. Kunev's account on cross-examination. Defense counsel failed to produce a third party who, according to counsel, witnessed his conversation with Dr. Kunev.

**30.** Dr. Kunev first testified that he could not recall whether Byers told him that the conversation with his wife took place before or after his admission to St. Elizabeths. Tr. 2/7/78 at 110. At a later point he responded to a question from the court: "To the best of my recollection, your Honor, he indicated that his wife was visiting him in the hospital when they were discussing the incident of the shooting." *Id.* at 111. Still later, he testified that the conversation coincided with Byers' admission to St. Elizabeths; it was right around the time of admission, but he did not know whether it was slightly before or slightly after. *Id.* at 113.

**31.** Tr. 2/7/78 at 139.

Kunev conceded that he did not record this comment in his contemporaneous notes of the interview [32] and that he did not include it in his report to the court.[33] In addition, there was no evidence that he passed this information on to the doctors who actually participated in the staff conference. The official hospital report makes no mention of any statement made by Byers regarding the fabrication of his insanity defense.[34]

In explaining this curious omission, Dr. Kunev stated that he did not consider the statement significant because he was only concerned with Byers' state of mind at the time of the offense. Dr. Kunev explained, "This being suggested by his wife, I didn't consider it important .... It was not his thinking." [35] Even after Dr. Kunev received the St. Elizabeths report, which relied on "roots" or "spells" as a basis for its

opinion of nonresponsibility, he still did not consider the statement significant.[36] Since the statement was irrelevant to the formation of his expert opinion, he explained, he simply excluded it from his report.[37]

Although the psychiatric expert seemed to attach little value to Byers' statement, the court, the prosecutor, and, in turn, the jury were of a different opinion. The trial judge noted that it would "take a great deal of the wind out of the defendant's sails" [38] and "perhaps will torpedo the [defendant] out of the water";[39] that it could be "devastating"; [40] and, if believed, it would help the prosecution "overcome a significant hurdle." [41] The court nevertheless admitted the testimony.[42] The prosecution's summation was devoted almost exclusively to this "critical thing" in the case.[43]

**32.** Tr. 2/7/78 at 200.

**33.** *See* Letter from Dr. J. Eardley, Medical Center for Federal Prisoners, Springfield, Missouri, to Honorable William B. Jones, United States District Court (April 8, 1977) (containing psychiatric evaluations by Springfield staff).

**34.** *See id.*

**35.** Tr. 2/7/78 at 75.

**36.** *Id.* at 75, 108.

**37.** Defense counsel clearly recognized the importance of Dr. Kunev's disputed testimony and conscientiously urged a variety of reasons for barring its receipt. Unfortunately, counsel did not exploit during cross-examination Dr. Kunev's failure to include the purported admission in his written report. Nor did counsel effectively attack Dr. Varhely's semantic distinction between "superstition" and "delusion." Most likely, as is often the case, this reflects an understandable lack of experience with the insanity defense. *See United States v. Wood,* 628 F.2d 554, 571–72 nn. 72–74 (D.C.Cir.1980) (en banc) (Bazelon, J., dissenting); *see generally* Goldstein & Fine, *The Indigent Accused, the Psychiatrist, and the Insanity Defense,* 110 U.Pa.L.Rev. 1061, 1064–65 (1962); *cf. Davis v. Alabama,* 596 F.2d 1214, 1214–21 (5th Cir.1979); *United States v. Edwards,* 488 F.2d 1154, 1163 (5th Cir.1974).

**38.** Tr. 2/7/78 at 82.

**39.** *Id.*

**40.** *Id.* at 107.

**41.** *Id.* at 135.

**42.** Unfortunately, the trial court offered no statement of reasons for admitting the testimony, notwithstanding its expressed concern with its serious prejudicial impact. Such a statement would facilitate appellate review, and is no burden when, as we assume, "the matter was dealt with in a conscientious manner in passing on the merits." *Davis v. Clark,* 404 F.2d 1356, 1358 (D.C.Cir.1968) (separate opinion of Tamm, J.).

**43.** The following are examples of the prosecution's insistent reliance on Dr. Kunev's testimony about Byers' admission:

Now, the defense is supposed to be ... insanity.... Members of the jury, I submit to you that that came tumbling right down to the ground with the testimony of Dr. Kunev.... He ... explained to you where all of this roots business began. He said that when he talked to Mr. Byers ... he asked "What was in your mind? What was going on?" And Mr. Byers admitted and, members of the jury, pay careful attention—Mr. Byers said that, at the time of the shooting, he wasn't thinking about roots or spells. He said that what happened was six weeks or so after the shooting ... Mr. Byers sat down with his wife and talked this very same thing over, and it was his wife ... who said, "Well you know, she was working a spell on Billy Byers."

Tr. 2/10/78 at 131.

The critical thing is, the critical thing is defendant told Dr. Kunev, "I got this idea from my wife. I got it from my wife." That's what cannot be avoided in this case. And that explains quite a bit about what happened at St. E's.

Byers was convicted of the lesser included offense of second degree murder and of two weapons offenses which are not challenged in the instant appeal.[44] His conviction was upheld in a *per curiam* judgment order over my dissent on December 24, 1980. After granting rehearing en banc, this court, on May 19, 1983, issued yet another judgment order, affirming Byers' conviction and noting that opinions would follow. On Jan. 9, 1984, the Supreme Court denied certiorari without the benefit of the court's opinions which issue today.[45]

## II. APPLICATION OF THE FIFTH AMENDMENT TO COURT-ORDERED INSANITY EXAMINATION

The Fifth Amendment bars compulsory self-incrimination in "any criminal case." It is clear, and the plurality agrees, that the privilege against self-incrimination has presumptive application in criminal cases where sanity is the only issue in dispute. It is clear as well that the values underlying the privilege against self-incrimination are uniquely threatened by the compelled psychiatric examination as it is presently administered. The plurality concedes that the traditional rationales for excluding the compelled examination from the protections of the Fifth Amendment are mere "devices"[46] and do not withstand analysis. Rather than rely upon such artifice, the plurality instead contrives a controversy. It assumes incorrectly that protection of the right requires sacrifice of important state interests. The plurality then denies the privilege in the name of "fundamental fairness." I cannot accept the plurality's needless balancing away of this essential privilege.[47]

*Id.* at 236.

> [A]nother false issue is the business about Mrs. Byers visiting the defendant at the hospital. You see that hurts, that testimony hurts.

*Id.*

> You see, these doctors are only as good as they are told.... What they were told is what Billy Byers was told by his wife. "You had roots or spells worked on you." You see, and that's where St. Elizabeths went off.

*Id.* at 144.

> But you see, what he told Dr. Kunev destroys every one of those if's. They are gone. There is no evidence upon which you could find that this man was mentally ill, no credible evidence.

*Id.* at 145.

> [H]e admitted to Dr. Kunev, back when he was in Springfield, this idea, roots and such, that came into his head through his wife.

*Id.* at 152.

> Six weeks after the shooting, she sits down with him and says, "Oh she was working a spell on you." That's something he needs to know. That is something he needs to sell, but I would say to you, "Don't buy it."

*Id.* at 160.

**44.** He was sentenced to terms of imprisonment of from five to twenty years on the murder charge and from thirty months to nine years on each of the weapons offenses. The sentences for the weapons offenses were to be served concurrently with each other but consecutively with the sentence for murder.

**45.** —— U.S. ——, 104 S.Ct. 717, 79 L.Ed.2d 179 (1984).

**46.** Pl. op. at ——.

**47.** The concurring opinion argues that Byers' Fifth Amendment claim is not properly before this court because he failed in his objections at trial to invoke the Fifth Amendment by name. For a variety of reasons, I share the plurality's view that Byers' claim, although not phrased in the talismanic language of the Constitution, demands our consideration on appeal.

1) His objections raised the issues of fairness and reliability that clearly underlie the Fifth Amendment. *See infra* pp. 1150–1155. When fundamental rights are at stake, a court cannot elevate form over substance, particularly in cases involving indigents, whose lawyers may be less likely to be alert to the constitutional dimensions of their clients' causes.

2) In this case, in addition, the court repeatedly interrupted defense counsel during his objection and continued to question the witness after the objection was raised. *See* Tr. 2/7/78 at 67, 69–70. Where the court has participated in or approved the allegedly prejudicial action, we "should ... refrain from rigid enforcement of Rule 51." *See* 8B MOORE'S FEDERAL PRACTICE ¶ 51.02 at 51–8 (2d ed. 1982).

3) Finally, Dr. Kunev's pivotal testimony was a complete surprise to the defense. Such surprise justifies departure from the usual rule that courts will not consider claims of error first raised on appeal. *See Smith v. Estelle,* 602 F.2d 694, 698–701, 708 n. 19 (5th Cir.1979), *aff'd* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). The concurrence asserts that Byers' failure to object has left us with a record too incomplete to decide his claim fairly. With respect, it was my repeated and emphatic suggestion in dissent to the concurring judges' panel majority that we remand the record to develop the factual circumstances surrounding Byers' examination at Springfield.

## A. *Insanity and Incrimination*

The Fifth Amendment guarantees that the compelled testimonial statements of the accused shall not be used to incriminate him in any criminal case. Psychiatric evidence from court-ordered examinations would clearly seem to fall within the literal terms of the privilege. The statements are compelled from the defendant; they are actual communications; and they are used to defeat an insanity defense and thus secure a criminal conviction. Courts nevertheless have historically refused to extend the privilege to court-ordered examinations, reasoning either that psychiatric evidence is not testimonial [48] or that statements offered only on insanity are not incriminating.[49] As the plurality points out, both of these arguments are unsound and both were cast into grave doubt by the Supreme Court's decision in *Estelle v. Smith*.[50]

### 1. *The Real vs. Testimonial Evidence Distinction*

The privilege against self-incrimination is not violated every time the government compels the criminal defendant to provide incriminating evidence. The Supreme Court has found that the defendant may be required to take part in a lineup,[51] to speak for voice identification,[52] to submit to a blood test,[53] and to give handwriting exemplars.[54] These practices were held not to violate the privilege because they secure "real" as opposed to "testimonial" or "communicative" evidence.[55] The Fifth Amendment is only implicated when the state compels active, conscious communication from the defendant.

The products of psychiatric examinations fall along the entire continuum from real to testimonial evidence. On one end of the spectrum are the clearly physical parts of the examination: x-rays; blood and urine tests; and electro-encephalograms.[56] Standardized psychological tests, which probe patterns of association, require vocal responses and more active cooperation from the individual examined.[57] The interview portion of the examination at issue in the instant case falls squarely at the testimonial end of the spectrum.

4) I find wholly unsatisfactory the concurrence's suggestion that Byers pursue his constitutional claims through collateral attack of his conviction under 28 U.S.C. § 2255 (1982). The standard for § 2255 relief is more stringent than the one employed by the concurrence to deny relief in this case. *See United States v. Frady*, 456 U.S. 152, 166, 102 S.Ct. 1584, 1593, 71 L.Ed.2d 816 (1982) ("We reaffirm the well-settled principle that to obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal.").

**48.** *See United States v. Handy*, 454 F.2d 885, 889 (9th Cir.1971), *cert. denied*, 409 U.S. 846, 93 S.Ct. 49, 34 L.Ed.2d 86 (1972); *United States v. Baird*, 414 F.2d 700, 709 (2d Cir.1969), *cert. denied*, 396 U.S. 1005, 90 S.Ct. 559, 24 L.Ed.2d 497 (1970).

**49.** *See United States v. Whitlock*, 663 F.2d 1094, 1107 (D.C.Cir.1980); *United States v. Bennett*, 460 F.2d 872, 878–79 (D.C.Cir.1972); *United States v. Bohle*, 445 F.2d 54, 66–67 (7th Cir. 1971); *United States v. Albright*, 388 F.2d 719, 725 (4th Cir.1968).

**50.** *See* pl. op. at 1112–1113.

**51.** *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

**52.** *United States v. Dionisio*, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973).

**53.** *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

**54.** *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967).

**55.** *See Schmerber v. California*, 384 U.S. 757, 763–64, 86 S.Ct. 1826, 1831–32, 16 L.Ed.2d 908 (1966). The "real" vs. "testimonial" distinction has been subject to criticism, *see, e.g., Gilbert v. California*, 388 U.S. 263, 278, 87 S.Ct. 1951, 1963, 18 L.Ed.2d 1178 (1967) (Black, J., concurring in part and dissenting in part).

**56.** *See* Meyers, *The Psychiatric Examination*, 54 J. Crim.L. & Criminology 431, 438 (1963).

**57.** Thematic apperception and Rorschach examinations fall into this category. *See* J. MacDonald, Psychiatry and the Criminal 102–05 (2d ed. 1969). Although requiring vocal responses, these tests are relatively immune to conscious distortion. *See* Schafer, *Psychological Tests in Clinical Psychiatry*, in Theory and Practice of Psychiatry 221–22 (F. Redlich & O. Freedman, eds. 1966); *see generally* M. Lezak, Neuropsychological Assessment 179, 480 (1976). Far more than the interview, the test responses are used not for their actual denotative meanings, but to discern conscious and subconscious patterns of association. The validity and reliability of such examinations have been seriously questioned. *See* J. Ziskin, Coping with Psychiatric and Psycho-

A number of courts have analogized this interview portion to the physical part of the psychiatric examination.[58] In this view, statements are elicited not for their substantive meaning, but rather to allow the psychiatrist to discern patterns of association and to divine subconscious significance. The defendant's words, it is argued, are mere symbols, communicating a wholly separate code of meaning. While some statements are used purely as diagnostic inputs, others are used to establish the truth of the matter asserted. When a statement is used in the latter fashion, it is clearly testimonial and within the scope of Fifth Amendment protection. In *Estelle v. Smith*, the Supreme Court drew this distinction between uses of statements made to psychiatrists. The Court held that "[t]he Fifth Amendment privilege, therefore, is directly involved here because the state used as evidence against respondent the *substance* of his disclosures during the pretrial psychiatric examination." [59] Similarly, in the instant case, Dr. Kunev viewed Byers' purported admission as significant solely for its substantive meaning.

## 2. The Factual vs. Legal Guilt Distinction

Courts of appeals are virtually unanimous in holding that the admission of psychiatric testimony concerning statements made in a compelled examination on the issue of the *actus reus*, or "factual" guilt, is "constitutionally forbidden." [60] The dispute has centered on whether testimony offered only on the issue of insanity is incriminating for Fifth Amendment purposes. A number of courts have held that such testimony is admissible because once factual guilt is established at trial, the accused is already incriminated and the privilege is exhausted.[61] Here again, simple logic and the Supreme Court's decision in *Smith* discredit the rationale offered to deny Fifth Amendment protection.

First, sanity is a condition of criminal guilt.[62] Except in the case of strict liability offenses, the government must prove not only that the defendant committed the acts charged, but also that he had the requisite mental state when he committed the acts.[63]

LOGICAL TESTIMONY 225–47 (3d ed. 1981); Trachtman, *Socioeconomic Class Bias in Rorschach Diagnosis: Contributing Psychosocial Attributes of the Clinician,* 35 J. PERSONALITY ASSESSMENT 229 (1971).

**58.** *See United States v. Handy,* 454 F.2d 885, 889 (9th Cir.1971), *cert. denied,* 409 U.S. 846, 93 S.Ct. 49, 34 L.Ed.2d 86 (1972); *United States v. Baird,* 414 F.2d 700, 709 (2d Cir.1969); *cert. denied,* 396 U.S. 1005, 90 S.Ct. 559, 24 L.Ed.2d 497 (1970).

**59.** *Estelle v. Smith,* 451 U.S. 454, 464–65, 101 S.Ct. 1866, 1873–74, 68 L.Ed.2d 359 (1981).

**60.** *See Gibson v. Zahradnick,* 581 F.2d 75, 78 (4th Cir.1978), *cert. denied,* 439 U.S. 996, 99 S.Ct. 597, 58 L.Ed.2d 669 (1978); *accord United States v. Reifsteck,* 535 F.2d 1030, 1034 n. 1 (8th Cir. 1976); *United States v. Julian,* 469 F.2d 371, 376 (10th Cir.1972); *United States v. Bennett,* 460 F.2d 872, 878–80 (D.C.Cir.1972); *United States v. Williams,* 456 F.2d 217, 218 (5th Cir.1972); *United States ex rel. Smith v. Yeager,* 451 F.2d 164, 165 (3d Cir.), *cert. denied,* 404 U.S. 859, 92 S.Ct. 112, 30 L.Ed.2d 101 (1971); *United States v. Bohle,* 445 F.2d 54, 66–67 (7th Cir.1971); *Thornton v. Corcoran,* 407 F.2d 695, 699–701 (D.C.Cir.

1969); *United States v. Albright,* 388 F.2d 719, 725 (4th Cir.1968).

**61.** *See United States v. Whitlock,* 663 F.2d 1094, 1107 (D.C.Cir.1980); *United States v. Bennett,* 460 F.2d 872, 878–79 (D.C.Cir.1972); *United States v. Bohle,* 445 F.2d 54, 66–67 (7th Cir. 1971); *United States v. Albright,* 388 F.2d 719, 725 (4th Cir.1968).

**62.** *United States v. Malcolm,* 475 F.2d 420, 427 (9th Cir.1973). *See United States v. Alvarez,* 519 F.2d 1036, 1042 (3d Cir.1975) (dicta).

**63.** *See generally Morissette v. United States,* 342 U.S. 246, 250–63, 72 S.Ct. 240, 243–49, 96 L.Ed. 288 (1952). Whether mens rea is a constitutional condition of criminality is unclear, *compare Lambert v. California,* 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957) *and Morissette v. United States, supra, with United States v. Park,* 421 U.S. 658, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975). *But cf.* Jeffries & Stephan, *Defenses, Presumptions and Burden of Proof in the Criminal Law,* 88 Yale L.J. 1325, 1371 (1979) ("blameworthiness" is substantive condition of criminality). In any event, *mens rea* was a contested issue at Byers' trial.

Whatever the burden of proof,[64] the insanity defense remains inseparable from the concept of culpable mental state.[65] In the words of Mr. Justice Frankfurter's oft-quoted maxim, "a muscular contraction resulting in a homicide does not constitute murder";[66] an admission that one has done the act does not establish one's legal guilt.

Moreover, even if proof of the *actus reus* could be considered equivalent to a conviction, the privilege against self-incrimination would still apply. The Supreme Court has invoked the Fifth Amendment in post-conviction contexts in which the only issue was the criminal sanction to be applied.[67] In *Estelle v. Smith,* the Court refused to distinguish between the guilt and sentencing phases of the accused's capital trial. The Court held that "the availability of the Fifth Amendment privilege does not turn upon the type of proceeding in which its protection is invoked, but upon the nature of the statement or admission and the exposure which it invites."[68] In a trial in which the insanity defense is raised, what is at stake is a criminal sanction. Both imprisonment and commitment do, of course, involve a loss of liberty.[69] But the fact that some form of sanction can be said to follow in any event does not limit the need for procedural safeguards. Commitment, which follows upon a verdict of not guilty by reason of insanity, is premised on the need for treatment, rather than punishment. The verdict is crucial to the moral basis for confinement.[70]

## B. *Values Underlying the Privilege*

Based upon these considerations, I am forced to conclude that the privilege against self-incrimination applies in a criminal trial on the issue of sanity, whether such a trial is conceived of as a determination of guilt or of sanction. This conclusion is reinforced, in my judgment, by consideration of the values that underlie the Fifth Amendment privilege against self-in-

---

**64.** In this case, the court instructed the jury that the defendant should be presumed sane until evidence of mental disease was introduced. At that point, the government had the burden of proving beyond a reasonable doubt that the "defendant was not suffering from a mental disease or else that he nevertheless had substantial capacity, both to conform his conduct to the requirements of the law and to appreciate the wrongfulness of his conduct." Tr. 2/11/78 at 43. The presumption of sanity, then, simply placed the burden of production on the defendant, and did not affect the government's responsibility to prove the defendant's sanity beyond a reasonable doubt. *See generally* Underwood, *The Thumb on the Scales of Justice: Burdens of Persuasion in Criminal Cases,* 86 YALE L.J. 1299, 1333–36 (1977).

Some jurisdictions have shifted the burden of proof on the issue of sanity, requiring the defendant to carry the burden of persuasion. Whether the claim of insanity is seen as going to *mens rea* or merely to exculpation, the rebuttal of a claim of insanity is inextricably tied to criminal guilt. The allocation of burdens of persuasion is irrelevant; guilt is not established until *actus reus, mens rea,* and the absence of excuse are all established.

**65.** *See* Danforth, *Death Knell for Pretrial Mental Examination? Privilege Against Self-Incrimination,* 19 RUTGERS L.REV. 489, 503 (1965) ("[i]nsanity would seem to be too closely related to *mens rea* to separate criminal responsibility from guilt as far as self-incrimination is concerned"); Comment, Miranda *On the Couch: An Approach to Problems of Self-Incrimination, Right to Counsel, and* Miranda *Warnings in Pre-Trial Psychiatric Examinations of Criminal Defendants,* 11 COLUM.J.L. & SOC.PROB. 403, 415 n. 78 (1975) [hereinafter Miranda *On the Couch* ]; Note, *Requiring a Criminal Defendant to Submit to a Government Psychiatric Examination: An Invasion of the Privilege Against Self-Incrimination,* 83 HARV.L.REV. 648, 661 n. 89 (1970) [hereinafter Harvard Note]; *United States v. Malcolm,* 475 F.2d 420, 427 (9th Cir.1973); *cf. United States v. Alvarez,* 519 F.2d 1036, 1042 (3d Cir.1975) (dicta).

**66.** *Leland v. Oregon,* 343 U.S. 790, 803, 72 S.Ct. 1002, 1009, 96 L.Ed. 1302 (1952) (Frankfurter, J., dissenting).

**67.** *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981); *Specht v. Patterson,* 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967) (procedural guarantees necessary at post-conviction hearing to determine whether convicted defendant should be confined).

**68.** *Estelle v. Smith,* 451 U.S. 454, 462, 101 S.Ct. 1866, 1872, 68 L.Ed.2d 359 (quoting *In re Gault,* 387 U.S. 1, 49, 87 S.Ct. 1428, 1455, 18 L.Ed.2d 527 (1967)).

**69.** *See* Harvard Note, *supra* note 65, at 665–66.

**70.** *See Durham v. United States,* 214 F.2d 862, 876 (D.C.Cir.1954).

crimination. The court-ordered psychiatric examination, as it was administered in Billy Byers' case, implicates all of the fundamental values that lie at the heart of the Fifth Amendment.

In *Murphy v. Waterfront Commission*,[71] Mr. Justice Goldberg, writing for the Court, set out the "fundamental values" and "noble aspirations" which underlie the privilege against self-incrimination:

> our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; our preference for an accusatorial rather than an inquisitorial system of criminal justice; our fear that self-incriminating statements will be elicited by inhumane treatment and abuses; our sense of fair play which dictates "a fair state-individual balance ... by requiring the government in its contest with the individual to shoulder the entire load ..."; our respect for the inviolability of the human personality and of the right of each individual "to a private enclave where he may lead a private life"; our distrust of self-deprecatory statements; and our realization that the privilege, while sometimes "a shelter to the guilty," is often a "protection to the innocent."[72]

The court-ordered psychiatric examination, as it is now conducted, poses a grave threat to each of the values enunciated by the Court.

### 1. *Privacy Rights*

The privilege is designed to prevent the state from delving into the private sanctum of the human mind. It "reflect[s] the concern of our society for the right of each individual to be let alone."[73] Its foundation "is the respect a government—state or federal—must accord to the dignity and integrity of its citizens."[74]

The compelled psychiatric examination significantly intrudes into the "private enclave" of the human personality.[75] The very goal of the examination is to discover and to analyze the intricacies of the individual's thought processes. The psychiatrist seeks to uncover aspects of the personality which the individual ordinarily does not reveal to others and which he may not consciously perceive. The information elicited —thoughts, dreams, fantasies, anxieties— is often that which the conscious mind tries to repress.[76] The articulation of these previously hidden thoughts may be profoundly threatening to the individual.[77] Far more than the police interrogation, which seeks objective facts of a crime, the psychiatric examination probes the core of the "inviolab[le] ... human personality."

### 2. *Fear of Inhumane Treatment and Abuses*

The privilege is also designed to ensure that the state has no incentive to use coercive tactics in extracting confessions. In *Miranda v. Arizona*,[78] the Supreme Court

---

**71.** 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964).

**72.** *Id.* at 55, 84 S.Ct. at 1596 (citations omitted).

**73.** *Tehan v. United States ex rel. Shott*, 382 U.S. 406, 416, 86 S.Ct. 459, 465, 15 L.Ed.2d 453 (1966).

**74.** *Miranda v. Arizona*, 384 U.S. 436, 460, 86 S.Ct. 1602, 1620, 16 L.Ed.2d 694 (1966).

**75.** *See* Aronson, *Should the Privilege Against Self-Incrimination Apply to Compelled Psychiatric Examinations?*, 26 STAN.L.REV. 55, 64–65 (1973); Griffith and Griffith, *The Patient's Right to Protection Against Self-Incrimination During the Psychiatric Examination,* 13 TOLEDO L.REV. 269, 284–85 (1982); Harvard Note, *supra* note 65, at 658; Miranda *On the Couch, supra* note 65, at 420–22.

**76.** The information sought often concerns the individual's sexual experiences, attitudes, and anxieties. *See* Lacovara, *Workshop Session on Mental Illness,* 37 F.R.D. 143 (1964). It may include ideas about which he may be highly sensitive and which he may find repulsive. *See* Miranda *On the Couch, supra* note 65, at 421 n. 109.

**77.** *See* Smith, *Psychiatric Examinations in Federal Mental Competency Proceedings,* 37 F.R.D. 171, 172 (1964) (examination may be so upsetting to accused that psychotherapy is required).

**78.** 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

held that incommunicado police interrogations were "inherently coercive" and therefore violative of the Fifth Amendment privilege against self-incrimination. The Court emphasized that it was guarding against the risk of coercion that "is psychologically rather than physically oriented."[79] It focused specifically on a number of police practices that contributed to the psychologically oppressive atmosphere: isolation of the accused,[80] removal of the accused from familiar surroundings,[81] and the interrogator's feigned friendliness and concern toward the accused.[82] The Court stated: "An individual swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to ... techniques of persuasion ... cannot be otherwise than under compulsion to speak."[83]

The compelled psychiatric examination is, at the very least, as "inherently coercive" as the custodial police interrogation proscribed in *Miranda.* Like the custodial interrogation, the court-ordered examination requires the defendant to submit to government inquiry directed toward issues that will be contested at trial. The examination often takes place over a period of weeks in the "unfamiliar surroundings" of a government institution far from the defendant's community. During this stay, the defendant is under the total control of his examiners. They control what he does, when he eats, when he sleeps, and whether he is to be given psychotropic drugs. A series of examinations, some with a single psychiatrist and others with the entire staff, are conducted entirely in secret.

The government psychiatrist who conducts the exam is a complex and threatening adversary. Some government psychiatrists may use trickery to gain information.[84] Some may consciously deceive defendants about their true role.[85] Some may slant their diagnoses to suit the prosecution's wishes.[86] In the main, however, the problem is not bad faith. Rather, the difficulty is inherent in the relationship between the institutional psychiatrist and the defendant-patient.[87]

The government psychiatrist is armed with the same technical expertise as the pri-

79. *Id.* at 448, 86 S.Ct. at 1614.

80. *Id.* at 449, 86 S.Ct. at 1614 ("The officers are told by the manuals that the 'principal psychological factor contributing to a successful interrogation is *privacy*—being alone with the person under interrogation.'" (citation omitted) (emphasis in original)).

81. *Id.* at 449–50, 86 S.Ct. at 1614–15.

82. *Id.* at 452, 86 S.Ct. at 1616.

83. *Id.* at 461, 86 S.Ct. at 1620.

84. *See Leyra v. Denno,* 347 U.S. 556, 559–60, 74 S.Ct. 716, 718, 98 L.Ed. 948 (1954); Aronson, *supra* note 75, at 65; Diamond & Louisell, *The Psychiatrist as an Expert Witness: Some Ruminations and Speculations,* 63 Mich.L.Rev. 1335, 1349 (1965); Harvard Note, *supra* note 65, at 659.

85. *See* Smith, *supra* note 77, at 171–72 ("[T]he successful performance of an examination will require the creation of a good doctor-patient relationship, devoid insofar as possible of strain and suspicion. The defendant will need some assurances that his disclosures will not be employed to his disadvantage...."); *see also People v. Leyra,* 302 N.Y. 353, 362–63, 98 N.E.2d 553, 558 (1951).

86. *See United States v. Morgan,* 567 F.2d 479 (D.C.Cir.1977) (St. Elizabeths psychiatrist changed diagnosis from "chronic undifferentiated schizophrenia" to "no mental disease" after prosecutor emphasized importance of case); Chernoff & Schaffer, *Defending the Mentally Ill: Ethical Quicksand,* 10 Am.Crim.L.R. 505, 510 (1972) (study of St. Elizabeths Hospital found it is not uncommon for psychiatrist to ask prosecutor if he would oppose certain diagnosis).

87. *See* Bazelon, *The Dilemma of Criminal Responsibility,* 72 Kentucky L.J. 263 (1984); Bazelon, *Should the Psychiatrist Have a Role in the Criminal Justice System?,* in Psychiatry at the Crossroads 191 (J. Brady & H. Brodie eds. 1980); Bazelon, *The Role of the Psychiatrist in the Criminal Justice System,* 6 Bull.Am.Acad. of Psychiatry & L. 139 (1978); Bazelon, *Psychiatrists and the Courts,* 8 J. Nat'l Ass'n of Private Psychiatric Hospitals 4 (Spring 1976); Bazelon, *Institutional Psychiatry—"The Self-Inflicted Wound,"* 23 Cath.Univ.L.Rev. 643 (1974); *see generally,* E. Goffman, Asylums: Essays on the Social Situation of Mental Patients and Other Inmates (1962); A. Stone, Mental Health and Law: A System in Transition 1975; T. Szasz, Psychiatric Justice 56–84 (1965).

vate psychiatrist. He is trained to gain the confidence of a patient. As a medical doctor, the psychiatrist is conceived of as a healer, a participant in a voluntary therapeutic alliance directed to the patient's benefit.[88] Unlike the policeman, whose goals and methods engender wariness in the defendant, the government psychiatrist in the state hospital engenders trust. But this trust is unwarranted. The psychiatrist's aim is diagnosis, not therapy. His primary commitment is to his institution, not to his patient.[89] Given these concerns, I must conclude that the court-ordered psychiatrist examination poses a threat of coercion similar to that in the interrogation deemed unconstitutional in *Miranda*.

In *Estelle v. Smith*,[90] the Supreme Court drew exactly this parallel between police custodial interrogation and the pretrial psychiatric examination. Noting that *Miranda* required safeguards to combat the "inherently compelling pressures" of police interrogation, the Court held:

> The considerations calling for the accused to be warned prior to custodial interrogation apply with no less force to the pretrial psychiatric examination at issue here.... During the psychiatric evaluation, respondent assuredly was "faced with a phase of the adversary system" and "was not in the presence of a person acting solely in his interest."[91]

### 3. *"Cruel Trilemma"*

As Judge Frank wrote, "[to] put an individual ... in a position where his natural instincts and personal interests dictate that he should lie ... and then punish him for lying is ... intolerable."[92] The Fifth Amendment privilege allows a third option, silence, which avoids the "cruel trilemma" of self-accusation, contempt, or perjury.[93]

The compelled psychiatric examination forces the accused into precisely that situation which the privilege is designed to prevent. Most defendants will realize that what they say will significantly affect the likelihood of a successful insanity defense. The pressure on defendants to lie or to feign what they conceive of as insane symptoms will be intense, even for those whose insanity defenses are legitimate. Even the truly mentally ill person is likely to have some stereotyped conception of what distinguishes sanity from insanity and to manifest symptoms of the latter.[94] The defendant cannot alleviate this pressure to dissemble by refusing to cooperate. Such a refusal is likely to precipitate sanctions which, in effect, forfeit the accused's

---

**88.** *See* Diamond & Louisell, *supra* note 84, at 1349; Comment, *Can a "Psychiatric* Miranda" *Work? A California Perspective*, 14 Rutgers L.J. 431, 433–34 (1983).

**89.** *See* Institute of Society, Ethics and the Life Sciences, *In the Service of the State: The Psychiatrist as Double Agent*, Hastings Center Report Special Supplement (April 1978) (statement of Arlene Daniels); Who is the Client?: The Ethics of Psychological Intervention in the Criminal Justice System 2–8 (J. Monahan ed. 1980); Slobogin, Estelle v. Smith: *The Constitutional Contours of the Forensic Evaluation*, 31 Emory L.J. 71, 133 (1982).

**90.** 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981).

**91.** *Id.* at 467, 101 S.Ct. at 1875 (quoting *Miranda v. Arizona*, 384 U.S. 436, 469, 86 S.Ct. 1602, 1625, 16 L.Ed.2d 694 (1966)). In *Smith,* the Court held that the defendant had a right to refuse to undergo an examination where his competency was not at issue and where he did not intend to raise an insanity defense. The state, therefore, had a duty to warn the defendant of this right and the consequences of its waiver. In dictum, the Court suggested that such a right to refuse would not attach when the defendant has raised an insanity defense. *Id.* at 465, 86 S.Ct. at 1623. The reason for denying the defendant this right is that "his silence may deprive the State of the only effective means it has of controverting his proof...." *Id.* The psychiatric examination in an insanity defense case is as "inherently coercive," but a right to silence, it is argued, would be unfair to the State. I believe, however, that other safeguards can guard against "inherent coercion," while still permitting the examination. *See infra* pp. 1156–1158.

**92.** *United States v. Grunewald*, 233 F.2d 556, 591 (2d Cir.1956) (Frank, J., dissenting).

**93.** *See Murphy v. Waterfront Commission*, 378 U.S. 52, 55, 84 S.Ct. 1594, 1596, 12 L.Ed.2d 678 (1964).

**94.** *See* J. MacDonald, *supra* note 57, at 60.

insanity defense.[95] Thus under current law, the defendant is faced with an analogous cruel trilemma: confessing responsibility,[96] feigning insanity or forfeiting the affirmative defense.

### 4. *Distrust of Self-Deprecatory Statements*

The Fifth Amendment demands "distrust of self-deprecatory statements."[97] This distrust stems from an awareness that individuals are unlikely to incur freely the sanction of a criminal conviction. Courts are alert to the risk that confessions may be coerced, forced on highly suggestible defendants, or simply fabricated by the interrogator. Because questions about reliability necessarily surround every confession, and because the confession is such powerful evidence,[98] courts demand that confessions be corroborated by "substantial independent evidence which would tend to establish the trustworthiness of the statement."[99]

This constitutional concern for trustworthiness is engaged when an accused asserting an insanity defense makes a statement in a mental hospital about whether he was indeed mentally ill at the time of the offense. A defendant who has chosen to raise the defense is unlikely to make an admission that undermines it. In the absence of a recording of the interview or a corroborating witness, the unverifiable testimony of a psychiatrist about statements made to him months or years before is highly untrustworthy.

### 5. *"Fair State-Individual Balance"*

The privilege against self-incrimination also seeks to safeguard a fair balance of advantages in the criminal process. As Mr. Justice Stewart noted, the privilege is directed "to preserving the integrity of a judicial system in which even the guilty are not to be convicted unless the prosecution 'shoulder the entire load.'"[100] By requiring the state to produce independent evidence of guilt, the privilege discourages oppressive tactics and encourages the production of more trustworthy evidence.

The compelled psychiatric examination threatens this structural integrity of our accusatorial system. The examination compels the defendant to be the prime source of the government's evidence. Because the psychiatrist is purportedly interpreting and relating the defendant's own statements, his testimony is likely to be accorded substantial weight. Given the availability of such evidence, the state is unlikely to seek out other, perhaps more probative evidence of the defendant's mental state.[101] Thus the fair state-individual

---

**95.** Those federal appellate courts that have considered the issue have held that the defendant who refuses to submit to a compelled examination is barred from introducing psychiatric testimony based on interviews with his own experts. *See United States v. Handy,* 454 F.2d 885, 888–89 (9th Cir.1971), *cert. denied,* 407 U.S. 846, 93 S.Ct. 49, 34 L.Ed.2d 86 (1972); *United States v. Baird,* 414 F.2d 700, 707 (2d Cir.1969), *cert. denied,* 396 U.S. 1005, 90 S.Ct. 559, 24 L.Ed.2d 497 (1970); *see also* FED.R.CR.P. 12.2(d) (court may exclude defendant's expert testimony if defendant refuses to undergo court-ordered examination).

**96.** Such confessions, however, may be unreliable psychological self-assessments. It is a symptom of certain mental diseases that the individual guards against disclosing his mental disorder. *See Rollerson v. United States,* 343 F.2d 269, 274 (D.C.Cir.1964); J. KATZ, J. GOLDSTEIN & A. DERSHOWITZ, PSYCHOANALYSIS, PSYCHIATRY & LAW 599 (1967).

**97.** *Murphy v. Waterfront Commission,* 378 U.S. 52, 55, 84 S.Ct. 1594, 1596, 12 L.Ed.2d 678 (1964).

**98.** *See* 3 WIGMORE, EVIDENCE § 820b (Chadbourn rev. 1970).

**99.** *Opper v. United States,* 348 U.S. 84, 93, 75 S.Ct. 158, 164, 99 L.Ed. 101 (1954).

**100.** *Tehan v. United States ex rel. Shott,* 382 U.S. 406, 415, 86 S.Ct. 459, 464, 15 L.Ed.2d 453 (1966).

**101.** For example, information about the defendant's functioning gathered from those who have interacted with the defendant in the real world is likely to enhance the accuracy of mental assessments. *See* Brief of *amicus curiae* American Psychological Association at 20–21; *see also Rollerson v. United States,* 343 F.2d 269, 274–75 (D.C.Cir.1964) (criticizing psychiatrists for failing to investigate beyond the psychiatric interview itself).

balance is subverted; the state has an incentive to ignore independent evidence and rely on the "cruel, simple expedient of compelling [testimony from the defendant's] . . . own mouth." [102]

## C. *The Plurality Approach*

Given that the examination yields testimonial evidence on the issue of guilt and that it threatens each of the privilege's underlying values, I cannot but conclude that the Fifth Amendment privilege against self-incrimination applies to the court-ordered psychiatric examination. The plurality disputes this conclusion, arguing simply that it would be unfair to allow a criminal defendant who presents expert testimony on the issue of sanity to refuse to undergo a state-requested examination.

I believe that the plurality's approach rests on a straw man. The plurality considers only a single remedy—blanket refusal to undergo the examination—to enforce the right and then rejects the right because the state cannot afford the remedy. It is clear that other, less severe, safeguards can be employed which permit the examination while still protecting the values that underlie the privilege.

### 1. *Alternative Safeguards*

The inquiry into whether a right exists is prior to and separate from consideration of the means of enforcing that right. If the right exists and the sole means of its enforcement conflicts with important state interests, then the court must resolve the difficult dilemma. In this case, however, safeguarding the right does not require any sacrifice of important state interests. Many intermediate safeguards are available which protect the values underlying the privilege against self-incrimination while still permitting the purportedly necessary compelled examination. Since I believe that the Fifth Amendment is applicable and can be safeguarded without prejudice to the state, I can see no reason why these protections should not apply. Even if, as the plurality argues, it is the scope of the remedy that determines the *existence* of the right, these narrower protections should still be afforded to all defendants asserting the insanity defense.

### a. *Recording of all interviews* **

Rational accommodation of the Fifth Amendment values implicated here can begin with the recording of all psychiatric interviews.[103] The very presence of a tape would help ensure that overreaching does not take place. It would quiet our concern that psychiatrists might manipulate or intimidate the defendant in an *in camera* interview. A complete record would also help inform the court's judgment regarding the voluntariness and reliability of the defendant's statement. Self-deprecatory statements are distrusted because of the possibility of coercion or dishonesty on the

---

**102.** *Miranda v. Arizona,* 384 U.S. 436, 460, 86 S.Ct. 1602, 1620, 16 L.Ed.2d 694 (1966).

** Judge Edwards would not mandate a full transcript or tape or video recording of the psychiatric examination. While he believes that a full and adequate record of the interview is required under the Fifth Amendment and the supervisory power, he would allow the district court in its discretion to determine in each case the appropriate method of obtaining that record. While he regards taping as one alternative method of assuring procedural fairness, he believes that, in some cases, taping may be inhibiting and not effective in deterring overreaching. It is his opinion that in many cases it would be adequate for a psychiatrist to maintain and produce complete notes of the interview.

In my view, a prophylactic rule is necessary to assure consistent protection of defendants'

rights. I am less concerned with the problems of taping, *see infra* pp. 1155–57, and more concerned with the deficiencies in psychiatrists' notetaking, *see infra* pp. 1168–69. In addition, I am reluctant to empower the district court to hypothesize about the best method for compiling a record on a case-by-case basis. Although not perfect, a firm rule requiring taping, in my opinion, will most reliably secure procedural fairness.

**103.** *See* Criminal Justice Mental Health Standards § 7–3.6(d) (Tent.Draft No. 1, 1983) (requiring taping of all court-ordered psychiatric evaluations); *cf. Thornton v. Corcoran,* 407 F.2d 695, 702 (D.C.Cir.1969) (suggesting that recording psychiatric diagnostic staff conferences would help ensure that participants are subject to meaningful cross-examination).

part of the interrogator. A recording of the examination would mitigate these causes for distrust.

The government and one of the *amici* suggest that even this alternative safeguard may prove disruptive or "inhibiting" to the clinical interview.[104] As I read the empirical evidence, however, it is decidedly mixed (as well as sparse).[105] Indeed, there is a strong argument that, to the extent that recording frees the interviewer from constant note-taking, its net effect may be to improve the free flow of communication.[106] In addition, the defendant may well be less apprehensive about the examination if he knows that his lawyer will have an opportunity to monitor the fairness and accuracy of the interviewer.

To the extent that distortions do occur, they seem to vary significantly with the type of subject and the nature of the clinical setting. Recent studies have found that concerns about distortion are "probably overstated"[107] and that "experienced therapists do not feel that the presence of video substantially alters their style."[108] In addition, much of the concern in the professional literature with the distorting effects of recording focuses on the response of the interviewer rather than the subject.[109] Because persons who conduct court-ordered clinical interviews are often required to relate the events of the inter-

view under oath and are subject to vigorous cross-examination, the additional "inhibition" due to recording, while slight, may even be salutary.

The studies tending to show such distortions, moreover, were all conducted in the context of voluntary, trusting therapeutic relationships. I dare to venture that a criminal defendant subject to a court-ordered clinical interview, knowing that none of what he says will be kept in confidence in any event, will be less likely to be "inhibited" by the presence of a recording device than a patient or client who fears an intrusion into an otherwise private and trusting relationship. A recent study notes that "[t]he wish to protect the sanctity of the therapeutic relationship is a major force opposing the use of [recording]."[110] No such relationship exists in the court-ordered examination.

Recording, moreover, is already an accepted and commonly-used tool of the mental health professions.[111] Many mental health professionals tape sessions with their patients or clients in order to come to more confident and thorough conclusions.[112] Recording is also used to facilitate training[113] and research.[114] The general acceptance of recording comes in the face of its risks, but in the belief that its utility usually outweighs those risks. In-

104. *See* Appellee's Memorandum Concerning the *Amicus* Briefs at 31; Brief for *amicus curiae* American Psychiatric Association at 30–31 & n. 16. The other *amicus,* however, favors recording as one of a number of possible Sixth Amendment safeguards. *See* Brief for *amicus curiae* American Psychological Association at 26–27 & n. 32.

105. Most of the significant studies are cited and reviewed in Gelso, *Effects of Recording on Counselors and Clients,* 15 COUNS.EDUC. & SUPER. 5 (1974). *See also* Goldberg, *Resistance to the Use of Video in Individual Psychotherapy Training,* 140 AM.J. PSYCHIATRY 1172 (1983).

106. *See* 1 A. FREEDMAN, H. KAPLAN & B. SADOCK, COMPREHENSIVE TEXTBOOK OF PSYCHIATRY 718 (2d ed. 1975).

107. Goldberg, *supra* note 105, at 1174.

108. *Id.*

109. Gelso, *supra* note 105, at 7–8; 1 A FREEDMAN, H. KAPLAN & B. SADOCK, *supra* note 106, at 718; Goldberg, *supra* note 105, at 1174.

110. Goldberg, *supra* note 105, at 1174.

111. *See* 1 A. FREEDMAN, H. KAPLAN & B. SADOCK, *supra* note 106, at 718; Gelso, *supra* note 105, at 5.

112. *Id.*

113. *See* Gelso, *supra* note 105, at 5; Muslin, *Overview: The Use of Recordings as Evaluation Mechanisms In Psychiatry,* in EVALUATIVE METHODS IN PSYCHIATRIC EDUCATION 77, 83 (1974) (audio-visual media are an "integral part of the teaching-learning armamentarium."); Goldberg, *supra* note 105, at 1172–74.

114. *See* J. MALCOLM, PSYCHOANALYSIS: THE IMPOSSIBLE PROFESSION 86–88 (1981).

deed, an author of the only study cited by the American Psychiatric Association in support of the proposition that recording has an "inhibiting" effect characterized the question in a later article as one of "cost-benefit." He concluded that, although caution may need to be exercised in some cases, "[w]hen the research discussed in this article is weighed against the many advantages of recording, ... it seems foolish to conclude that we [ought to] stop recording." [115] As a court concerned with upholding the constitutional rights of a defendant—and with mitigating the effects of other "distortions" that may dilute those rights and that we know to occur in the absence of recording—our cost-benefit equation seems even more clear.

In light of the preceding discussion, I would hold that the fruits of court-ordered clinical examinations should not be admitted at trial unless defendant's counsel is provided with a full and accurate record of the clinical interview.[116] The plurality concedes that recording psychiatric interviews "may be a good idea," [117] but concludes that it is not required by the Constitution. I fail to see, however, how the plurality can make the policy judgment that it would be unfair to the government to permit a defendant to refuse to cooperate, and then fail to accord lesser protections which

serve Fifth Amendment values without compromising the government's interests. The plurality has rejected the constitutional right because one means of enforcement is unfair, and then rejected presumably fairer means because the Constitution doesn't require them.

b. *Exclusion of defendant's statements irrelevant to diagnosis*

Although the Constitution permits the compelled examination, the Fifth Amendment does impose limitations upon the use of the defendant's statement to the government's doctor. Under current law, for example, the Fifth Amendment protects the defendant from prosecutorial use of statements made to the government psychiatrist to prove factual guilt or future dangerousness.[118] I would extend that protection to statements made by the defendant to the psychiatrist which are not integral to his process of diagnosis.

Psychiatric examinations are authorized for the limited purpose of expert evaluation of the defendant's mental state. A psychiatrist may need to relate certain statements of the defendant which were essential to his evaluation. Byers' confession of sanity, however, was irrelevant to the expert evaluation.[119] Dr. Kunev himself tes-

---

**115.** *See* Gelso, *supra* note 105, at 11.

**116.** The Constitution, of course, is not wedded to particular technologies. If audio or video taping were unavailable, the defendant's privilege could be preserved by having counsel or a defense expert present to observe and make notes of the interviewing. What is critical is that there be some independent monitoring of the interaction, so that a court is not required, as it was in Byers' case, to take a psychiatrist's representations purely on faith.

**117.** Pl. op. at 1121.

**118.** *See supra* note 60; *Estelle v. Smith* 451 U.S. 454, 463, 101 S.Ct. 1866, 1873, 68 L.Ed.2d 359 n. 6 (1981); 18 U.S.C. § 4244 (1982); Fed.R.Cr.P. 12.2(c).

**119.** The plurality asserts that it is "wrong" to describe the statement as irrelevant to Dr. Kunev's diagnosis. Pl. op. at 1111 n. 8. With respect, Dr. Kunev unequivocally and repeatedly stated that this statement was *not* one of the

factors upon which he based his diagnosis. He did not use this statement to arrive at a diagnosis; he simply *excluded* it from his diagnostic process:

> [Dr. Kunev]: [Defense counsel] asked me why I didn't put it in the record. I told him that this was an idea that was suggested to Mr. Byers by his wife. It was not part of his thinking at the time of the alleged offense. Therefore, it had no connection with his thinking at the time.
> ....
> [Dr. Kunev]: [H]e said that his wife suggested that the reason for the shooting could be under the influence of magic or some roots or spells that were put on him and because of that, this being suggested by his wife, I didn't consider it important.

Later on, after we received evaluation from St. Elizabeth's Hospital, and this was also listed there, in my conversation with Mr. Byers, it did not become an issue because from my discussion with my colleagues from the medical center, I found out that he has given the

tified that he made no use of the critical admission in forming his own expert opinion that the defendant was sane. Without any testimony concerning defendant's alleged admission, Dr. Kunev could have given the jury a full presentation of his expert opinion of Byers' mental state.

By simply describing Byers' admission that his wife had belatedly suggested the factual predicate for his insanity defense, Dr. Kunev was expressing no expert opinion. Simple logic, not expertise, dictates that if the basis for the defense arises after the act is committed, then it cannot excuse the offense. The statement supported no expert inference; rather, it was presented as a statement of historical fact.

If the necessity of remedying the imbalance of expert testimony justifies suspension of the privilege against self-incrimination, then only "expert testimony," not simply testimony by an "expert" should be admitted. The Fifth Amendment's concerns for reliability and for preventing "the cruel, simple expedient of forcing" a confession of criminal responsibility from the accused's "own lips" [120] dictated the exclusion of this self-condemnatory statement on the issue of mental state.[121]

### c. *Provision of* Miranda-*type warnings*

The court-ordered examination is a confusing and ambiguous interaction for the defendant. He is a patient in a hospital. He daily encounters a variety of solicitous, confidence-inspiring mental health professionals. But neither the institution nor its professionals are devoted to making him well. The government hospital presents a therapeutic facade beneath which exists a real adversity of interests.

In my view, the defendant has a right to be alerted to the realities of this inherently deceptive situation, wherein "pressures which work to undermine the individual's will to resist" [122] are not apparent. If we are going to compel a defendant to talk to a professional who may testify against him at trial, we must, at the very least, inform him of that fact.[123]

Mental health professional organizations believe that there is an ethical obligation to inform a defendant in advance of the interviewer's conflictual roles and of the absence of confidentiality.[124] In view of the Fifth Amendment's concern for voluntari-

---

same story to Dr. Dwyer, [the] psychiatrist who was also evaluating him, and because this was compatible with what he told me and this was not his thinking but something suggested by his wife, it was not pertinent, your honor.

It was not important. It was not his thinking at the time of the alleged offense.... [Dr. Kunev]: I was evaluating his mental condition, his thinking, his feelings, at the time of the shooting on September 18 of 1976. This was to me clear that at the time of the incident on September 18 he had no thoughts of roots, spells, magic; that this happened at a time later. If this happened six weeks or eight weeks later, this was not important to me because I was evaluating as to his thinking at the time of the alleged incident.
Tr. 2/7/78 at 74–75, 117–118.

**120.** *Culombe v. Connecticut,* 367 U.S. 568, 582, 81 S.Ct. 1860, 1867, 6 L.Ed.2d 1037 (1961).

**121.** I am of the opinion that such "confessions of responsibility" may be inherently unreliable and prejudicial. The defendant has no knowl-

edge of diagnostic criteria and is likely not to have full awareness of his mental processes. Such self-diagnoses also seem very likely to reflect the cues and suggestions offered by the examiner. However, since Dr. Kunev testified that the admission was irrelevant to his diagnosis, it is unnecessary to resolve this question in the instant case.

**122.** *Miranda v. Arizona,* 384 U.S. 436, 467, 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694 (1966).

**123.** In a related context, this court held in *United States v. Hinckley* that an F.B.I. "background" interview, which was likely to yield "prime lay" testimony on the insanity issue, was a "custodial interrogation" in which *Miranda* rules applied. 672 F.2d 115, 124–25 (D.C.Cir.1982).

**124.** *See* Who is the Client? The Ethics of Psychological Intervention in the Criminal Justice System, *supra* note 89, at 59–60; American Psychological Association, *Ethical Principles of Psychologists,* 36 Am. Psychology 633, 636 (1981); Brief of *amicus curiae* American Psychiatric Association at 5–7.

ness, I believe that there is a constitutional obligation as well.[125]

### 2. *Other Considerations*

In arriving at its conclusion, the plurality, in my view, misapplies its own test. If, as the plurality asserts, the cost of the safeguard determines whether the right exists, then clearly a defendant subject to a court-ordered examination should be afforded the relatively costless Fifth Amendment protections that I suggest. I must also, however, challenge the plurality test itself. In my view, whether an individual has a right is a separate question from whether countervailing considerations are sufficient to preclude its exercise. The plurality implies that the Fifth Amendment has a built-in principle of prudence. It notes that its policy of denying Fifth Amendment protection reflects "the need to maintain a fair state-individual balance (one of the values underlying the Fifth Amendment ...)."[126]

I cannot agree with the plurality's suggestion that the privilege is self-limiting. The privilege is premised on an *a priori* belief that a "fair state-individual balance" is one in which incriminating testimony is not compelled. The value underlies the privilege; it does not condition its application.

I believe that when a court considers denying the privilege in a situation where it would otherwise apply, it must acknowledge that the source of the limitation is not the Fifth Amendment itself. Rather, the court must admit that it is weighing an important individual right against a state interest—not rooted in the privilege—that is incompatible with the assertion of that right. In striking that balance, the court must be "ever mindful of its critical role as the protector of the citizen."[127] The court must also make certain that the government interest is truly fundamental and that its accommodation is irreconcilable with meaningful exercise of the right. While I firmly believe that no such balancing test needed to be conducted in this case, I feel that the balancing test that the plurality did conduct failed to articulate and consider the serious interests at stake.

The plurality asserts that the suggested safeguards go beyond the scope of the privilege against self-incrimination and "import[ ] ... unrelated ... constitutional guarantees,"[128] chiefly from the due process clause. Prior to the major Fifth Amendment cases of the 1960's, the Supreme Court *did* deal with the issues of trustworthiness and voluntariness of confessions under the due process clause.[129]

---

**125.** The plurality derisively "admire[s] the dissent's courage in assessing the needs and prescribing the details of psychiatric practice." Pl. op. at 1114 n. 9. This is a complete misrepresentation of the intent or effect of the suggested protections. First, the *Miranda*-type warnings, an attempt at full disclosure, are embraced by psychologists and psychiatrists alike as ethical imperatives. *See supra* note 124 and sources cited therein. Second, the requirement of tape recording is minimally intrusive into the interview process and is already in wide use in the profession. *See supra* note 111. Finally, and of critical importance, forensic diagnosis is not a creature of psychiatry; it is a creature of law. The forensic examination is ordered by and performed for the legal system. The entire evaluation is designed to yield information bearing on legal issues and is a construct of the legal system. It is therefore inappropriate and fundamentally incorrect to term court-imposed conditions on that procedure "prescribing the details of psychiatric practices."

**126.** Pl. op. at 1113.

**127.** *Florida v. Meyers,* —— U.S. ——, 104 S.Ct. 1852, 80 L.Ed.2d 381, 35 Crim.L.Rep. (BNA) 4024 (1984) (Stevens, J., dissenting).

**128.** Pl. op. at 1115. The plurality refers to these protections as a "veritable constitutional delicatessen." *Id.* In my view, this and other metaphoric flights of fancy (dressing psychiatrists in police uniforms, for example, pl. op. at 1115) unhelpfully deflect attention away from rational discussion of serious constitutional issues.

**129.** *See Rochin v. California,* 342 U.S. 165, 173, 72 S.Ct. 205, 210, 96 L.Ed. 183 (1952) ("Use of involuntary verbal confessions in State criminal trials is constitutionally obnoxious not only because of their unreliability. They are inadmissible under the Due Process Clause even though statements contained in them may be independently established as true. Coerced confessions offend the community's sense of fair play and decency."); *Brown v. Mississippi,* 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936) (excluding as untrustworthy under due process clause of the Fourteenth Amendment a confession secured

During the 1960's, however, the Court explicitly construed the privilege against self-incrimination to include concerns that had previously been treated under the rubric of due process. In *Murphy v. Waterfront Commission*, Mr. Justice Goldberg wrote for the Court that the application of the privilege "must depend, of course, on whether such an application of the privilege promotes or defeats its policies and purposes." [130] Three terms later, Mr. Chief Justice Warren, writing for the Court in *Miranda*, explicitly endorsed the *Murphy* Court's construction of the privilege and acknowledged its novelty:

> As a "noble principle often transcends its origins," the privilege has come rightfully to be recognized in part as an individual's substantive right, a "right to a private enclave where he may lead a private life. That right is the hallmark of our democracy." *United States v. Grunewald*, 233 F.2d 556, 579, 581–582 (Frank, J., dissenting), rev'd, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957). We have recently noted that the privilege against self-incrimination—the essential mainstay of our adversary system—is founded on a complex of values, *Murphy v. Waterfront Comm'n*, 378 U.S. 52, 55–57, n. 5, 84 S.Ct. 1594, 1596–1597 n. 5, 12 L.Ed.2d 678 (1964); *Tehan v. Shott*, 382 U.S. 406, 414–415, n. 12, 86 S.Ct. 459, 464–465 n. 12, 15 L.Ed.2d 453 (1966). All these policies point to one overriding thought: the constitutional foundation underlying the privilege is the respect a government—state or federal—must accord to the dignity and integrity of its citizens. To maintain a "fair state-individual balance," to require the govern-

ment "to shoulder the entire load," 8 Wigmore, Evidence 317 (McNaughton rev. 1961), to respect the inviolability of the human personality, our accusatory system of criminal justice demands that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth. *Chambers v. Florida*, 309 U.S. 227, 235–238, 60 S.Ct. 472, 476–477, 84 L.Ed. 716 (1940). In sum, the privilege is fulfilled only when the person is guaranteed the right "to remain silent unless he chooses to speak in the unfettered exercise of his own will." *Malloy v. Hogan*, 378 U.S. 1, 8, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 658 (1964).[131]

As the *Miranda* Court noted, the privilege "has always been 'as broad as the mischief against which it seeks to guard.'"[132] The forensic examination presents a clear risk of the type of "mischief" that the Court has declared anathema to the policies of the privilege. The suggested safeguards are closely tailored to remedy that mischief. Tape recording, for example, not only enhances trustworthiness, but also protects against the central evil to which *Miranda* was directed: the risk of coercion and deception in extracting statements from a criminal defendant.

The privilege against self-incrimination applies to all incriminating compelled testimonial communications. Statements made during a court-ordered forensic examination clearly fall within the literal terms of the privilege. The plurality denies applica-

---

after a prisoner had been whipped); *see also Rogers v. Richmond*, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961); *Blackburn v. Alabama*, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960); *Spaho v. New York*, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959).

**130.** 378 U.S. 52, 54, 84 S.Ct. 1594, 1596, 12 L.Ed.2d 678 (1964). The *Murphy* Court's statement of the policies of the privilege is set out at pp. 28–29. This expansion of the privilege beyond its original contours has been criticized. *See* Friendly, *The Fifth Amendment Tomorrow: The Case for Constitutional Change*, 37 U.Cɪɴᴄ.L.

Rᴇᴠ. 671, 681–82 (1968) ("the Warren Court ... has pressed the amendment far beyond anything that went before"). Nevertheless, whatever our views as to the wisdom of such a construction, it undoubtedly remains good law.

**131.** *Miranda v. Arizona*, 384 U.S. 436, 460, 86 S.Ct. 1602, 1620, 16 L.Ed.2d 694 (1966).

**132.** *Id.* at 459–60, 86 S.Ct. at 1619–20 (quoting *Counselman v. Hitchcock*, 142 U.S. 547, 562, 12 S.Ct. 195, 198, 35 L.Ed. 1110 (1892)).

tion of the privilege on the ground that refusal to undergo the examination would deprive the government of necessary information. The safeguards described above, however, allow the government to obtain what it needs while furthering the core purposes of the privilege. The plurality's dismissal of these safeguards as "exotic" reflects a crabbed construction of the privilege wholly at odds with the unambiguous pronouncements of the Supreme Court. As the Court has said of the privilege, "[t]his constitutional protection must not be interpreted in a hostile or niggardly spirit." [133] In constructing a false dichotomy between a completely unmonitored psychiatric interrogation, on the one hand, and the absence of any compelled evaluation on

the other, this court has manifestly failed to heed the Supreme Court's precepts.

III. THE COURT-ORDERED CLINICAL INTERVIEW AND THE SIXTH AMENDMENT [***]

The Sixth Amendment guarantees an accused the right to the assistance of counsel in connection with any "critical stage" of the proceedings against him.[134] A "critical stage" is any (1) pretrial "confrontation" with the government [135] (2) occurring at or after the start of "adversary judicial proceedings," [136] (3) for which the assistance of counsel is necessary to prevent "potential prejudice to defendant's rights." [137] It is undisputed in this case that the second of these three requirements—the onset of adversary judicial proceedings—has been met. I consider the other two requirements in turn.[138]

**133.** *Ullmann v. United States,* 350 U.S. 422, 426, 76 S.Ct. 497, 500, 100 L.Ed. 511 (1956).

[***] Judge Edwards, being of the opinion that resolution of the Sixth Amendment issue is unnecessary for decision of this case, does not join in Part III. Judge Edwards expresses no opinion as to the applicability of the Sixth Amendment to court-ordered insanity examinations.

**134.** *See Estelle v. Smith,* 451 U.S. 454, 469–71, 101 S.Ct. 1866, 1876–77, 68 L.Ed.2d 359 (1981); *United States v. Henry,* 447 U.S. 264, 269, 100 S.Ct. 2183, 2186, 65 L.Ed.2d 115 (1980); *United States v. Wade,* 388 U.S. 218, 227, 87 S.Ct. 1926, 1932, 18 L.Ed.2d 1149 (1967).

**135.** *See United States v. Henry,* 447 U.S. 264, 269, 274–75, 100 S.Ct. 2183, 2186, 2188–89, 65 L.Ed.2d 115 (1980); *Moore v. Illinois,* 434 U.S. 220, 228, 229, 98 S.Ct. 458, 464, 465, 54 L.Ed.2d 424 (1977); *Brewer v. Williams,* 430 U.S. 387, 398–401, 97 S.Ct. 1232, 1239–1240, 51 L.Ed.2d 424 (1977); *United States v. Ash,* 413 U.S. 300, 317–18, 93 S.Ct. 2568, 2577–78, 37 L.Ed.2d 619 (1973).

**136.** *See Estelle v. Smith,* 451 U.S. 454, 469–70, 101 S.Ct. 1866, 1876–77, 68 L.Ed.2d 359 (1980); *Moore v. Illinois,* 434 U.S. 220, 226–29, 98 S.Ct. 458, 463–65, 54 L.Ed.2d 424 (1977); *Kirby v. Illinois,* 406 U.S. 682, 688–89, 92 S.Ct. 1877, 1881–82, 32 L.Ed.2d 411 (1972) (plurality opinion).

The *Fifth* Amendment, of course, confers an independent right to the presence of counsel during any custodial "interrogation," whether held before or after the start of "adversary judicial proceedings." *See Rhode Island v. Innis,* 446 U.S. 291, 300–301, 100 S.Ct. 1682, 1689–1690, 64 L.Ed.2d 297 (1980); *Miranda v. Arizo-*

*na,* 384 U.S. 436, 473–74, 86 S.Ct. 1602, 1627–28, 16 L.Ed.2d 694 (1966).

**137.** *United States v. Wade,* 388 U.S. 218, 227, 87 S.Ct. 1926, 1932, 18 L.Ed.2d 1149 (1967); *see Estelle v. Smith,* 451 U.S. 454, 470–71, 101 S.Ct. 1866, 1876–77, 68 L.Ed.2d 359 (1981); *Coleman v. Alabama,* 399 U.S. 1, 9–10, 90 S.Ct. 1999, 2003–2004, 26 L.Ed.2d 387 (1970) (plurality opinion); *Powell v. Alabama,* 287 U.S. 45, 69, 53 S.Ct. 55, 64, 77 L.Ed. 158 (1932).

**138.** The concurrence contends that the Sixth Amendment issue, like the Fifth, is not properly before this court. It is true that the Sixth Amendment claim was not raised either at trial or on appeal. While courts will not generally consider on a petition for rehearing issues that were not raised in the original appellate briefs, *see, e.g., Bullock v. Mumford,* 509 F.2d 384, 388 (D.C.Cir.1975), courts are "bound to consider any change, either in law or fact, which has supervened since the judgment was entered." *Patterson v. Alabama,* 294 U.S. 600, 607, 55 S.Ct. 575, 578, 79 L.Ed. 1082 (1935). In applying this exception, this court has noted that when "substantial rights [are] hanging in the balance, elemental justice requires our determination whether appellant can reap any benefit" from supervening alterations or clarifications in the law. *Pendergast v. United States,* 416 F.2d 776, 781 (D.C.Cir.1969) (Robinson, J.); *see Alexander v. United States,* 418 F.2d 1203, 1205 (D.C.Cir. 1969) (Robinson, J.).

Byers' Sixth Amendment claim falls squarely within this exception. The consistent view of the federal courts of appeals has been that no Sixth Amendment right attaches to court-ordered clinical interviews conducted on defendants who raise the defense of insanity. *Estelle v. Smith,* handed down by the Supreme Court

## A. *"Confrontation"*

The Sixth Amendment right to the assistance of counsel in connection with events before trial is an extension of the right to counsel *at* trial.[139] Its application is therefore limited to events constituting an actual "confrontation" between the accused and the state, rather than to all activities undertaken by the state between the start of adversary proceedings and the time of trial.[140] There is no requirement, however, that "confrontations" be themselves formal proceedings.[141] Indeed, lineups [142] and unwitting conversations with government informants [143] are two quintessential examples of informal but nevertheless crucial "confrontations" between the accused and the state.

A court-ordered clinical interview is clearly a "confrontation" in the sense that the accused is present and is the object of the inquiry. The plurality attempts to delineate far more restrictive criteria for a confrontation, and then exclude the psychiatric examination from Sixth Amendment protections for failing to meet those criteria. In my view, the plurality's test for a Sixth Amendment "confrontation" is unsupported by precedent. Moreover, even under the plurality's standard, the compelled psychiatric examination would still constitute a "confrontation" for purposes of the Sixth Amendment.

In *United States v. Wade,*[144] the Supreme Court determined that a defendant had a Sixth Amendment right to assistance of counsel at a police lineup conducted to elicit identification evidence. The Court noted that the presence of counsel was required "to protect Wade's most basic right as a criminal defendant—his right to a fair trial at which the witnesses against him might be meaningfully cross-examined." [145] The Court observed that a lineup was an inherently suggestive procedure and that a defendant would be unable to perceive the suggestive or distorting influences and reconstruct them at trial.

In *United States v. Ash,*[146] the Court refused to extend the Sixth Amendment guarantees of *Wade* to a photographic identification session, reasoning that such an identification was not a "confrontation." The difference between *Wade* and *Ash,* which made one a confrontation and the other not, is apparent: in *Wade,* the accused was present, and in *Ash,* he was not.

The plurality construes *Ash* as a repudiation of that portion of *Wade* which bases the Sixth Amendment right on the ground that counsel will be able to reconstruct the interaction at trial far more effectively than will a criminal defendant.[147] *Ash,* in my view, excludes reconstruction at trial as the *sole* ground for extending Sixth Amendment protection. *Ash* does, how-

since Byers' appeal, changed two features of the legal landscape in which Byers' case was planted. First, it made clear that clinical interviews can be "critical stages" for purposes of the Sixth Amendment. Second, it suggested that a proceeding can be a "critical stage" without requiring the presence of counsel and that courts can fashion safeguards tailored to preserve the particular role counsel is expected to serve in connection with a particular proceeding. These major clarifications in Sixth Amendment doctrine were of significant benefit to Byers and made viable a claim that may have previously seemed futile.

**139.** *See United States v. Ash,* 413 U.S. 300, 309–12, 93 S.Ct. 2568, 2573–75, 37 L.Ed.2d 619 (1973).

**140.** *Id.* at 317, 93 S.Ct. at 2577.

**141.** *United States v. Wade,* 388 U.S. 218, 226, 87 S.Ct. 1926, 1931, 18 L.Ed.2d 1149 (1967) ("The

accused is guaranteed that he need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial.") (citation omitted).

**142.** *Id.* at 228–39, 87 S.Ct. at 1933.

**143.** *See United States v. Henry,* 447 U.S. 264, 270–75, 100 S.Ct. 2183, 2186–89, 65 L.Ed.2d 115 (1980).

**144.** 388 U.S. at 218, 87 S.Ct. at 1926 (1967).

**145.** *Id.* at 224, 87 S.Ct. at 1930.

**146.** 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973).

**147.** *See* pl. op. at 1116–1117.

ever, construe *Wade* as conferring a right to the assistance of counsel when the accused is subject to an encounter with the state that presents the possibility of suggestive influence which the accused will be unable to articulate at trial. The Court in *Ash* observed:

> The function of counsel in rendering "Assistance" continued at the lineup under consideration in *Wade* and its companion cases. Although the accused was not confronted there with legal questions, the lineup offered opportunities for prosecuting authorities to take advantage of the accused. *Counsel was seen by the Court as being more sensitive to, and aware of, suggestive influences than the accused himself, and as better able to reconstruct the events at trial.* Counsel present at lineup would be able to remove disabilities of the accused in precisely the same fashion that counsel compensated for the disabilities of the layman at trial. Thus, the Court mentioned that the accused's memory might be dimmed by "emotional tension," that the accused's credibility at trial would be diminished by his status as defendant, and that the accused might be unable to present his version effectively without giving up his privilege against self-incrimination. It was in order to compensate for these deficiencies that the Court found the need for the assistance of counsel.[148]

*Ash* stands for the proposition that there is no general right for counsel to attend pretrial proceedings as an observer. Where the accused is present at the proceeding, however, it is a confrontation and counsel is permitted to remedy the defendant's comparative disadvantage as an observer.

As Mr. Justice Brennan noted in his dissent in *Ash:*

> There is something ironic about the Court's conclusion that a pretrial lineup identification is a "critical stage" of the prosecution because counsel's presence can help to compensate for the accused's deficiencies as an observer, but that a pretrial photographic identification is not a "critical stage" of the prosecution because the accused is not able to observe at all.[149]

The plurality, however, views *Ash* as limiting the Sixth Amendment to those "confrontations" in which the accused is confronted *"either* with the need to make a decision requiring distinctively legal advice ... or with the need to defend himself against the direct onslaught of the prosecutor."[150] Such a construction, however, would exclude from protection that which the Court explicitly said would be included: a proceeding where counsel was needed to reconstruct suggestive events.

*United States v. Henry,*[151] decided seven years after *Ash,* makes clear that the plurality's test for a "confrontation," if it were ever valid, is valid no longer. In *Henry,* while the defendant was in jail awaiting trial, government agents contacted an inmate in defendant's cellblock and instructed him to be alert to any statement made by the defendant, but not to initiate any conversations. The Court reasoned that by intentionally creating a situation likely to induce the defendant to make incriminating statements, the government had created a postindictment confrontation which was a "critical stage." The Court found a violation of the defendant's right to counsel even though no legal advice was required *and* there was no "direct onslaught of the prosecutor." The jailhouse

---

148.  413 U.S. at 312–13, 93 S.Ct. at 2575 (emphasis added).

149.  *Id.* at 344, 93 S.Ct. at 2591. The plurality echoes Justice Brennan's questioning of the *Ash* Court's distinction for Sixth Amendment purposes between situations in which the defendant is present and those in which he is not. I suggest, *infra* at 1167 notes 175–176, the distinction between *Ash* and *Wade* may have to do with the different potentials for distortion in

lineups and photographic identifications. Whatever the wisdom or logic of such a distinction, it is the only way to reconcile the holding of *Ash* with its explicit endorsement of *Wade.*

150.  Pl. op. at 1118 (emphasis in original).

151.  447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980).

informant was in no way an "expert adversary"; he was merely an individual confronting the defendant in an interaction instigated by the government which was likely to prove harmful to the defendant at trial.

That *Henry* broadened the test for a confrontation in *Ash* was made clear in Justice Rehnquist's dissent in *Henry*. His dissent is premised in part on a view that the Court in *Henry* had moved away from what he viewed as the core functions of counsel:

> [M]ore recently this Court has again observed that the concerns underlying the Sixth Amendment right to counsel are to provide aid to the layman in arguing the law and in coping with intricate legal procedure. *United States v. Ash*, 413 U.S. 300, 307–308 [93 S.Ct. 2568, 2572–2573, 37 L.Ed.2d 619] (1973), and to minimize the imbalance in the adversary system that otherwise resulted with the creation of the professional prosecuting official. Thus, in examining whether a stage of the proceedings is a "critical" one at which the accused is entitled to legal representation it is important to recognize that the theoretical foundation of the Sixth Amendment right to counsel is based on the traditional role of an attorney as a legal expert and strategist.[152]

For good or ill, *Henry* clearly extends protection to situations beyond those in which the accused is confronted by the intricacies of legal procedure or by his expert adversary.

Even if the criteria for Sixth Amendment applicability *were* limited to those two suggested by the plurality, the compelled psychiatric examination would still, in my view, fulfill one of these criteria. The psychiatrists and other behavioral experts who conduct court-ordered clinical interviews are clearly professional adversaries. They are experts employed by the government. They meet with the accused after he has been charged with a crime and while he is in criminal custody. Their reports are transmitted to the government and may be used by it to help prove the defendant's guilt. They routinely testify on behalf of the government. Even if we assume their complete objectivity, their interest in evaluating the defendant's mental state can clearly be at odds with his interest in being acquitted.[153]

Whatever doubts there once may have been on this point are, I believe, completely eliminated by *Estelle v. Smith*. In *Smith*, the Court unequivocally held that the competency examination at issue "proved to be a 'critical stage' of the aggregate proceedings against respondent," in connection with which he was entitled to the assistance of counsel.[154] This holding logically required the Court to find both (a) that the examination was a "confrontation" and (b) that the assistance of counsel was necessary to preserve the defendant's rights. The *Smith* decision's first finding clearly

---

**152.** *Id.* at 292, 100 S.Ct. at 2198 (citation and footnotes omitted).

**153.** *See United States v. Bass*, 477 F.2d 723, 725–26 (9th Cir.1973); *United States v. Theriault*, 440 F.2d 713, 715 (5th Cir.1971), *cert. denied*, 411 U.S. 984, 93 S.Ct. 2278, 36 L.Ed.2d 960 (1973); *State v. Corbin*, 15 Or.App. 536, 546–47, 516 P.2d 1314, 1319 (1973); A. STONE, *supra* note 87, at 188; Fersch, *Ethical Issues for Psychologists in Court Settings* (paper prepared for American Psychological Association's Task Force on the Role of Psychology in the Criminal Justice System), in WHO IS THE CLIENT?, *supra* note 89, at 54–55; Miranda *On the Couch, supra* note 65, at 427–28; *cf.* Bazelon, *Should the Psychiatrist Have a Role in the Criminal Justice System?, supra* note 87.

**154.** 451 U.S. 454, 470 n. 14, 101 S.Ct. 1866, 1876 n. 14, 68 L.Ed.2d 359 (1981). *Smith* confers a right to *assistance* of counsel, rather than a right to have counsel actually present. The plurality construes *Smith* to relinquish any right to counsel once the psychiatric examination begins, relying upon Chief Justice Burger's approving reference to his earlier dissent in *Thornton v. Corcoran*, 407 F.2d 695, 705 (1969). *See* pl. op. at 1119 n. 16. As then-Judge Burger's dissent makes clear, however, the restriction on counsel's presence is dictated not by arbitrarily set time frames, but by a legitimate concern about possible interference with the diagnostic process. Tape recording as a nonintrusive measure provides assistance of counsel consistent with the *Smith* Court's reservations about counsel's actual presence. *See infra* pp. 1171–1172.

controls in this case. With regard to whether a clinical interview constitutes a "confrontation," I see no relevant distinction between defendants who plead insanity and those who do not. Indeed, although the "confrontation" finding was only implicit in the *Smith* decision's Sixth Amendment discussion, I find strikingly relevant to the instant issue the portion of *Smith's* Fifth Amendment discussion in which the Court spoke explicitly about the adversary nature of a clinical examination. The Court stated that, to the extent that an examination aids the prosecution, it is a species of "official interrogation" in which the role of the interviewer is "essentially like that of an agent of the State." [155] It then concluded what should also be obvious in this case: the accused subject to such an examination "assuredly was 'faced with a phase of the adversary system' and was 'not in the presence of [a] perso[n] acting solely in his interest.' " [156]

In the plurality view, the psychiatrist is not an adversary because at the time of the examination he has not yet decided to testify for the prosecution and is therefore neutral. [157] Witnesses for the state, however, are often neutral at the time of their contact with the defendant and only later decide to aid the state. Indeed, police officers and prosecutors should be neutral when they first confront the defendant. Sides are taken on the basis of the information gathered in the interviews. It would clearly be senseless to withhold protection in situations likely to provide the substance of a prosecution witness' testimony and then confer protection once the information has been extracted and the neutral observer declares himself for the prosecution.

## B. *The Possibility of Prejudice*

Once it is established that a stage of proceedings is a "confrontation," it is necessary to consider whether the absence of the assistance of counsel in connection with that confrontation will prejudice the defendant's rights in a way that cannot be remedied at trial. As the Court noted in *Smith*, quoting *United States v. Wade:*

> It is central to the Sixth Amendment principle that in addition to counsel's presence at trial, the accused is guaranteed that he need not stand alone against the State at any stage of the prosecution, formal or informal, *where counsel's absence might derogate from the accused's right to a fair trial.* [158]

The specific reason for the *Smith* Court's finding that counsel's assistance was necessary does not control in this case. The Court focused in *Smith* on the need for counsel to preserve the accused's Fifth Amendment right not to undergo the examination. [159] There are, however, independent reasons—grounded in previous Sixth Amendment decisions expressly relied upon by *Smith*—for requiring certain safeguards in connection with the clinical interview.

The Court in *Smith* cited ten cases in support of its right-to-counsel analysis. [160]

**155.** 451 U.S. at 467, 101 S.Ct. at 1875.

**156.** *Id.* (quoting *Miranda v. Arizona,* 384 U.S. 436, 469, 86 S.Ct. 1602, 1625, 16 L.Ed.2d 694 (1966)).

**157.** Pl. op. at 1119.

**158.** *Estelle v. Smith,* 451 U.S. 454, 470, 101 S.Ct. 1866, 1876, 68 L.Ed.2d 359 (citing *United States v. Wade,* 388 U.S. 218, 226–27, 87 S.Ct. 1926, 1931–32, 18 L.Ed.2d 1149 (1967)) (emphasis added) (footnote omitted).

**159.** The Court also strongly suggested in dictum that no right to refuse to undergo the examination would be available to a defendant pleading insanity. 451 U.S. at 465–66, 101 S.Ct. at 1874–75.

**160.** *Id.* at 469–71, 101 S.Ct. at 1876–77. The ten cases cited were *United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980); *Moore v. Illinois,* 434 U.S. 220, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977); *Maness v. Meyers,* 419 U.S. 449, 95 S.Ct. 584, 42 L.Ed.2d 574 (1975); *Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972) (plurality opinion); *Coleman v. Alabama,* 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970) (plurality opinion); *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); *White v. Maryland,* 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963); *Hamilton v. Alabama,* 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114 (1961); and *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932).

Of those ten cases, only one involved, like *Smith* itself, the protection of an attendant Fifth Amendment privilege against self-incrimination.[161] Indeed, many of those cases upheld a defendant's right to the assistance of counsel while at the same time explicitly [162] or implicitly [163] determining that the confrontation at issue did *not* implicate Fifth Amendment concerns. The nine cases that did not rely on an attendant Fifth Amendment right rested their right-to-counsel analyses instead on one or another form of the more general proposition introduced above: a defendant is guaranteed the right to the assistance of counsel in connection with a pretrial confrontation whenever the lack of such assistance could seriously and irreparably prejudice his basic rights.[164]

The most directly relevant of the Sixth Amendment cases cited in *Estelle v. Smith* is *United States v. Wade.*[165] Having determined that requiring a defendant to participate in a lineup conducted to elicit identification evidence did not violate his privilege against self-incrimination,[166] the Court went on to inquire whether the presence of counsel was necessary "to protect Wade's ... right to a fair trial at which the witnesses against him might be meaningfully cross-examined."[167] The Court explained that, with regard to

> systematized or scientific analyzing of the accused's fingerprints, blood sample,

clothing, hair, and the like[,] ... [k]nowledge of the techniques of science and technology is sufficiently available, and the variables in techniques few enough, that the accused has the opportunity for a meaningful confrontation of the Government's case at trial through the ordinary processes of cross-examination of the Government's expert witnesses and the presentation of the evidence of his own experts. The denial of a right to have his counsel present at such analyses does not therefore violate the Sixth Amendment; they are not critical stages since there is minimal risk that his counsel's absence at such stages might derogate from his right to a fair trial.[168]

The Court concluded that lineups, however, pose a markedly different set of circumstances. It found inherent in the nature of lineups a serious risk that procedures might be employed that are intentionally or unintentionally suggestive [169] and that might easily give rise to "miscarriage of justice from mistaken identification." [170] The Court found, moreover, that the dangers inherent in lineups cannot adequately be met by skillful advocacy at trial. "[N]either witnesses nor lineup participants are apt to be alert for conditions prejudicial to the suspect. And if they were, it would likely be of scant benefit to the suspect since neither witnesses nor

---

**161.** That case was *Maness v. Meyers,* 419 U.S. 449, 95 S.Ct. 584, 42 L.Ed.2d 574 (1975). *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), might have been another, but it has been held, at least in retrospect, to have "rest[ed] squarely" on the Sixth Amendment. *United States v. Henry,* 447 U.S. 264, 270, 100 S.Ct. 2183, 2186, 65 L.Ed.2d 115 (1980).

**162.** *See United States v. Henry,* 447 U.S. 264, 272–73, 100 S.Ct. 2183, 2188, 65 L.Ed.2d 115 (1980); *United States v. Wade,* 388 U.S. 218, 221, 87 S.Ct. 1926, 1929, 18 L.Ed.2d 1149 (1967); *cf. Moore v. Illinois,* 434 U.S. 220, 224–26, 98 S.Ct. 458, 462–63, 54 L.Ed.2d 424 (1977) (construing Sixth Amendment right established in *Wade*); *Kirby v. Illinois,* 406 U.S. 682, 687–88, 92 S.Ct. 1877, 1881, 32 L.Ed.2d 411 (1972) (same).

**163.** *See Coleman v. Alabama,* 399 U.S. 1, 8–9, 90 S.Ct. 1999, 2002–2003, 26 L.Ed.2d 387 (1970).

**164.** *See, e.g., United States v. Henry,* 447 U.S. 264, 270, 100 S.Ct. 2183, 2186, 65 L.Ed.2d 115 (1980); *Coleman v. Alabama,* 399 U.S. 1, 9, 90 S.Ct. 1999, 2003, 26 L.Ed.2d 387 (1970); *United States v. Wade,* 388 U.S. 218, 227, 87 S.Ct. 1926, 1932, 18 L.Ed.2d 1149 (1967); *Hamilton v. Alabama,* 368 U.S. 52, 54, 82 S.Ct. 157, 158, 7 L.Ed.2d 114 (1961); *Powell v. Alabama,* 287 U.S. 45, 69, 53 S.Ct. 55, 64, 77 L.Ed. 158 (1932).

**165.** 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

**166.** *Id.* at 221, 87 S.Ct. at 1929.

**167.** *Id.* at 224, 87 S.Ct. at 1930.

**168.** *Id.* at 227–28, 87 S.Ct. at 1932–33.

**169.** *Id.* at 228, 232–35, 87 S.Ct. at 1932, 1934–36.

**170.** *Id.* at 228, 87 S.Ct. at 1932.

lineup participants are likely to be schooled in the detection of suggestive influences."[171] In addition, "[i]mproper influences may go undetected by a suspect, guilty or not, who experiences the emotional tension which we might expect in one being confronted with potential accusers."[172] The defense's resulting "inability effectively to reconstruct at trial any unfairness that occurred at the lineup may deprive [the defendant] of his only opportunity meaningfully to attack the credibility of the witness' courtroom identification."[173] The Court therefore required that, in the absence of waiver, the results of lineups not be admissible in court unless counsel was present as an expert observer capable of averting prejudice and assuring meaningful rebuttal and cross-examination at trial.[174]

As Judge Wilkey has noted, the lineup is "a little drama," a complex event involving a variety of actors over an appreciable period of time.[175] Like all theater, it is ephemeral; once completed, it leaves no record. What distinguishes the photographic identification in *Ash* from the lineup in *Wade* is the existence of an objective record. The raw material of the identification—the photographs—remain and can be presented at trial. The preservation of these immobile photographs ensures that any "unfairness

can be demonstrated at trial from an actual comparisons of the photographs used."[176] The lesson of *Ash* is that an objective record, which allows reconstruction at trial of suggestive influences, can serve as an adequate surrogate for the presence of counsel and thereby satisfy the requirements of the Sixth Amendment.

### 1. *The Clinical Interview*

It is obvious to me, merely on the face of the discussion in *Wade*, that a compelled clinical interview bears more resemblance for Sixth Amendment purposes to a lineup than to a fingerprint analysis or a photographic identification. I do not rest on my intuition, however, for I am convinced that any thorough analysis of the sort conducted in *Wade* itself must inevitably lead to the conclusion that court-ordered clinical interviews pose an even greater threat of prejudice to a defendant's right to a fair trial than do the lineups analyzed in *Wade*.

I do not base this conclusion merely on the oft-made observation that the nature of knowledge in the behavioral sciences is inexact and uncertain.[177] Nor do I rely simply on the fact that psychiatrists and others who conduct clinical interviews often hold widely different theoretical positions[178] and may be subject to personal and

**171.** *Id.* at 230, 87 S.Ct. at 1934 (footnote omitted).

**172.** *Id.* at 230–31, 87 S.Ct. at 1934 (footnote omitted).

**173.** *Id.* at 232, 87 S.Ct. at 1934.

**174.** *Id.* at 236–37, 87 S.Ct. at 1937.

**175.** *United States v. Ash*, 461 F.2d 92, 108 (D.C. Cir.1972) (en banc) (Wilkey, J., dissenting), *rev'd*, 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973).

**176.** *United States v. Ash*, 413 U.S. 300, 324, 93 S.Ct. 2568, 2581, 37 L.Ed.2d 619 (1973) (Stewart, J., concurring).

**177.** *See, e.g., Suggs v. LaVallee*, 570 F.2d 1092, 1119 (2d Cir.) (Kaufman, J., concurring) ("[P]sychiatry is at best an inexact science, if, indeed, it is a science, lacking the coherent set of proven underlying values necessary for ultimate decisions on knowledge or competence."), *cert. de-*

*nied*, 439 U.S. 915, 99 S.Ct. 290, 58 L.Ed.2d 263 (1978); Diamond & Louisell, *supra* note 84, at 1340–43; Ennis & Litwack, *Psychiatry and the Presumption of Innocence: Flipping Coins in the Courtroom*, 62 Calif.L.Rev. 693, 729–32 (1974); Kubie, *The Ruby Case: Who or What Was On Trial*, 1 J. Psychiatry & L. 475, 480–83 (1973); Morse, *Law and Mental Health Professionals; The Limits of Expertise*, 9 Prof. Psychology 389, 392–95 (1978); Pollack, *Principles of Forensic Psychiatry for Psychiatric-Legal Opinion-Making*, 1971 Legal Med.Ann. 261, 267–69.

**178.** *See, e.g.*, J. Malcolm, *supra* note 114, *passim;* The Theory and Practice of Psychiatry *supra* note 57, at 22–23; Diamond, *The Psychiatrist as Advocate*, 1 J. Psychiatry & L. 5, 13–16 (1973); Ennis & Litwack, *supra* note 177, at 722; Pugh, *The Insanity Defense in Operation: A Practicing Psychiatrist Views Durham and Brawner*, 1973 Wash.U.L.Q. 87, 103–05. In this case, for example, one of the psychologists examining Byers at Springfield, Dr. Varhely, testified that he believed that all psychoses were the result of

institutional biases.[179] These limitations on the reliability of expert testimony in the behavioral sciences could presumably be the subject of effective cross-examination without the necessity for specific additional safeguards.[180] Rather, I focus more narrowly on the specific concerns at work in *Wade:* the risk of distortion and the difficulty of factual reconstruction.

A typical psychiatric or other clinical interview is a complex event, in which the accused exhibits a host of subtle but important behaviors.[181] The interviewer's task is to select from all those behaviors the ones that are particularly meaningful and to translate that set of observations into a clinical conclusion. As I suggested above,[182] this process of translation could in theory be challenged by skillful cross-examination. Counsel could press the expert witness to detail the specific observations upon which the expert bases his or her conclusions. Counsel could then ask the expert precisely how he or she arrived from those observations to his or her conclusions. Armed with this information, counsel could attack the overall theoretical structure or specific criteria employed by the expert, or ask other witnesses how they would evaluate the same data.

The problem with this scenario, however, is that the expert cannot be a completely objective and reliable informant even with respect to the bare "facts" of the interview.[183] The same intellectual presuppositions and personal and institutional biases that affect his or her evaluation of the data also affect his or her conscious or unconscious decisions regarding what sort of behavior to notice, remember, and record.[184] And what is left out in that process may—in the minds of other equally competent behavioral scientists—cast serious doubt on the validity of the interviewer's conclusions.[185] Perhaps more importantly, even

chemical imbalances. Tr. 2/6/78 at 110. Dr. Varhely did not indicate that he had used any biochemical tests in making his diagnosis of no psychosis. This example illustrates to me the need to penetrate beneath the veneer of impartiality to the value-laden core of psychiatric diagnosis. It seems to me no accident that the government employs an expert who believes in an organic etiology of mental disease.

179. *See, e.g.,* Diamond & Louisell, *supra* note 84, at 1344–45; Kubie, *supra* note 177, at 479; Pasamanick, Dinitz & Lefton, *Psychiatric Orientation and Its Relation to Diagnosis and Treatment in a Mental Hospital,* 116 AM.J. PSYCHIATRY 127, 131–32 (1959); Poythress, *Mental Health Expert Testimony: Current Problems,* 5 J. PSYCHIATRY & L. 201, 206–07 (1977).

180. *See generally* J. ZISKIN, *supra* note 57, at 96–199.

181. *See* P. HOCH, DIFFERENTIAL DIAGNOSIS IN CLINICAL PSYCHIATRY 19–46 (M. Strahl & N. Lewis eds. 1972); THE THEORY AND PRACTICE OF PSYCHIATRY, *supra* note 57, at 197, 211; S. SARASON, THE CLINICAL INTERACTION 7–19 (1954).

182. *See supra* pp. 1167–1168 & nn. 177–80.

183. *See* E. COLES, CLINICAL PSYCHOPATHOLOGY 56, 68 (1982); R. ROSENTHAL, EXPERIMENTER EFFECTS IN BEHAVIORAL RESEARCH 20–21 (1966); S. Sarason, *supra* note 181, at 9; Grosz & Grossman, *The Sources of Observer Variation and Bias in Clinical Judgments: I. The Item of Psychiatric History,* 138 J. NERVOUS & MENTAL DISEASE 105 (1964);

Leff, *International Variations in the Diagnosis of Psychiatric Illness,* 131 BRIT.J. PSYCHIATRY 329, 329–31 (1977).

184. *See* E. COLES, *supra* note 183, at 68–69 ("The importance of [the] pervasive influence of training and experience cannot be overestimated. Some psychiatrists will reach a diagnostic conclusion within the first few minutes of the interview; and psychiatrists who encounter cues that don't fit with their diagnostic conclusions are prone to misinterpret, misperceive, and even ignore them.") (citations omitted); R. ROSENTHAL, *supra* note 183, at 7 ("Events occurring in the clinical interaction are often unobserved or at least unreported by the clinician.... And often, the errors may be shown to be related to the personal characteristics of the clinical observer, particularly to his personal 'blind spots.'"); S. SARASON, *supra* note 181, at 9 n. 2 ("One of the clinician's most revealing experiences is to listen to a recording of his interaction with a patient. He becomes embarrassingly aware of how much he forgot or was unconscious ... of [in] the patient's behavior....").

185. *See* S. SARASON, *supra* note 181, at 9–18; Katz, Cole & Lowery, *Studies of the Diagnostic Process: The Influence of Symptom Perception, Past Experience, and Ethnic Background on Diagnostic Decisions,* 125 AM.J. PSYCHIATRY 937 (1969); Leff, *supra* note 183, at 329–32; Pasamanick, Dinitz & Lefton, *supra* note 179, at 131 ("Clinicians ... may be selectively perceiving and emphasizing only those characteristics

those "facts" that the interviewer does perceive can easily be distorted by his or her presuppositions, expectations, and sheer random errors.[186] All these effects—compounded by the normal deficiencies of human memory—necessarily become even more severe when the interviewer is asked to reconstruct the events of the interview in the charged atmosphere of a criminal trial.[187]

The clinical interview poses yet another problem even more directly akin to the threat of suggestiveness identified in *Wade:* the interviewer not only may misperceive the behavior of the person being interviewed, but also may unintentionally *determine* that behavior. A clinical interview is more than a complex and subtle event; it is also a complex and subtle set of *interactions* between the interviewer and the accused.[188] The interviewer asks certain questions rather than others. He or she follows up on certain responses and not others. He or she may be of the same race, sex, or class as the accused, or of a different race, sex, or class. Each of these often-subtle variations in the interviewer's character and behavior may have a profound effect on the responses offered by the person being interviewed.[189] Empirical

and attributes of their patients which are relevant to their own preconceived system of thought. As a consequence, they may be overlooking other patient characteristics which would be considered crucial by colleagues who are otherwise committed.")

**186.** *See* R. ROSENTHAL, *supra* note 183, at 21 ("One variable that has been shown especially likely to bias the assessment of behavior is the expectancy of the observer or interpreter."); S. SARASON, *supra* note 181, at 9 ("Although it is usually assumed that a clinician's description of a patient's overt behavior is reliable in terms of inter-clinician agreement, convincing evidence for such an assumption cannot be found. Those who have been responsible for the training of clinical students will attest to the fact that there are discouragingly large individual differences in the ability to describe reliably the overt behavior of a patient. There is no evidence to suggest that graduate training reduces the range of these differences to the point where one need have no particular concern about the matter."); Bacharach, *Diagnosis as Strategic Understanding,* 38 BULL. OF THE MENNINGER CLINIC 390, 391 (1974) ("[The diagnostician's] interests, training, experience, identifications, character attitudes, cognitive style, and interpersonal-cultural heritage guide his observations and shape what he is able to perceive and his attitudes toward diagnosis."); Kubie, *Multiple Fallacies in the Concept of Schizophrenia,* 153 J. NERVOUS & MENTAL DISEASE 331, 340 (1971) ("[W]e have ... misled ourselves by pretending ... that behavior has been more carefully observed, recorded, and differentiated than was possible until the recent introduction of audio-visual aids.... [Until] audio-visual aids [are] used on every patient whose record is to be accepted as dependable scientific data[,] ... we will continue to depend on fallible reports of fallible and weighted memories of our skewed perceptions of rapidly changing and emotionally charged moments of behavior in which many things were occurring simultaneously.").

**187.** In this regard, the interviewer's notes may be something of a mixed blessing. On the one hand, they can help refresh the interviewer's memory. On the other hand, they may help create and perpetuate false memories.

**188.** *See generally* H. SULLIVAN, THE INTERPERSONAL THEORY OF PSYCHIATRY (1953).

**189.** *See* E. COLES, *supra* note 183, at 68 ("Differences in [the interviewer's] experience, training and personality will result in different questions being asked, different answers being given, different emphases placed on the answers that are given, and different interpretations of those answers."); R. ROSENTHAL, *supra* note 183, at 38–86 (characteristics such as experimenter's race, sex, and age, as well as his or her behavior during the interview, may all affect subject's responses); H. STORROW, INTRODUCTION TO SCIENTIFIC PSYCHIATRY 76–78 (1967) ("One can color what patients say without their knowing what's being done. Even worse, the doctor can do this without realizing it himself.... [In one study, for example,] [a]pproval-seeking therapists discouraged angry talk by ignoring such remarks or shifting to other topics. Anger-expressing therapists were likely to do the opposite.... These measures were effective. Patients encouraged to go on in the same vein did so nine times out of ten; those who were discouraged stopped their angry comments more than half the time. Would these two types of therapists be likely to describe their patients in the same way at case conference time?"); Carkhuff & Pierce, *Differential Effects of Therapist's Race and Social Class Upon Patient Depth of Self-Exploration in the Initial Clinical Interview,* 31 J. CONSULTING PSYCHOLOGY 632 (1957); Fleiss, *Estimating the Reliability of Interview Data,* 31 J. CONSULTING PSYCHOLOGY 632 (1957); Leff, *supra* note 183, at 331 ("the stage of inferring pathology on the basis of what has been perceived is subject to the psychiatrist's ethnocentric bias. This increases in proportion to his ignorance of the culture to which his patient belongs."). Both prosecution experts in this case were of different racial and cultural

research indicates that the results of even such ostensibly "objective" parts of the clinical interview as the IQ and Rorschach tests can be markedly influenced by the precise way in which the tests are administered.[190]

It is exceedingly unlikely that a criminal defendant will be able to perceive and present at trial these complex and subtle distortions. The defendant, in all probability, will not be able to recall the wide-ranging, seemingly irrelevant questions put to him by the psychiatrist. His "memory might be dimmed by 'emotional tension'"[191] or impaired by a mental disability. Should the defendant wish to challenge the psychiatrist's testimony or claim unfairness, he would be forced to waive his privilege not to testify. The accused's word would then be pitted against that of a mental health professional, who will undoubtedly have far greater verbal skills, social status, and credibility in his professional domain.[192]

The record in Byers' own case represents almost a caricature of these problems. Indeed, one commentator has already described the facts of *this* case as "illustrat[ive] of the vagaries of reconstructing the clinical evaluation and why counsel must be personally cognizant of the relationship between the evaluator and the defendant."[193] Byers' alleged statements regarding his conversation with his wife were not mentioned in Dr. Kunev's written report. We do not know if they were recorded in his notes because those notes presumably were destroyed. Dr. Kunev's memory of Byers' exact words seems to have changed over time.[194] And that change—amounting to perhaps one or two words—may have

meant the difference between a trivial piece of information and a "critical thing" credibly alleged to have sent Byers' defense "tumbling right down to the ground."

We know, moreover, that Byers' comment about his conversation with his wife came after some pressing by Dr. Kunev. We do not know the nature or intensity of that pressure. We do not know if Dr. Kunev inadvertently engaged in the sort of behavior that could have led Byers to give a distorted or untrue response. In short, we do not know—and more importantly, the jury at Byers' trial could not know—whether these ostensibly crucial statements were made, what they meant, or whether they were reliable.

### 2. *Conclusions*

I do not presume to assess the precise significance of the phenomena I have described, nor do I intend to cast a disparaging light on the general utility of clinical interviews and expert testimony in helping juries decide the enormously difficult issue of criminal responsibility. I do conclude, however, that the phenomena I have described may pose a serious risk to the reliability of expert testimony in a significant number of cases. I also think it obvious that the threats to a fair trial posed by these effects are of the same type as those identified in *United States v. Wade.* If defense counsel had an accurate, complete record of the clinical interview he could, with the aid of his own experts, attempt to identify the distortions and interactions that may have affected the substance of the interviewer's reports and testimony.

---

background from Byers. Dr. Varhely was born in Hungary and educated in Hungary, Germany, and France, as well as the United States. Dr. Kunev was born and trained in Bulgaria. Tr. 2/1/78 at 51–53; Tr. 2/7/78 at 10.

**190.** *See, e.g.,* Dirolenzo & Nagler, *Examiner Differences in the Stanford-Binet,* 22 Psychological Rep. 443 (1968); Hersen & Greaves, *Rorschach Productivity As Related to Verbal Reinforcement,* 35 J. Personality Assessment 436 (1971); Trachtman, *supra* note 57, at 229.

**191.** *United States v. Ash,* 413 U.S. 300, 312, 93 S.Ct. 2568, 2575, 37 L.Ed.2d 619 (1973) (quoting *United States v. Wade,* 388 U.S. 218, 230, 87 S.Ct. 1926, 1934, 18 L.Ed.2d 1149 (1967)).

**192.** *See* Slobogin, *supra* note 89, at 120; Brief of *amicus curiae* American Psychological Association at 23.

**193.** Slobogin, *supra* note 89, at 121 n. 213.

**194.** *See supra* note 30.

But such a complete, accurate record cannot, by virtue of the very effects I have described, be expected to be forthcoming from the interviewer. The accused, moreover, whatever his mental state, cannot be relied upon to fill in the gaps necessary for a complete and accurate assessment. It is therefore clear that—in the absence of safeguards that will afford to counsel the ability effectively to reconstruct at trial the events of the clinical interview—counsel may be unable to detect distortions or to cross-examine meaningfully the government's expert and rebut his conclusions. The accused is therefore deprived of his right to the assistance of counsel in connection with that interview.

C. *Safeguarding the Sixth Amendment Right*

In addition to arguing either that compelled psychiatric interviews are not "confrontations" or that they do not pose the sorts of dangers addressed in *Wade,* the plurality maintains that a clinical interview cannot be a "critical stage" because the presence of counsel at such an interview would be unduly disruptive.[195] The lesson of *Smith* and *Ash,* however, is that the actual presence of counsel may not be required at all "critical stages."[196] In *Ash,* the existence of an objective record from the photographic identification made the actual presence of counsel unnecessary for meaningful reconstruction at trial. *Smith* invites us to inquire *first* into whether a pretrial confrontation implicates Sixth Amendment values to the point that it should be considered a "critical stage," and

*only then* to inquire into the particular safeguards that may be necessary to protect those values. Having conducted the former inquiry and concluded that the compelled interview is a "critical stage," I consider the question of safeguards below.

D. *The Constitutional Safeguard*

Lawyers play a variety of roles in helping defendants through the various pretrial confrontations that the courts have recognized as "critical stages" of the prosecution. Depending on the context, the "assistance of counsel" may consist in advocating the defendant's cause,[197] advising the defendant,[198] or monitoring a particular event to help insure a fair confrontation at trial.[199] I assume that, whatever the context, the constitutional safeguard of first resort is the physical presence of counsel during the actual course of the confrontation. Nevertheless, there may in some very limited circumstances be powerful arguments against such a presence, and the Constitution should not be read to take an "all-or-nothing" approach to the possibility of alternative safeguards.

In *Estelle v. Smith,* the Court was concerned with the need to allow counsel to advise the accused with respect to the self-incrimination risks inherent in his pretrial competency examination. The examination itself was the "critical stage" that triggered the right to the assistance of counsel.[200] But the Court expressed the fear that the presence of counsel during the clinical interview "could contribute little and might seriously disrupt the examina-

**195.** See pl. op. at 1117.

**196.** See 451 U.S. at 470 n. 14, 101 S.Ct. at 1876 n. 14. I do not mean to suggest that the presence of counsel should be dispensed with lightly. See infra p. 1171. Where an objective record is adequate to permit effective reconstruction at trial, however, Sixth Amendment concerns can be satisfied without requiring the presence of counsel. See supra p. 1167; see also United States v. Ash, 413 U.S. 300, 321–25, 93 S.Ct. 2568, 2579–81, 37 L.Ed.2d 619 (1973) (Stewart, J., concurring).

**197.** See, e.g., Coleman v. Alabama, 399 U.S. 1, 9, 90 S.Ct. 1999, 2003, 26 L.Ed.2d 387 (1970) (plu-

rality opinion); Hamilton v. Alabama, 368 U.S. 52, 54, 82 S.Ct. 157, 158, 7 L.Ed.2d 114 (1961).

**198.** See, e.g., Estelle v. Smith, 451 U.S. 454, 471, 101 S.Ct. 1866, 1877, 68 L.Ed.2d 359 (1981); Maness v. Meyers, 419 U.S. 449, 466, 95 S.Ct. 584, 595, 42 L.Ed.2d 574 (1975).

**199.** See, e.g., Coleman v. Alabama, 399 U.S. 1, 9, 90 S.Ct. 1999, 2003, 26 L.Ed.2d 387 (1970) (plurality opinion); United States v. Wade, 388 U.S. 218, 228–36, 87 S.Ct. 1926, 1932–37, 18 L.Ed.2d 1149 (1967).

**200.** 451 U.S. at 470, 101 S.Ct. at 1876.

tion." [201] It therefore held that the particular sort of assistance that needed to be rendered by counsel required not counsel's presence *at* the examination but "the guiding hand of counsel" *before* the examination.[202]

In this opinion I have focused on the constitutionally required need to have counsel *monitor* the court-ordered clinical interview. The essence of this role is to equip counsel with the ability "effectively to reconstruct at trial" [203] the possible distortions and suggestive influences present in the interview. If the presence of counsel were the only means to achieve that goal, we would—in light of both *Smith* and earlier cases [204]—be left with a difficult dilemma. But fortunately there are alternative safeguards that are less disruptive (and perhaps even more effective) than the actu-

al presence of counsel. A complete tape recording or videotape of the interview would provide counsel with exactly the sort of objective and precise record that, as I have previously discussed, is often a prerequisite to detection of distortions and to effective cross-examination or rebuttal at trial. As discussed above, such a taped record would facilitate constitutional aims [205] without impairing the interview process itself.[206]

In light of the above discussion, I would hold that, in the absence of waiver, the fruits of court-ordered clinical interviews conducted after the initiation of "adversary judicial proceedings" should not be admitted at trial unless counsel was either allowed to be present or was provided with a complete and accurate taped record of the interview.[207] Because the testimony of the

**201.** *Id.* at 470 n. 14, 101 S.Ct. at 1876 n. 14 (quoting *Smith v. Estelle,* 602 F.2d 694, 708 (5th Cir.1979)).

**202.** *Id.* 451 U.S. at 470–71, 101 S.Ct. at 1876–77 (quoting *Powell v. Alabama,* 287 U.S. 45, 69, 53 S.Ct. 55, 64, 77 L.Ed. 158 (1932)).

**203.** *United States v. Wade,* 388 U.S. 218, 232, 87 S.Ct. 1926, 1935, 18 L.Ed.2d 1149 (1967); *United States v. Ash,* 413 U.S. 300, 312, 93 S.Ct. 2568, 2575, 37 L.Ed.2d 619 (1973).

**204.** *See United States v. Cohen,* 530 F.2d 43, 48 (5th Cir.), *cert. denied,* 429 U.S. 855, 97 S.Ct. 149, 50 L.Ed.2d 130 (1976); *United States v. Baird,* 414 F.2d 700, 711 (2d Cir.1969), *cert. denied,* 396 U.S. 1005, 90 S.Ct. 559, 24 L.Ed.2d 497 (1970); *United States v. Albright,* 388 F.2d 719, 726 (4th Cir.1968).

**205.** *See supra* pp. 1170–1171.

**206.** *See supra* pp. 1156–1157.

**207.** Tape recording, of course, is the best means of obtaining such a record. As I noted in the Fifth Amendment discussion, *supra* note 116, if taping facilities are unavailable, alternative monitoring methods may have to be employed. In addition, to avoid possible confusion regarding my views, I should make clear a number of subsidiary points:

First, I see no distinction for purposes of the Sixth Amendment between examinations ordered to assess mental state at the time of the offense and examinations ordered for other purposes. As *Estelle v. Smith* makes clear, it is the use to which an examination is put, rather than its initial purpose, that is crucial to whether it

constitutes a critical stage. *See* 451 U.S. at 470, 101 S.Ct. at 1876; *cf. id.* at 465, 467, 101 S.Ct. at 1874, 1875.

Second, I also see no distinction for purposes of the Sixth Amendment between court-ordered examinations resulting from defendant's motion and those initiated by the prosecution or the court, as long as the interview is under the control of the court or prosecution and is not being conducted solely in the interests of the defendant. *Cf. United States v. Bass,* 477 F.2d 723, 725–26 (9th Cir.1973) (distinguishing between court-ordered examination under 18 U.S.C. § 4244 and provision of court-appointed defense psychiatrist under 18 U.S.C. § 3006A(e)). In addition to the theoretical justifications for this conclusion, it should be noted that court-ordered psychiatric examinations have become so routine in insanity cases that there is often little more than formal significance to whether one party's name or the other's is attached to the motion. The transcript of Byers' own arraignment is as good an illustration as I can find of this phenomenon:

[DEFENSE COUNSEL]: ... The case will revolve around the determination of [Byers'] sanity at the time of the offense.

THE COURT: Hadn't we better get an order to get him over to Saint Elizabeths?

[DEFENSE COUNSEL]: I am willing to cooperate with the Government to do that.

[PROSECUTION ATTORNEY]: We are not the moving party, but I will be glad to show counsel a copy of the form we usually use.

THE COURT: If you have the form order—I am granting the defendant's motion for an insanity examination.

Tr. 11/2/76 at 6.

Third, I recognize that some parts of a clinical interview arguably are more "objective" than

government experts was admitted in this case without such a record having been provided, Billy Byers was deprived of his right to the assistance of counsel under the Sixth Amendment.

## IV. THE SUPERVISORY POWER AND SAFE-GUARDS TO PROMOTE A RELIABLE JUDICIAL PROCESS [i]

The plurality concedes that recording clinical interviews "may be a good idea," [208] but argues that such a procedure should not be required because it is not constitutionally compelled. In my view, this court must evaluate the efficacy of recording on non-constitutional grounds as well. It is well established that federal appellate courts have "supervisory authority over the administration of criminal justice in the federal courts." [209] It is the obligation of this court to consider "good ideas" that

protect the integrity and reliability of the truth-finding process.

The supervisory power does not confer on "the federal judiciary a 'chancellor's foot' veto over law enforcement practices of which it does not approve." [210] It is rather a limited and traditional power of the judiciary "to adopt measures to regulate and improve the quality of the judicial process." [211] Oversight of the administration of the insanity defense falls squarely within the recognized contours of the supervisory power.

Since we have the inherent power to order psychiatric examinations,[212] we have a corresponding duty to mandate safeguards which guarantee that the examination will be fair to the accused and will yield reliable results. Many appellate courts have recognized the power of trial courts to order such protections as the presence of counsel or the recording of interviews.[213] Fifteen

---

other parts. But as noted earlier, even "objective" tests conducted in the course of a clinical interview may be subject to distortive effects. *See supra* note 190. Rather than attempt to make fine distinctions clearly unjustified by their practical worth, I would simply hold that the rule I propose today be applied to the entire confrontation.

Finally, I wish to emphasize that the portion of a psychiatric staff conference conducted with the defendant present is clearly as much a clinical interview as a one-on-one confrontation. Whether the part of the staff conference during which the defendant is *not* present can be a "critical stage" seems doubtful in light of *United States v. Ash*, 413 U.S. 300, 309–13, 93 S.Ct. 2568, 2573–75, 37 L.Ed.2d 619 (1973). On the other hand, fundamental fairness or the proper exercise of the court's supervisory power over institutions serving directly under its mandate may require protections analogous to those I have proposed today. *See generally Thornton v. Corcoran*, 407 F.2d 695, 698–703 (D.C.Cir.1969).

† Judge Edwards agrees that the supervisory power should be employed to require some record of the clinical interview. He does not believe that tape recording should be the required means of obtaining such a record. *See supra* p. 1155 n. *.

**208.** Pl. op. at 1153.

**209.** *McNabb v. United States*, 318 U.S. 332, 341, 63 S.Ct. 608, 613, 87 L.Ed. 819 (1943). *See Cupp v. Naughten*, 414 U.S. 141, 146, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). The plurality asserts that the supervisory power issue is not properly before this court "since the defendant did not

even raise below any concerns that are the proper object of that power." Pl. op. at 1122. Assuring that the truth-finding process is not subverted by the systematic admission of inherently untrustworthy evidence is surely the "proper object of that power." The repeated objections raised by Byers' counsel to the admission of Kunev's statements, challenging their untrustworthy and prejudicial nature, were surely adequate to preserve this issue on appeal.

**210.** *United States v. Russell*, 411 U.S. 423, 435, 93 S.Ct. 1637, 1644, 36 L.Ed.2d 366 (1973).

**211.** Hill, *The Bill of Rights and the Supervisory Authority*, 61 COLUM.L.REV. 181, 194 (1969). The plurality's insistence that "no conceivable permissible purpose [for use of supervisory powers] exists in this case (where no unlawful activity has occurred) except self-deterrence," pl. op. at 1123, is contradicted by an opinion upon which the plurality relies: "[W]e agree that the supervisory power serves the 'twofold' purpose of deterring illegality and protecting judicial integrity." *United States v. Payner*, 447 U.S. 727, 736 n. 8, 100 S.Ct. 2439, 2447 n. 8, 65 L.Ed.2d 468 (1980). By ensuring proof of confession, voluntariness, and accuracy, we protect the integrity of the judicial process.

**212.** *See supra* note 13.

**213.** *See, e.g., United States v. Greene*, 497 F.2d 1068, 1079–80 (7th Cir.1974), *cert. denied*, 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975); *United States v. Bohle*, 445 F.2d 54, 67 (7th Cir.1971); *United States v. Driscoll*, 399 F.2d

years ago, in *Thornton v. Corcoran*, this court suggested that "our responsibility for the administration of the insanity defense ... may require the exercise of our supervisory power" to compel taping of the staff conference.[214]

As courts have long recognized, a trial court's obligation to the defendant and to the judicial process cannot end with the signing of the commitment order.[215] Having exercised its authority to send a defendant to a government-run, custodial mental hospital, the court must order procedures which protect the accused's rights and which assure reliable and verifiable results.[216] In the absence of such procedures, evidence from the interview should not be admitted.

The plurality constructs a false dilemma in asserting that exclusion of Dr. Kunev's statements requires a choice between excluding probative evidence and protection of judicial integrity. Exercising our supervisory power in this case would not require such a difficult choice. Rather, we would be excluding evidence that *both* threatens judicial integrity and is highly unreliable.[217] As a prospective requirement ordered pursuant to our supervisory power over the administration of the insanity defense, tape recording of psychiatric interviews would guarantee judicial integrity and evidentiary reliability without requiring exclusion of any evidence. Here again, the plurality contrives a controversy, while ignoring the safeguards that eliminate the need to choose between competing values.

The interview conducted in Byers' case perfectly illustrates the urgent need for the court to exercise its supervisory power over the compelled clinical interview. What Mr. Byers was reported to have said was interpreted as tantamount to a confession that he was mentally well at the time of the offense. Courts distrust confessions because it is unlikely that a criminal defendant will willingly inculpate himself. Hence, courts require that a confession be "well proved." Without any verifiable recording of the interview, however, the only possible "proof" is the unverifiable word of a psychiatrist testifying long after the event.

Assuming that Byers did make such a statement, we have no way of knowing, in the absence of a taped record, whether the statement made was voluntary. As discussed above,[218] Byers was questioned by skilled professionals in the coercive atmosphere of a custodial prison mental hospital. Dr. Kunev admitted that he "pressed" Byers; we do not know whether the intensity of that pressure makes the voluntariness of the statement doubtful.

Finally, even if we accept that the statement was made and that it was voluntary, we do not know precisely what Byers said. Dr. Kunev testified that, according to Byers, Mrs. Byers told him about the roots, *"about* the time that he was admitted to St. Elizabeths." At various times, Dr. Kunev stated that this conversation occurred after admission to the hospital[219] and on the way to the hospital.[220] This imprecision, of course, was critical. If the statement had been made after admission to the hospital,

135, 138 (2d Cir.1968); *United States v. Albright,* 388 F.2d 719, 726 (4th Cir.1968); *cf. Thornton v. Corcoran,* 407 F.2d 695, 698–703 (D.C.Cir.1969).

**214.** 407 F.2d 695, 702 (D.C.Cir.1969).

**215.** See *United States v. Morgan,* 482 F.2d 786, 793 (D.C.Cir.1973); *Thornton v. Corcoran,* 407 F.2d 695, 702 (D.C.Cir.1969).

**216.** The plurality incorrectly asserts that the supervisory power is here employed to command more than what the Fifth and Sixth Amendments require. Pl. op. at 1123. In fact, the scope of that supervisory power is precisely coextensive with what, in my view, the Constitution commands.

**217.** In the opinions cited by the plurality, the concern was over the exclusion of *accurate* evidence. *See United States v. Payner,* 447 U.S. 727, 735, 100 S.Ct. 2439, 2446, 65 L.Ed.2d 468 (1980); *Lopez v. United States,* 373 U.S. 427, 440, 83 S.Ct. 1381, 1388, 10 L.Ed.2d 462 (1963).

**218.** *See* pp. 1151–1153.

**219.** Tr. 2/7/78 at 111.

**220.** *Id.* at 120.

it would have been irrelevant.[221] Instead, the prosecution was able to capitalize on Dr. Kunev's failure of memory and to transform an ambiguous, unverifiable statement into the "critical thing" which "torpedo[ed] the [defendant] out of the water."

The plurality argues that it is "difficult to imagine a less auspicious case" for applying the supervisory power, relying on the emotional assertion that by excluding the evidence "we set a convicted murderer free."[222] Both logically and practically, this statement is simply false. First, the exclusion of one expert's testimony does not deprive the prosecution of the only piece of evidence probative of guilt. A prosecutor could readily obtain another expert evaluation. Second, in the instant case, no person, convicted murderer or otherwise, would go free as a result of a reversal in this case. On May 29, 1984, Billy Byers was released from prison pursuant to a federal district court order reducing sentence. This court's declaration of fair and reliable procedure would be costless.

The abuses in Billy Byers' case are emblematic of this court's failure to exercise its supervisory authority over the administration of the insanity defense. We presently condone a process in which conviction can hinge on a recollection by a government psychiatrist with potentially conflicting loyalties of a secret interview conducted far in the past. In my view, this court should employ its supervisory powers to require the recording of all compelled clinical interviews. In the instant case, I would rely on our supervisory power to exclude Dr. Kunev's testimony as unverifiable, unreliable, prejudicial, and lacking in probative value.

## V. CONCLUSION

Thirty years ago, with the opinion that I wrote for the court in *Durham v. United States,*[223] this circuit undertook to transform the role of the psychiatric expert from moral oracle to modern behavioral scientist. We acted largely in response to the psychiatrists' representations that they did not want to resolve ultimate questions of right and wrong, but wanted only to report their findings as scientific investigators. We challenged mental health professionals to disclose to us their intermediate observations and inferential processes.

We were sorely disappointed. As we began to work with the *Durham* formulation, two lessons became clear. First, we learned that psychiatrists were unwilling to make juries privy to their techniques and their thought processes. The diagnostic process remained a black box from which only legal conclusions emerged. Second, we learned that we had reason to suspect the validity of the conclusions coming from those black boxes. We knew that the government psychiatrists to whom we sent insanity defendants were, in theory, impartial officers of the court. But our experience administering the insanity defense taught us that government doctors often identified with the prosecution, consulted with the prosecution, testified for the pros-

---

**221.** The plurality argues that the timing of Mrs. Byers' alleged statement was not a critical issue in this case. The opinion suggests that if Byers had told Dr. Kunev that Mrs. Byers' statements had been made after his admission to St. Elizabeths, it was probably the result of a chronological error on Byers' part. Clearly this is pure speculation.

Both the timing and the significance of the statement are critical and unknowable. If Byers reported that he had this discussion *before* entering the hospital, then the logical inference can be drawn that his account of the spells to the St. Elizabeths doctors may have been the product of that conversation. If, however, Byers claimed that this discussion took place

*after* his admission, then the discussion could not have been the origin of his symptoms. Rather, this conversation, if it took place, was likely to have been a reminder or a reiteration of a set of symptoms of which both Mr. and Mrs. Byers were previously aware. In the absence of recording, however, we have no basis for speculating as to when Mr. Byers reported having had this conversation or whether he was correct or mistaken in his report of the substance of the conversation.

**222.** Pl. op. at 1123.

**223.** 214 F.2d 862 (D.C.Cir.1954).

ecution, and were subject to institutional and career pressures to support the prosecution. We tried in a series of cases to illuminate the *process* of diagnosis. In *Washington v. United States*,[224] for example, we tried to force psychiatrists to focus on the examination process by excluding testimony on the ultimate question of responsibility. In *Thornton*,[225] we considered the advisability of preserving a portion of that process—the staff conference—on tape. Nothing worked; the oracular moral pronouncements continued and the divided loyalties of the institutional psychiatrists remained unexamined.

Twelve years ago, in *United States v. Brawner*,[226] we unanimously abandoned the *Durham* formulation for a new test of insanity. At that time, I noted that the real problem with the insanity defense lay in the fairness of its administration, not in its verbal formulation. I observed:

> Neither *Durham* nor *Brawner* lets slip our well-guarded secret that the great majority of responsibility cases concern indigents, not affluent defendants with easy access to legal and psychiatric assistance. In a long line of cases we have been asked to confront difficult questions concerning the right to an adequate psychiatric examination, the right to psychiatric assistance in the preparation of the defense, [and] the right to counsel at various stages of the process.... If the promise of *Durham* has not been fulfilled, the primary explanation lies in our answers, or lack of answers, to those questions.[227]

*Brawner* failed to dispel our ignorance about the diagnostic process. It failed as well to confront the problem of safeguarding the rights of poor and ill-informed defendants swept into a system that they could not comprehend. I wrote, "I fear that it can fairly be said of *Brawner*, just as it should be said of *Durham*, that while

the generals are designing an inspiring new insignia for the standard, the battle is being lost in the trenches." [228]

And so too it must now be said of *Byers*. Byers' experience in the system of institutional psychiatry was a grotesque catalogue of what we have been decrying for three decades. The government psychiatrist offered a conclusory pronouncement of responsibility based on an unverifiable and ambiguous statement allegedly made by Byers during an *in camera* examination, the details of which are unknown. Once again, this court has failed to intervene in a system with such demonstrated capacity to abuse, distort, and degrade.

I am aware that today the insanity defense is not at all popular. Its purposes, its prevalence, and its consequences are poorly understood. We must be mindful, however, that the insanity defense is integral to the moral foundation of the criminal law. We cannot ignore our obligation to assure that the defense is administered fairly, that the inquiries conducted are thorough, that the data is scrutinized, and that the rights of those who assert the defense are guarded zealously. I fear that this court's failure to protect the rights of defendants permits the conversion of the insanity defense from a moral bulwark into a trap for the ignorant and unwary.

---

**224.** 390 F.2d 444 (D.C.Cir.1967) (Bazelon, C.J.).

**225.** 407 F.2d 695 (D.C.Cir.1969) (Bazelon, C.J.).

**226.** 471 F.2d 969 (D.C.Cir.1972) (en banc).

**227.** *Id.* at 1012 (Bazelon, C.J., concurring in part and dissenting in part).

**228.** *Id.*